SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA 92122
Telephone: 858.652.3100
Facsimile: 858.652.3101

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletreedeakins.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

Attorneys for Plaintiffs
CALIFORNIA TRUCKING
ASSOCIATION, RAVINDER SINGH,
and THOMAS ODOM

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and JULIE A. SU, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, <br><br> Defendants. | Case No. **'18CV2458 BEN BLM** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

CTA v. California - FINAL

Plaintiffs CALIFORNIA TRUCKING ASSOCIATION ("CTA"), RAVINDER SINGH, and THOMAS ODOM (collectively, "Plaintiffs") state their complaint for declaratory and injunctive relief against Defendants as follows:

## INTRODUCTION

1. Plaintiffs bring this lawsuit to vindicate their rights guaranteed by the Supremacy Clause and Commerce Clause of the United States Constitution. Plaintiffs seek declaratory and injunctive relief prohibiting the Defendants from applying and enforcing Industrial Welfare Commission Wage Order No. 9 ("Wage Order No. 9"), 8 Cal. Code Regs. § 11090, as interpreted by the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*").

2. In *Dynamex*, the California Supreme Court adopted for the first time the so-called "ABC test" for determining whether a worker is an employee or independent contractor for purposes of Wage Order No. 9:

> Under this test, a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex*, 4 Cal. 5th at 916-917.

3. Many of CTA's members regularly contract with individual independent contractors who own and operate their own trucks ("owner-operators") to provide interstate trucking services to customers in California and other states in accordance with federal and state regulations governing the transportation of property. Plaintiffs SINGH and ODOM are owner-operators who regularly contract

with licensed motor carriers to provide trucking services in California and in other states.

4. Under the California Supreme Court's new interpretation of Wage Order No. 9, the motor-carrier members of CTA may no longer operate in California using individual owner-operators to provide trucking services for their customers, unless they also treat such owner-operators as employees entitled to the protections of Wage Order No. 9.  It would be impracticable if not impossible for CTA's motor-carrier members to contract with owner-operators to provide interstate trucking services while treating the drivers as employees under Wage Order No. 9.  The direct and real consequence of the new interpretation of Wage Order No. 9, therefore, is that CTA's motor-carrier members must cease using independent contractors to perform trucking services for customers in California and use employee drivers only, or face the risk of significant civil and criminal penalties arising from the violation of Wage Order No. 9.  Plaintiffs SINGH and ODOM face the risk of losing their business of providing trucking services in California for other motor carriers because motor carriers operating in California are now effectively prohibited under the new interpretation of Wage Order No. 9 from contracting with individual owner-operators to provide such services.

5. Plaintiffs seek a declaration that Wage Order No. 9 as interpreted in *Dynamex* is preempted by the Federal Aviation Administration Authorization Act of 1994 ("the FAAAA"), 49 U.S.C. § 14501, and a corresponding injunction prohibiting Defendants from attempting to apply or enforce Wage Order No. 9 as interpreted in *Dynamex*.  Wage Order No. 9 as interpreted in *Dynamex* is expressly preempted by the FAAAA because the requirement that motor carriers treat all drivers as employees and the concomitant *de facto* prohibition on motor carriers using individual owner-operators to perform trucking services in California directly impacts the services, routes, and prices offered by CTA's motor-carrier members to their customers.  The new interpretation of Wage Order No. 9 is also impliedly

preempted by the FAAAA insofar as the new interpretation of Wage Order No. 9 effectively barring CTA motor-carrier members from using individual owner-operators to provide trucking services to their customers is an obstacle to the achievement of "Congress' overarching goal" of "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces.'" *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008).  Further, Wage Order No. 9 as interpreted in *Dynamex* imposes an impermissible burden on interstate commerce and thus violates the Commerce Clause of the United States Constitution.

## JURISDICTION AND VENUE

6. This action arises under the Constitution and laws of the United States, including the Supremacy Clause, U.S. Const. art. VI, § 3; the Commerce Clause, U.S. Const., art. 1, § 8; the FAAAA, 49 U.S.C. §§ 14501(c), 14504a(c), and 14506; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.  This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201.

7. This is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201, 2202, and the Supremacy Clause and Commerce Clause of the United States Constitution.  This action presents an actual controversy within the Court's jurisdiction.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the transportation services provided by the individual Plaintiffs and other motor carriers whose interests are represented by CTA were contracted for and carried out within the geographical boundaries of this district, such that a substantial part of the events giving rise to the claim occurring in this district.

## PARTIES

9. CTA is an association devoted to advancing the interests of its motor-carrier members who provide transportation services in California.

10. CTA members are licensed motor-carrier companies that manage, coordinate, and schedule the movement of property throughout California in

1  interstate commerce through so-called "motor contract carrier permits" issued by the
2  Federal Motor Carrier Safety Administration ("FMCSA"), a division of the U.S.
3  Department of Transportation ("DOT").  Many of CTA's members are based in this
4  judicial district, and many other CTA members are based elsewhere but provide
5  transportation services in this judicial district.  Many of CTA's motor-carrier
6  members contract with owner-operators to provide interstate trucking services to
7  their customers in and between several states, including California.
8        11.    Plaintiff RAVINDER SINGH is an individual residing in Fremont,
9  California.  Plaintiff SINGH owns and operates his own truck and performs trucking
10 services for different motor carriers and brokers in California.
11       12.    Plaintiff THOMAS ODOM is an individual residing in Madera,
12 California.  Plaintiff ODOM owns and operates his own truck and performs trucking
13 services for a national motor carrier hauling property in California and between
14 California and Texas.
15       13.    Defendant Xavier Becerra is the Attorney General of California and is
16 charged with enforcing and defending all state laws.  California's IWC wage orders
17 are constitutionally authorized, quasi-legislative regulations that have the force of
18 law.  *See* Cal. Const., art. XIV, § 1; Cal. Labor Code §§ 1173, 1178, 1178.5, 1182,
19 1185; *Industrial Welfare Comm'n v. Superior Court*, 27 Cal.3d 690, 700-703 (1980).
20 Because this action challenges the constitutional validity of the wage order as
21 authoritatively interpreted by the California Supreme Court (*see Auto Equity Sales,*
22 *Inc. v. Superior Court of Santa Clara Cty.*, 369 P.2d 937, 939 (1962) ("The decisions
23 of this court are binding upon and must be followed by all the state courts of
24 California")), the Attorney General is an appropriate party to defend this action.  *See*
25 Cal. Govt. Code § 12510 *et seq*.
26       14.    Defendant Andre Schoorl is the Acting Director of the Department of
27 Industrial Relations, an executive agency in California that is charged with
28

defending, amending, and republishing California's wage orders.[1] *See* Cal. Labor Code § 1182.

15. Defendant Julie Su is the Labor Commissioner of the California Department of Industrial Relations, which is a department of the California Labor and Workforce Development Agency. The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") is specifically empowered by the Legislature to interpret and enforce the Industrial Welfare Commission wage orders, including Wage Order No. 9. *See* Cal. Labor Code §§ 61 and 1193.5.

## GENERAL ALLEGATIONS

### Federal Regulation of the Trucking Industry

16. Prior to 1980, both federal and state governments regulated the trucking industry. These regulations dictated, both directly and indirectly, how transportation services could be provided and the prices that could be charged for those services.

17. In 1980, Congress passed the Motor Carrier Act, which deregulated interstate trucking so that the rates and services offered by licensed motor carriers and related entities would be set by the market rather than by government regulation. 79 Stat. 793.

18. Fourteen years later, in 1994, to bolster deregulation, Congress included a provision within the FAAAA that expressly preempts state regulation of the trucking industry:

> [A] State… may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* (other than a carrier affiliated with a direct air carrier covered by

---

[1] The Industrial Welfare Commission ("IWC"), a five-member commission within the Department of Industrial Relations (Cal. Labor Code § 70), is charged by statute with promulgating wage orders for various industries. Cal. Labor Code § 517. Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect. *Bearden v. U.S. Borax, Inc.*, 138 Cal. App. 4th 429, 434 (2006).

        section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (emphasis added).

19. In enacting the FAAAA, Congress' "overarching goal" was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe,* 552 U.S. at 371 (internal quotations omitted). The FAAAA's express-preemption provision furthers this purpose by "'prevent[ing] States from undermining federal regulation of interstate trucking' through a 'patchwork' of state regulations." *American Trucking Ass'ns v. City of Los Angeles*, 660 F.3d 384, 395-96 (9th Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 2096 (2013).

20. The United States Supreme Court has explained that the "ban on enacting or enforcing any law 'relating to rates, routes, or services is most sensibly read . . . to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier." *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995).[2]

21. Deregulation requires not only that states not interfere with the ability of private parties to contract, but also that they not interfere with the enforcement of those contracts. "Market efficiency requires effective means to enforce private agreements." *Wolens*, 513 U.S. at 230 (quotation marks omitted). Moreover, "[t]he stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at

---

[2] Although *Wolens* was interpreting the Airline Deregulation Act ("ADA"), the FAAAA's preemption clause borrows its language directly from the ADA and courts analyze the two acts similarly. *Rowe,* 552 U.S. at 370 ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well") (internal quotation marks and alteration omitted).

the time." *Id.*

## The Owner-Operator Model

22. For decades, the trucking industry has heavily relied on the owner-operator model—which involves the use by licensed motor carriers of independent contractors who own and operate their own trucks—to provide the transportation of property in interstate commerce. A motor carrier's ability to contract with independent contractors is necessary because the demand for, duration of, and volume of trucking services provided by individual motor carriers fluctuates significantly.

23. In many segments of the national economy, the volume of trucking services needed varies over time based on numerous factors. In the agricultural industry, for example, the demand for trucking services varies depending on the time of year, the price at which the produce can be sold, the available markets (both foreign and domestic) for the produce, the length of the growing season, and the size of the crop, which itself varies based on the temperature, rainfall, and other factors. Likewise, a motor carrier could have an abundance of jobs during the growing season, but a small number of such jobs during the winter months.

24. Motor carriers offer many types of trucking services including, but not limited to, conventional trucking, the transport of hazardous materials, refrigerated transportation, flat bed conveyance, intermodal container transport, long-haul shipping, movement of oversized loads, dedicated trucking, less-than-truckload shipping, and dump truck haulage.

25. In order to meet this fluctuating demand for highly varied services, motor carriers contract with owner-operators to provide trucking services. Because the demand for shipment of goods fluctuates depending on the season, consumer demand, overseas orders, natural disasters, type of truck, and a multitude of other factors, many motor carriers depend on the use of individual owner-operators to provide consistent, uninterrupted, skilled and specialized trucking services to their

customers.

26. Given the sizable investment that is necessary to acquire and maintain a truck, the fluctuating demand for trucking services generally, the sporadic demand for specialized trucking services in particular, and other related considerations, it would be extremely difficult if not impossible for a motor carrier doing business in California, particularly a smaller motor carrier, to own (or finance) and maintain a fleet of trucks operated by employee drivers that is sufficiently large to service their customers' needs for specialized trucking services or haulage during times of peak demand.

27. Rather, because demand for their various services fluctuates, sometimes widely, throughout the year, motor carriers need to be able to expand and contract their capacity to provide transportation services at a moment's notice. For example, if a motor carrier owned and operated its own fleet of 60 trucks and employed only 60 employee drivers to operate those trucks, that motor carrier would not be able to provide trucking services to a customer or group of customers when such customers needed a total of eighty (80) trucks on a particular day. Conversely, a motor carrier that is permitted to use independent contractor owner-operators could simply contract with individual owner-operators to provide the twenty (20) additional trucks needed.

28. Employing a business model that is common both nationally and in California, individual owner-operators typically work for themselves for a period of time to build up their experience and reputation in the industry. When such an owner-operator is ready to expand his or her business, that owner-operator will contract or bid on jobs that require more than one truck. At that time, the owner-operator will subcontract with one or more other owner-operators to complete the job.

29. Eventually, the owner-operator may have enough business to warrant hiring one or more employee-drivers. In this way, the owner-operator model enables

small businesses to grow from one-truck, one-driver operations to larger fleets with multiple trucks and multiple employee-drivers.

30. Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently. Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies. This can make them more attractive to other motor carriers that need to increase their freight hauling capacity during the course of the year, because they can obtain the services of additional drivers and equipment without having to make large capital investments in either skilled operators or expensive equipment.

**The Impact of the *Dynamex* Decision**

31. Wage Order No. 9, promulgated by the Industrial Welfare Commission, governs the working conditions of employees in the transportation industry. Wage Order No. 9 defines the "Transportation Industry" to mean "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles." Wage Order No. 9, Section 2(P).

32. Wage Order No. 9 imposes numerous obligations on "employers" with respect to "employees." These obligations include detailed requirements governing hours and days of work, minimum wages, reporting time pay, recordkeeping, meal periods, rest periods, uniforms and equipment, and other matters. Employers must exercise sufficient control over the working conditions of employees covered by Wage Order No. 9 to ensure that the employees are provided the protections set forth in Wage Order No. 9. The requisite control includes, among other things, tracking all hours worked by the employee to fulfill the recordkeeping and minimum wage requirements, implementing and maintaining lawfully compliant compensation

plans, managing the employee's tasks and work schedule to ensure compliance with the meal and rest-period requirements as well as the reporting time requirements, and identifying, providing and maintaining the tools and equipment necessary to the performance of the job.

33. It has long been understood that owner-operators are independent contractors and thus are not "employees" within the meaning of Wage Order No. 9. Accordingly, prior to *Dynamex*, motor carriers could contract with owner-operators without incurring obligations to them under Wage Order No. 9.

34. In *Dynamex*, the California Supreme Court announced a new interpretation of Wage Order No. 9 for purposes of classifying workers as either employees (and thus covered by the order) or independent contractors (and thus outside its remit).

35. As noted above, *Dynamex* adopted the so-called "ABC test" for classifying workers. Under Prong B of the ABC test, an individual is deemed an employee rather than an independent contractor unless he or she "performs work that is outside the usual course of the hiring entity's business."

36. Because drivers perform work that is within rather than outside the usual course of a motor carrier's business, the unavoidable effect of Prong B is to automatically classify every driver who works for a motor carrier as an "employee" no matter the actual and contractual relationship between the driver and the motor carrier. As a consequence, under the new interpretation of Wage Order No. 9, motor carriers are required to extend to all drivers, even owner-operators who are otherwise independent contractors, the full range of benefits mandated by Wage Order No. 9 and to otherwise comply with Wage Order No. 9's requirements with respect to such drivers. Motor carriers that fail to do so face the significant risk of civil and criminal liability arising from the violation of Wage Order No. 9.

37. Given the need to control drivers' working conditions to ensure compliance with Wager Order No. 9 with respect to those drivers, Wage Order No. 9

1  as construed in *Dynamex* effectively compels motor carriers to use only employees
2  rather than individual owner-operators to provide trucking services to their
3  customers.

4      38.    Conversely, as motor carriers are no longer able to contract with
5  individual owner-operators to perform trucking services without risking significant
6  civil and criminal liability arising from the violation of Wage Order No. 9, Wage
7  Order No. 9 as construed in *Dynamex* undermines the economic viability of
8  independent owner-operators.  As a consequence, owner-operators, who have
9  invested considerable amounts in their businesses (including for the purchase of
10 vehicles), face the prospect of being forced to abandon their business and losing the
11 freedom that comes with being small-business owners.

12     39.    Effectively prohibiting motor carriers from contracting with individual
13 owner-operators to provide trucking services significantly alters the services that the
14 motor carriers provide to their customers because motor carriers no longer have the
15 ability to provide the diverse and specialized services they were able to provide prior
16 to adoption of the ABC test for purposes of identifying employees within the
17 meaning of Wage Order No. 9.  Motor carriers cannot feasibly acquire on a short-
18 term basis the trucks and skilled drivers necessary for a particular type of job.  As a
19 result, because they do not have the equipment, personnel, and experience necessary
20 to perform certain jobs, these motor carriers must either stop providing certain
21 services for their customers or continue doing so using owner-operators and face the
22 significant civil and criminal consequences arising from the violation of Wage Order
23 No. 9.

24     40.    In addition, due to the variable and unpredictable nature of freight
25 transportation, compelling motor carriers to cease contracting with individual owner-
26 operators and use employee drivers only in accordance with Wage Order No. 9
27 significantly impacts the services that motor carriers provide to their customers.
28 Customers of motor carriers rely upon motor carriers for the timely pick-up and

delivery of freight, which is typically required by a specified time or within a specified window of time.  Customers rely upon these pick-up and delivery times for the efficiencies of their own operations (*i.e.*, scheduling personnel to perform loading and unloading, arranging for future distribution of the goods, etc.).  Customers factor compliance with pick-up and delivery times into the compensation paid to motor carriers to ensure efficient productivity and to avoid disruption to the movement of goods.  Motor carriers contract with owner-operators to fulfill these customer demands, recognizing that the owner-operator is limited only by the federal Department of Transportation safety and hours of service regulations and the owner-operator's own capacity and willingness to perform the requested services.  Wage Order No. 9, as interpreted by *Dynamex*, conversely, imposes additional burdensome obligations upon the motor carrier and the configuration and management of its business operations which significantly affects the motor carrier's ability to provide efficient pick-up and delivery service to its customers.

41. Effectively prohibiting motor carriers from contracting with individual owner-operators and requiring that such drivers be treated as employees entitled to the protections under Wage Order No. 9 also directly impacts the routes that a motor carrier must use when providing services to its customers insofar as the routes must be reconfigured and possibly consolidated by the motor carrier in order to increase efficiency and minimize the fixed costs per hour associated with employee drivers and related vehicle expenses.  In addition, routes must be reconfigured by the motor carriers to ensure drivers are able to park the trucks legally and safely in order to take the meal and rest periods mandated under Wage Order No. 9.

42. The prices that a motor carrier charges its customers are also directly impacted by the new interpretation of Wage Order No. 9 because a motor carrier incurs significantly more expenses maintaining a fleet of trucks and employee drivers than it does using individual owner-operators driving trucks that they own.  The additional costs include the expenses of exercising the control over the drivers

and the drivers' operations that is necessary to ensure that the full panoply of protections required under Wage Order No. 9 are provided to the drivers, the related training and benefits costs, costs in lower productivity from employee drivers as compared to individual owner-operators, and the capital expenditures necessary to obtain and maintain the trucks needed to provide the trucking services.

### FIRST CLAIM FOR RELIEF

**Supremacy Clause, U.S. Const. art. VI, § 3,**

**Preemption by the FAAAA, § 49 U.S.C. 14501(c)**

43. Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

44. The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of the FAAAA, prohibit the State of California from making, applying, and enforcing laws "related to a price, route, or service of any motor carrier… or any private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

45. At all relevant times, Plaintiffs, CTA members, and all others similarly situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are otherwise preempted by federal law.

46. An actual controversy exists among the parties because CTA members cannot simultaneously contract with owner-operators and satisfy Wage Order No. 9 as construed in *Dynamex* and therefore are forced to cease contracting with Plaintiffs SINGH and ODOM and other similarly situated independent contractors to provide trucking services.

47. Application of Prong B of the ABC test to Wage Order No. 9, as mandated by *Dynamex*, directly impacts the services, routes and prices that CTA's members and other similarly situated motor carriers offer their customers for the

transportation of property.

48.  Under the interpretation of Wage Order No. 9 that prevailed prior to *Dynamex*, motor carriers were able to contract with an extensive network of independent contractors to provide virtually any type and number of trucks, trailers, drivers, and equipment needed for a particular job on very short notice.  Following *Dynamex*, motor carriers that continue to use individual owner-operators to provide such services face the risk of significant civil and criminal penalties arising from the violation of Wage Order No. 9.

49.  If they wish to avoid incurring such liability, motor carriers will be forced to cease using independent contractors to provide trucking services.  If they do so, licensed motor carriers will also be forced to cease providing the services of certain trucks, trailers, drivers, and equipment because they do not have them available in their own fleet or workforce.  It is cost-prohibitive for motor carriers to acquire every possible type of truck, trailer, and equipment that might possibly be needed at any given time, especially those that are only utilized occasionally.  A motor carrier that chooses to invest in specialized trucks demanded only sporadically by its customers will have to charge its customers higher prices than before for those specialized services—services that the motor carrier had previously provided on an as-needed basis by contracting with owner-operators.  As independent contractors providing services to the customers of various motor carriers, owner-operators could aggregate the demand for specialized services and could thus amortize the cost of the specialized equipment over more loads—and thus charge lower per load prices—than is possible for any one motor carrier.

50.  Thus, under the new rule interpreting Wage Order No. 9, licensed motor carriers must scale back their service offerings to only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand, must charge higher prices for those services, or must incur the risk of enforcement and civil actions and significant civil and criminal liability.  Similarly, under the new rule interpreting

Wage Order No. 9, Plaintiffs SINGH and ODOM face the threat of losing their businesses because they are not able to lawfully contract as individual owner-operators with motor carriers to provide trucking services in California to the motor carriers' customers.

51.  The new interpretation of Wage Order No. 9 is also impliedly preempted by the FAAAA because, insofar as the new rule effectively bars CTA motor-carrier members from using individual owner-operators to provide trucking services to their customers, it is an obstacle to "Congress' overarching goal" of "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces.'"  *Rowe*, 552, U.S. at 371.

52.  Unless Defendants are restrained and enjoined from enforcing Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, CTA members and other similarly situated motor carriers will suffer irreparable harm. Under the new construction of Wage Order No. 9, CTA members and other similarly situated motor carriers that continue to engage owner-operators when needed to provide services to their customers face the prospect of the civil and criminal penalties and enforcement actions authorized by Wage Order No. 9 as well as costly litigation, including class-action worker-misclassification lawsuits initiated by private parties who claim to be improperly classified as independent contractors.  If motor carriers instead cease contracting with bona fide independent contractors like Plaintiffs SINGH and ODOM in order to avoid liability, that change to their business model will directly impact the types of services the motor carriers provide to their customers, the routes the drivers must take, and the prices that the motor carriers charge their customers for services.

53.  The threat that Wage Order No. 9 as construed in *Dynamex* will be enforced against the CTA's members, and the fact that it currently is being used to challenge their use of independent contractors in private class actions, constitutes an irreparable harm that makes injunctive relief appropriate.

54. Plaintiffs suffer irreparable harm when Wage Order No. 9 is enforced as construed in *Dynamex*. Such irreparable harm to the CTA motor carriers includes, but is not limited to, civil and criminal liability authorized under Wage Order No. 9, costly litigation, including class actions initiated by private parties who claim to be improperly classified as independent contractors, and being compelled to cease providing to their customers the trucking services which can be afforded only by specialized independent owner-operators. The irreparable harm to Plaintiffs SINGH and ODOM, and other owner-operators who are similarly situated, is the loss of their respective businesses, their ability to operate and grow as independent small businesses providing trucking services, and the attendant loss of personal freedom and opportunity.

55. Plaintiffs have no plain, speedy, and adequate remedy at law, making injunctive relief necessary.

## SECOND CLAIM FOR RELIEF

### Commerce Clause of the United States Constitution,

### Article 1, Section 8

56. Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

57. The Commerce Clause of the United States Constitution, Article 1, section 8, protects the right to engage in interstate commerce free of undue burdens and discrimination by state governments.

58. Wage Order No. 9 as interpreted in *Dynamex* means that motor carriers must cease contracting with individual owner-operators to provide trucking services in California or face the risk of significant civil and criminal penalties arising from the violation of Wage Order No. 9. Accordingly, the new interpretation of Wage Order No. 9 deprives CTA's motor-carrier members, and other similarly situated motor carriers of the right to engage in interstate commerce—in particular, the interstate transportation of property—free of unreasonable burdens, as protected by

the Commerce Clause.

59. For example, in order to comply with the new interpretation of Wage Order No. 9, motor carriers that contract with individual owner-operators to provide trucking services to customers for movements that originate in other states and terminate in California can no longer use that same individual owner-operator to perform the entire movement. Instead, under the new interpretation of Wage Order No. 9, the motor carrier must terminate that movement by the individual owner-operator at the California border and arrange for the final leg of that movement within California by an employee driver entitled to the protections of Wage Order No. 9. Similarly, for movements that originate in California and terminate in a different state, the motor carrier cannot contract with an individual owner-operator for that entire movement but must instead employ a driver entitled to the protections afforded by Wage Order No. 9 to complete that first leg of the movement to the California border.

60. The new interpretation of Wage Order No. 9 is unlawful, and is void and unenforceable pursuant to the Commerce Clause of the United States Constitution as an unreasonable burden on interstate commerce.

61. Individual Plaintiff motor carriers, CTA's motor-carrier members, and other similarly situated motor carriers will incur irreparable harm from this constitutional violation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1. This Court issue a declaration that, with respect to the trucking industry, Wage Order No. 9 as authoritatively construed by the California Supreme Court in *Dynamex* is expressly and impliedly preempted by federal law;

2. This Court issue a declaration that, with respect to the trucking industry, Wage Order No. 9 as authoritatively construed by the California Supreme Court in *Dynamex* violates the Commerce Clause and is therefore unconstitutional;

3. This Court issue a preliminary and permanent injunction prohibiting Defendants from enforcing Wage Order No. 9 as authoritatively construed by the California Supreme Court in *Dynamex*;

4. For an award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

5. Such other relief as this Court deems just and proper.

DATED: October 25, 2018    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By: /s/ Robert R. Roginson
Robert R. Roginson
Spencer C. Skeen
Alexander M. Chemers

Attorneys for Plaintiffs
CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM

36091614.1