SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA  92122
Telephone:  858.652.3100
Facsimile:   858.652.3101

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California  90071
Telephone:  213.239.9800
Facsimile:   213.239.9045

Attorneys for Plaintiffs
CALIFORNIA TRUCKING ASSOCIATION,
RAVINDER SINGH, and THOMAS ODOM

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM, | Case No. 3:18-cv-02458-BEN-BLM |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department. | |
| Defendants. | |

Plaintiffs CALIFORNIA TRUCKING ASSOCIATION ("CTA"),

RAVINDER SINGH, and THOMAS ODOM (collectively, "Plaintiffs") state their

complaint for declaratory and injunctive relief against Defendants as follows:

## INTRODUCTION

1.      Plaintiffs bring this lawsuit to vindicate their rights guaranteed by the

Supremacy Clause and Commerce Clause of the United States Constitution.

Plaintiffs seek declaratory and injunctive relief prohibiting the Defendants from

applying and enforcing California's new test for whether a worker is an employee or

independent contractor, as interpreted by the California Supreme Court in *Dynamex*

*Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*") and

subsequently codified by the California Legislature through Assembly Bill 5 ("AB-

5") at Labor Code § 2750.3.

2.      In *Dynamex*, the California Supreme Court adopted for the first time the

so-called "ABC test" for determining whether a worker is an employee or

independent contractor for purposes of Industrial Welfare Commission Wage Order

No. 9 ("Wage Order No. 9"), 8 Cal. Code Regs. § 11090:

> Under this test, a worker is properly considered an
> independent contractor to whom a wage order does not
> apply only if the hiring entity establishes: (A) that the
> worker is free from the control and direction of the hirer in
> connection with the performance of the work, both under
> the contract for the performance of such work and in fact;
> (B) that the worker performs work that is outside the usual
> course of the hiring entity's business; and (C) that the
> worker is customarily engaged in an independently
> established trade, occupation, or business of the same
> nature as the work performed for the hiring entity.

*Dynamex*, 4 Cal. 5th at 916-917.

3.      On September 11, 2019, the California Legislature passed AB-5, which

was signed by Governor Gavin Newsom a week later on September 18, 2019.  It was

"the intent of the [California] Legislature in enacting [AB-5] to include provisions

that would codify the decision of the California Supreme Court in *Dynamex* and would clarify the decision's application in state law."  AB-5, Section 1.  Pursuant to Section 2 of AB-5, Section 2750.3(a)(1) of the California Labor Code will provide that:

> [A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:
>
> > (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
> >
> > (B) The person performs work that is outside the usual course of the hiring entity's business.
> >
> > (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

4.     The ABC test set forth in the preceding paragraph will apply not only to the determination under Wage Order No. 9 and other wage orders of whether a worker is an employee or independent contractor, but also to whether the worker is an employee under the Labor Code and the Unemployment Insurance Code unless one of the narrow exceptions set forth in AB-5 applies.  The new statute takes effect on January 1, 2020.

5.     Many of CTA's members regularly contract with individual independent contractors who own and operate their own trucks ("owner-operators") to provide interstate trucking services to customers in California and other states in accordance with federal and state regulations governing the transportation of property.

6.     Prior to *Dynamex*, it was lawful for CTA's members who contracted with owner-operators to treat them as independent contractors and not employees for purposes of California's labor laws.  Now, however, under the ABC test adopted in *Dynamex* and codified at Labor Code § 2750.3, each motor-carrier member of CTA

that continues to use individual owner-operators to provide trucking services for their customers must treat such workers as employees and will be required by law to provide them with all protections that California law affords to employees.

7.      Given the realities of trucking, it would be impracticable if not impossible for CTA's motor-carrier members to provide interstate trucking services by contracting with independent owner-operators and to simultaneously comply with California's onerous requirements for employees.  The direct and real consequence of *Dynamex* and AB-5, therefore, is that CTA's motor-carrier members, if they wish to avoid significant civil and criminal penalties, must cease contracting with owner-operators to perform trucking services for customers in California and to shift to using employee drivers only when operating within the State.

8.      Plaintiffs SINGH and ODOM are owner-operators who regularly contract with licensed motor carriers to provide trucking services in California and in other states.  Under the ABC test adopted in *Dynamex* and now codified by AB-5, Plaintiffs SINGH and ODOM will, by operation of law, be deemed to be the employees of any motor carrier that enters into a contract with them to provide trucking services in California.  Because it would be impracticable for motor carriers to contract with individual owner-operators to provide such services, motor carriers will risk potential liability whenever they contract with owner-operators to provide trucking services.  The prospect of liability resulting from AB-5 will discourage, if not outright prevent, motor carriers from contracting with Plaintiffs SINGH and ODOM, thereby harming their businesses.

9.      Plaintiffs seek a declaration that the ABC test set forth in AB-5 (and, before it, Wage Order No. 9 as interpreted in *Dynamex*) is preempted by the Federal Aviation Administration Authorization Act of 1994 ("the FAAAA"), 49 U.S.C. § 14501, and a corresponding injunction prohibiting Defendants from attempting to apply or enforce Prong B of the ABC test under AB-5 or the preceding interpretation in *Dynamex*.  Prong B of the ABC test under AB-5 (and, before it, Wage Order No. 9

as interpreted in *Dynamex*) is expressly preempted by the FAAAA because the requirement that motor carriers treat all drivers as employees and the concomitant *de facto* prohibition on motor carriers contracting with independent owner-operators to perform trucking services in California directly impacts the services, routes, and prices offered by CTA's motor-carrier members to their customers. Prong B of the ABC test under AB-5 (and the preceding interpretation of Wage Order No. 9) is also impliedly preempted by the FAAAA insofar as the ABC test effectively bars CTA motor-carrier members from using individual owner-operators to provide trucking services to their customers is an obstacle to the achievement of "Congress' overarching goal" of "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces.'" *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008). Further, Prong B of the ABC test imposes an impermissible burden on interstate commerce and thus violates the Commerce Clause of the United States Constitution.

10. Insofar as application of *Dynamex* and AB-5 would compel motor carriers to comply with the meal and rest period requirements under California law, Plaintiffs also seek a declaration that such meal and rest period requirements are preempted by the Motor Carrier Safety Act (the "MCSA"), 49 U.S.C. § 31141, and a corresponding injunction prohibiting Defendants from attempting to apply or enforce such meal and rest period provisions.

## JURISDICTION AND VENUE

11. This action arises under the Constitution and laws of the United States, including the Supremacy Clause, U.S. Const. art. VI, § 3; the Commerce Clause, U.S. Const., art. 1, § 8; the FAAAA, 49 U.S.C. §§ 14501(c), 14504a(c), and 14506; the MCSA, 49 U.S.C § 31141; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201.

/ / /

/ / /

12.     This is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202 and the Supremacy Clause and Commerce Clause of the United States Constitution.  This action presents an actual controversy within the Court's jurisdiction.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the transportation services provided by the individual Plaintiffs and other motor carriers whose interests are represented by CTA were contracted for and carried out within the geographical boundaries of this district, such that a substantial part of the events giving rise to the claim occurring in this district.

**PARTIES**

14.     CTA is an association devoted to advancing the interests of its motor-carrier members who provide transportation services in California.  CTA promotes advocacy, safety, and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members operating in California.

15.     CTA members are licensed motor-carrier companies that manage, coordinate, and schedule the movement of property throughout California in interstate commerce through so-called "motor contract carrier permits" issued by the Federal Motor Carrier Safety Administration ("FMCSA"), a division of the U.S. Department of Transportation ("DOT").  Many of CTA's members are based in this judicial district, and many other CTA members are based elsewhere but provide transportation services in this judicial district.  Many of CTA's motor-carrier members contract with owner-operators as independent contractors to provide interstate trucking services to their customers in and between several states, including California, and treat these owner-operators as independent contractors rather than employees and are therefore directly impacted the *Dynamex* opinion.

16.     Plaintiff RAVINDER SINGH is an individual residing in Fremont, California.  Plaintiff SINGH owns and operates his own truck and performs trucking services for different motor carriers and brokers in California.  He contracts with and

is treated by these motor carriers as an independent contractor and not an employee.

17.     Plaintiff THOMAS ODOM is an individual residing in Madera, California.  Plaintiff ODOM owns and operates his own truck and performs trucking services for a national motor carrier hauling property in California and between California and Texas.  He contracts with and is treated by these motor carriers as an independent contractor and not an employee.

18.     Defendant Xavier Becerra is the Attorney General of California and is charged with enforcing and defending all state laws.  California's wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law. *See* Cal. Const., art. XIV, § 1; Cal. Labor Code §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Comm'n v. Superior Court*, 27 Cal. 3d 690, 700-703 (1980). Because this action challenges the constitutional validity of the wage order as authoritatively interpreted by the California Supreme Court (*see Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*, 369 P.2d 937, 939 (1962) ("The decisions of this court are binding upon and must be followed by all the state courts of California")), the Attorney General is an appropriate party to defend this action.  *See* Cal. Gov't Code § 12510 *et seq*.

19.     Defendant Julie Su is the Secretary of the California Labor and Workforce Development Agency.  The Labor and Workforce Agency is an executive branch agency overseeing the Department of Industrial Relations and its Divisions, including the Division of Labor Standards Enforcement and the Industrial Welfare Commission, the Employment Development Department, and the California Unemployment Insurance Appeals Board.  *See* Cal. Gov't Code § 12813.

20.     Defendant Andre Schoorl is the Acting Director of the Department of Industrial Relations, an executive agency in California that is charged with

defending, amending, and republishing California's wage orders.[1]  *See* Cal. Labor Code § 1182.

21.     Defendant Lilia Garcia-Brower is the Labor Commissioner of the California Department of Industrial Relations, which is a department of the California Labor and Workforce Development Agency.  The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") is specifically empowered by the Legislature to interpret and enforce the Industrial Welfare Commission ("IWC") wage orders, including Wage Order No. 9.  *See* Cal. Labor Code §§ 61 and 1193.5.  The DLSE investigates complaints and takes enforcement actions against companies, including motor carriers, seeking to impose penalties on the basis that the company has misclassified employees as independent contractors.  Enforcement actions taken by the DLSE include audits of payroll records, collection of unpaid wages, and issuing citations for violations of any applicable wage order and Labor Code provisions.  The DLSE also adjudicates wage claims, pursuant to California Labor Code §§ 96 and 98, on behalf of drivers who file claims contending that they are employees misclassified as independent contractors.

22.     Defendant Patrick Henning is the Director of the Employment Development Department.  The Employment Development Department is specifically empowered by the Legislature to interpret and enforce the Unemployment Insurance Code.  *See* Unemployment Ins. Code § 317.

## GENERAL ALLEGATIONS

### Federal Regulation Of The Trucking Industry

23.     Prior to 1980, both federal and state governments regulated the trucking

---

[1] The Industrial Welfare Commission, a five-member commission within the Department of Industrial Relations (Cal. Labor Code § 70), is charged by statute with promulgating wage orders for various industries.  Cal. Labor Code § 517.  Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect.  *Bearden v. U.S. Borax, Inc.*, 138 Cal. App. 4th 429, 434 (2006).

industry.  These regulations dictated, both directly and indirectly, how transportation services could be provided and the prices that could be charged for those services.

24.     In 1980, Congress passed the Motor Carrier Act, which deregulated interstate trucking so that the rates and services offered by licensed motor carriers and related entities would be set by the market rather than by government regulation. 79 Stat. 793.

25.     Fourteen years later, in 1994, to bolster deregulation, Congress included a provision within the FAAAA that expressly preempts state regulation of the trucking industry:

> [A] State… may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (emphasis added).

26.     In enacting the FAAAA, Congress' "overarching goal" was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality."  *Rowe,* 552 U.S. at 371 (internal quotations omitted).  The FAAAA's express-preemption provision furthers this purpose by "'prevent[ing] States from undermining federal regulation of interstate trucking' through a 'patchwork' of state regulations."  *Am. Trucking Ass'ns v. City of Los Angeles*, 660 F.3d 384, 395-96 (9th Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 2096 (2013).

27.     The United States Supreme Court has explained that the "ban on enacting or enforcing any law 'relating to rates, routes, or services is most sensibly read . . . to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier."  *Am. Airlines,*

*Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995).[2]

28.     Deregulation requires not only that states not interfere with the ability of private parties to contract, but also that they not interfere with the enforcement of those contracts.  "Market efficiency requires effective means to enforce private agreements."  *Wolens*, 513 U.S. at 230 (quotation marks omitted).  Moreover, "[t]he stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at the time."  *Id.*

## The Owner-Operator Model

29.     For decades, the trucking industry has heavily relied on the owner-operator model—which involves the use by licensed motor carriers of independent contractors who own and operate their own trucks—to provide the transportation of property in interstate commerce.  A motor carrier's ability to contract with independent contractors is necessary because the demand for, duration of, and volume of trucking services provided by individual motor carriers fluctuates significantly.

30.     In many segments of the national economy, the volume of trucking services needed varies over time based on numerous factors.  In the agricultural industry, for example, the demand for trucking services varies depending on the time of year, the price at which the produce can be sold, the available markets (both foreign and domestic) for the produce, the length of the growing season, and the size of the crop, which itself varies based on the temperature, rainfall, and other factors.  Likewise, a motor carrier could have an abundance of jobs during the growing season, but a small number of such jobs during the winter months.

---

[2] Although *Wolens* was interpreting the Airline Deregulation Act ("ADA"), the FAAAA's preemption clause borrows its language directly from the ADA and courts analyze the two acts similarly.  *Rowe,* 552 U.S. at 370 ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well") (internal quotation marks and alteration omitted).

31.     Motor carriers offer many types of trucking services including, but not limited to, conventional trucking, the transport of hazardous materials, refrigerated transportation, flatbed conveyance, intermodal container transport, long-haul shipping, movement of oversized loads, dedicated trucking, less-than-truckload shipping, and dump-truck haulage.

32.     In order to meet this fluctuating demand for highly varied services, motor carriers contract with owner-operators to provide trucking services.  Because the demand for shipment of goods fluctuates depending on the season, consumer demand, overseas orders, natural disasters, type of truck, and a multitude of other factors, many motor carriers depend on the use of individual owner-operators to provide consistent, uninterrupted, skilled, and specialized trucking services to their customers.

33.     Given the sizable investment that is necessary to acquire and maintain a truck, the fluctuating demand for trucking services generally, the sporadic demand for specialized trucking services in particular, and other related considerations, it would be extremely difficult if not impossible for a motor carrier doing business in California, particularly a smaller motor carrier, to own (or finance) and maintain a fleet of trucks operated by employee drivers that is sufficiently large to service their customers' needs for specialized trucking services or haulage during times of peak demand.

34.     Rather, because demand for their various services fluctuates, sometimes widely, throughout the year, motor carriers need to be able to expand and contract their capacity to provide transportation services at a moment's notice.  For example, if a motor carrier owned and operated its own fleet of sixty (60) trucks and employed only sixty (60) employee drivers to operate those trucks, that motor carrier would not be able to provide trucking services to a customer or group of customers when such customers needed a total of eighty (80) trucks on a particular day.  Conversely, a motor carrier that is permitted to use independent contractor owner-operators could

simply contract with individual owner-operators to provide the twenty (20) additional trucks needed.

35. Employing a business model that is common both nationally and in California, individual owner-operators typically work for themselves for a period of time to build up their experience and reputation in the industry. When such an owner-operator is ready to expand his or her business, that owner-operator will contract for or bid on jobs that require more than one truck. At that time, the owner-operator will subcontract with one or more other owner-operators to complete the job.

36. Eventually, the owner-operator may have enough business to warrant hiring one or more employee-drivers. In this way, the owner-operator model enables small businesses to grow from one-truck, one-driver operations to larger fleets with multiple trucks and multiple employee-drivers.

37. Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently. Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies. This can make them more attractive to other motor carriers that need to increase their freight-hauling capacity during the course of the year, because they can obtain the services of additional drivers and equipment without having to make large capital investments in either skilled operators or expensive equipment.

### The ABC Test Prevents Motor Carriers
### From Contracting With Owner-Operators

38. Individually and together, the California Labor Code and Wage Order No. 9 set forth wide-ranging requirements on employers.

39. The California Labor Code imposes numerous obligations on "employers" with respect to "employees." Such obligations attach "[a]t the time of hiring," when an employer must provide a detailed notice to employees setting forth

many categories of information.  Labor Code § 2810.5.  And these obligations continue through the last day that the employee works, with all wages due on the last day of employment.  Labor Code § 202.  Each day in between and during employment, the employer is subject to detailed requirements governing hours and days of work, minimum wages, reporting time pay, recordkeeping and wage statements, meal periods, rest periods, uniforms and equipment, expense reimbursement, and other matters.

40.     In order to satisfy these obligations, employers must exercise sufficient control over the working conditions of their employees to ensure that they are provided the protections set forth in the Labor Code.  The requisite control includes, among other things, tracking all hours worked by the employee to fulfill the recordkeeping and minimum-wage requirements; implementing and maintaining lawfully compliant compensation plans; issuing itemized wage statements that include many categories of information; managing the employee's tasks and work schedule to ensure compliance with the meal and rest-period requirements as well as the reporting-time requirements; identifying, providing, and maintaining the tools and equipment necessary to the performance of the job; as well as reimbursing employees for such items.

41.     Similar obligations exist in Wage Order No. 9, which was promulgated by the IWC to govern the working conditions of employees in the transportation industry.  Wage Order No. 9 defines the "Transportation Industry" to mean "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles."  Wage Order No. 9, § 2(P).

42.     Like the Labor Code, Wage Order No. 9 imposes numerous obligations on "employers" with respect to "employees," including detailed requirements

governing hours and days of work, minimum wage, reporting time pay, recordkeeping, and so forth.  Wage Order No. 9 also requires that employers engage in a similarly high level of control over their employees to ensure that these obligations are met.

43.     Prior to the adoption of the ABC test in *Dynamex* and now AB-5, CTA's motor-carrier members operating in California could—and did—lawfully contract with and treat owner-operators as independent contractors and not as "employees" within the meaning of the Labor Code and Wage Order No. 9. Accordingly, prior to *Dynamex* and AB-5, CTA's motor-carrier members contracted with owner-operators without incurring obligations to them under the Labor Code or Wage Order No. 9 and without risking an enforcement action or private misclassification suit in which such owner-operators would inevitably be deemed employees for purposes of California law.

44.     In *Dynamex*, the California Supreme Court announced a new interpretation of Wage Order No. 9 for purposes of classifying workers as either employees (and thus covered by numerous obligations) or independent contractors (and thus outside the ambit of numerous rules).

45.     As noted above, *Dynamex* adopted the so-called "ABC test" for classifying workers, which has now been codified by AB-5.  Under Prong B of the ABC test, an individual is deemed an employee rather than an independent contractor unless he or she "performs work that is outside the usual course of the hiring entity's business."

46.     Because drivers perform work that is within rather than outside the usual course of a motor carrier's business, the unavoidable effect of Prong B is to automatically classify every driver who works for a motor carrier as an "employee" under the Labor Code and Wage Order No. 9, no matter the actual and contractual relationship between the driver and the motor carrier.  As a consequence, under the new ABC test, all motor carriers operating in California, including CTA's motor-

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

carrier members, are required to extend to all drivers, including owner-operators who heretofore have been lawfully treated as independent contractors under prior law, the full range of benefits mandated by the Labor Code and Wage Order No. 9 and to otherwise comply with the regulatory and statutory requirements with respect to such drivers.  Motor carriers that fail to do so face the significant risk of civil and criminal liability arising from the violation of the Labor Code and Wage Order No. 9.

47.     As a practical matter, for a motor carrier to comply with the Labor Code and Wage Order No. 9—which include detailed requirements governing hours and days of work, minimum wages, reporting-time pay, meal periods, rest periods, uniforms and equipment, recordkeeping, itemized wage statements, reimbursement, and other matters—the motor carrier must exercise significant control over each driver's route and working conditions.  It would be impracticable if not impossible for CTA's motor-carrier members to continue using the owner-operator model, under which they contract with independent drivers to perform particular shipments, while exercising the degree of control over the drivers that would be required to ensure compliance with the Labor Code and Wage Order No. 9.  Therefore, to avoid violating the Labor Code and Wage Order No. 9 under the new ABC test, motor carriers operating in California, including CTA's members, will be forced to discontinue using the owner-operator model and instead use only employees to provide trucking services to their customers.

48.     Conversely, because motor carriers cannot as a practical matter comply with the substantive requirements of the Labor Code and Wage Order No. 9 when they contract with individual owner-operators to perform trucking services, motor carriers that continue to employ that business model will risk significant civil and criminal liability arising from the violation of these statutes.  As a result, motor carriers will cease using individual owner-operators to perform trucking services and will hire employee drivers to perform such services.  The ABC test, as construed in *Dynamex* and codified by AB-5, therefore, undermines the economic viability of

independent owner-operators.  As a consequence, owner-operators, who have invested considerable amounts in their businesses (including for the purchase of vehicles), face the prospect of being forced to abandon their business and losing the freedom that comes with being small-business owners.

49.     AB-5 contains a series of exceptions for specific professions and industries, which can be found at the newly enacted Labor Code § 2750.3(b)-(h). None of these exceptions apply to the relationships between motor carriers and individual owner-operators.  For example, there is a narrow exception for persons performing work "pursuant to a subcontract in the construction industry," or providing "construction trucking services" (with the latter exception also set to expire on December 31, 2021).  Labor Code § 2750.3(f).

50.     Likewise, there is a narrow exception for a "*bona fide* business-to-business contracting relationship," which requires the independent contractor to satisfy twelve separate criteria.  Labor Code § 2750.3(e).  Plaintiffs SINGH and ODOM cannot satisfy those criteria, including the requirements that a business operate a "business location that is separate from the business or work location of the contracting business," "advertise[] and hold[] itself out to the public" to provide services, "negotiate its own rates," and "set its own hours and location of work."  For similar reasons, CTA's motor-carrier members will be unable to recast their historic use of owner-operators as falling within the "business-to-business" exception.  That AB-5 specifically excludes motor carriers and owner-operators like SINGH and ODOM from the scope of Section 2750.3(e) was made clear by the sponsor of AB-5, Assembly Member Lorena Gonzalez.  On September 11, 2019, shortly before AB-5 was enacted, Assembly Member Gonzalez discussed the "business-to-business" exception during floor debate.  She noted that Section 2750.3(e) was not intended to encompass Plaintiffs, since "we are . . . getting rid of an outdated broker model that allows companies to basically make money and set rates for people that they called independent contractors that act a lot like employees."

51.     The intent and impact of the *Dynamex* decision and now AB-5 is clear—motor carriers can no longer contract with independent owner-operators and must shift to using an employee-only business model.

### The Impact Of The ABC Test On Services, Routes, And Prices

52.     Because the ABC test effectively makes it unlawful for motor carriers to contract with individual owner-operators to provide trucking services, and as a practical matter, requires them to use employee drivers instead if they wish to avoid liability, it will significantly alter the services that the motor carriers provide to their customers.  Forced by *Dynamex* and now AB-5 to cease using the owner-operator model, motor carriers will no longer have the ability to provide the diverse and specialized services they were able to provide prior to adoption of the ABC test. Until now, motor carriers have contracted with owner-operators to acquire access on a short-term basis to the trucks and skilled drivers necessary to accommodate peak demand and customers' specialized trucking needs.  Given their limited capitalization and access to financing, it is not feasible for motor carriers to maintain the diverse fleets and large workforces that they would need in order to offer equivalent service using employee drivers.  As a result, because they do not currently have and cannot feasibly acquire and maintain the equipment, personnel, and experience necessary to perform certain jobs using employee drivers, these motor carriers must either stop providing certain services for their customers or continue doing so using owner-operators and face the risk of civil and criminal liabilities arising from the violation of the Labor Code and Wage Order No. 9.

53.     Due to the variable demand for freight transportation, effectively compelling motor carriers to cease contracting with independent owner-operators and to instead use only employee drivers will significantly impact the services that motor carriers provide to their customers.  Customers of motor carriers rely upon motor carriers for the timely pick-up and delivery of freight, which is typically required by a specified time or within a specified window of time.  Customers rely

upon these pick-up and delivery times for the efficiencies of their own operations (*i.e.*, scheduling personnel to perform loading and unloading, arranging for future distribution of the goods, etc.). Customers factor compliance with pick-up and delivery times into the compensation paid to motor carriers to ensure efficient productivity and to avoid disruption to the movement of goods. Motor carriers contract with owner-operators to fulfill these customer demands, recognizing that the owner-operator is limited only by federal safety and hours-of-service regulations and the owner-operator's own capacity and willingness to perform the requested services. By effectively rendering all drivers employees within the meaning of the Labor Code and Wage Order No. 9 and thereby imposing burdens and constraints on motor carriers far beyond those imposed on the owner-operators with whom they have contracted until now and would otherwise continue to contract, *Dynamex* and now AB-5 significantly impair motor carriers ability to provide—and their customers' ability to obtain—timely, peak, and/or specialized trucking services.

54. Effectively prohibiting motor carriers from contracting with individual owner-operators and requiring that such drivers be treated as employees entitled to the protections of the Labor Code and Wage Order No. 9 also directly impacts the routes that a motor carrier must use when providing services to its customers. This is true for at least three distinct reasons. First, routes must be reconfigured by the motor carriers to ensure drivers are able to park the trucks legally and safely in order to take the meal and rest periods mandated by California law. Second, motor carriers must reconfigure and consolidate routes to minimize, through increased efficiency, the effect of the higher fixed costs associated with owning vehicles and the decreased productivity, greater fuel consumption, and increased emissions in using employee drivers subject to the Labor Code and Wage Order No. 9. Third, for motor carriers that contract with owner-operators to provide interstate trucking services originating or terminating in other states, such motor carriers must reconfigure routes to arrange for the transfer and movement of any cargo within California by employee drivers

only.

55.     The prices that a motor carrier charges its customers are also directly impacted by the effective foreclosure of the use of independent-contractor owner-operators.  Because a motor carrier incurs significantly more expenses maintaining a fleet of trucks and employee drivers than it does using individual owner-operators driving trucks that they own, forcing motor carriers to hire employees rather than contracting with independent contractors will materially increase motor carriers' costs.  The additional costs include the expenses of exercising the control over the drivers and the drivers' operations that is necessary to ensure that the full panoply of protections required under the Labor Code and Wage Order No. 9 are provided to the drivers; the related training and benefits costs; costs in lower productivity from employee drivers as compared to individual owner-operators; and the capital expenditures necessary to obtain and maintain the trucks needed to provide the trucking services.  Although not completely insensitive to changes in price, the demand for trucking services is relatively inelastic given shippers' needs.  A farmer, for example, is unlikely to let his or her crop rot in the field merely because the cost of shipping it to market has increased a few percent.  Given the relative inelasticity of demand for trucking services, much of the increased cost that motor carriers will incur as a result of having to hire employees rather than contracting with independent contractors will be passed on to their customers and reflected in higher shipping prices.

56.     The *Dynamex* decision and now AB-5 put Plaintiffs in an impossible bind.  CTA's motor-carrier members must either completely revamp their traditional business model, and change the prices, routes, and services that they offer their customers, or risk criminal and civil liability for violation of the Labor Code and Wage Order No. 9.

57.     For their part, if they are to comply with the Labor Code and Wage Order No. 9, motor carriers must begin to acquire trucks, to hire and train employees,

and to establish the administrative infrastructure necessary to ensure compliance with these statutes.  This is particularly true since AB-5 is scheduled to take effect on January 1, 2020, which is less than two months away and which highlights the immediate need for the injunctive relief requested by Plaintiffs.

58.     Obtaining the necessary capital, finding the appropriate employees, and building the requisite administrative capacity to comply with *Dynamex* and now AB-5 requires long-term planning.  Such planning is difficult if not impossible so long as the legal validity of the ABC test remains in dispute.  A bank is unlikely to lend money to a motor carrier to acquire a fleet of trucks, which represents a durable asset, when the bank knows that a motor carrier using owner-operators could provide the same trucking services at much lower cost and could thus make it hard for the borrower to service its debt if the ABC test is found to be preempted by federal law, as it has been in other jurisdictions and as is requested here.  Ironically, therefore, a failure to resolve the status of California's new ABC test will make it difficult for most motor carriers to comply with that test, thereby placing them in a terrible bind. If a motor carrier fearful of an enforcement action somehow manages to overcome the obstacles and obtain the necessary capital, that motor carrier risks competitive disadvantage and possible financial ruin if California's narrow ABC test is ultimately overturned and the motor carrier is saddled with capital expenses and administrative overhead that its competitors, who instead risked an enforcement action, are not burdened with.  Debt servicing and competitors aside, a motor carrier who, out of fear of enforcement, begins acquiring trucks and hiring employees in light of *Dynamex* and now AB-5 will be unable to recover certain costs—and will thus suffer irreparable injury—even if the ABC test is ultimately found to be unenforceable.  A motor carrier should not have to risk criminal and civil penalties to avoid those consequences.

59.     Alternatively, a motor carrier may decide to abandon the use of independent contractors in California and cease operating in California, as some

motor carriers have done.  The fact that motor carriers which had previously operated throughout the United States cease operating in California illustrates the effect that *Dynamex* and now AB-5 are having on prices, routes, and services, and on interstate commerce.  Less competition in the California market for trucking services necessarily results in heightened prices, diminished services, and the elimination of certain routes.

60.   Uncertainty as to the legal status of the ABC test also places owner-operators in a difficult bind.  As small-business owners, owner-operators, such as the two individual Plaintiffs in this action, must also make long-term capital investments—most importantly, in purchasing or leasing a truck.  They cannot reasonably do so until the legal status of *Dynamex* has been resolved.  They cannot afford to invest in a new truck, which will take years to pay off, if the motor carriers that have hired them until now will no longer do so.  The inability to invest in new trucks will cause owner-operators irreparable harm, by either forcing them out of business if their current truck dies or by preventing them from expanding their business despite otherwise feasible opportunities to do so.  Such losses are irreparable.

## **FIRST CLAIM FOR RELIEF**

### **Supremacy Clause, U.S. Const. art. VI, § 3,**

### **Preemption by the FAAAA, § 49 U.S.C. 14501(c)**

61.   Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

62.   The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of the FAAAA, prohibit the State of California from making, applying, and enforcing laws "related to a price, route, or service of any motor carrier . . . or any private carrier, broker, or freight forwarder with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).

63.     At all relevant times, Plaintiffs, CTA members, and all others similarly situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are otherwise preempted by federal law.

64.     An actual controversy exists among the parties because CTA members cannot simultaneously contract with owner-operators and satisfy the ABC test as construed in *Dynamex* and codified by AB-5 and therefore are forced to cease contracting with Plaintiffs SINGH and ODOM and other similarly situated independent contractors to provide trucking services.

65.     Application of Prong B of the ABC test, as mandated by *Dynamex* and AB-5, directly impacts the services, routes and prices that CTA's members and other similarly situated motor carriers offer their customers for the transportation of property.

66.     Under the interpretation of Wage Order No. 9 that prevailed prior to *Dynamex*, motor carriers were able to contract with an extensive network of independent contractors to provide virtually any type and number of trucks, trailers, drivers, and equipment needed for a particular job on very short notice.  Following *Dynamex* and now AB-5, motor carriers that continue to use individual owner-operators to provide such services face the risk of significant civil and criminal penalties arising from the violation of the Labor Code and Wage Order No. 9.

67.     If they wish to avoid incurring such liability, motor carriers will be forced to cease using independent contractors to provide trucking services.  If they do so, licensed motor carriers will also be forced to cease providing the services of certain trucks, trailers, drivers, and equipment because they do not have them available in their own fleet or workforce.  It is cost-prohibitive for motor carriers to acquire every possible type of truck, trailer, and equipment that might possibly be needed at any given time, especially those that are only utilized occasionally.  A motor carrier that chooses to invest in specialized trucks demanded only sporadically

by its customers will have to charge its customers higher prices than before for those specialized services—services that the motor carrier had previously provided on an as-needed basis by contracting with owner-operators.  As independent contractors providing services to the customers of various motor carriers, owner-operators could aggregate the demand for specialized services and could thus amortize the cost of the specialized equipment over more loads—and thus charge lower per load prices— than is possible for any one motor carrier.

68.     Thus, under the new ABC test announced in *Dynamex* and codified by AB-5, licensed motor carriers must scale back their service offerings to only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand, must charge higher prices for those services, or must incur the risk of enforcement and civil actions and significant civil and criminal liability.  Similarly, under the new ABC test, Plaintiffs SINGH and ODOM face the threat of losing their businesses because they are not able to lawfully contract as individual owner-operators with motor carriers to provide trucking services in California to the motor carriers' customers.

69.     The ABC test is also impliedly preempted by the FAAAA because, insofar as the new rule effectively bars CTA motor-carrier members from using individual owner-operators to provide trucking services to their customers, it is an obstacle to "Congress' overarching goal" of "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces.'" *Rowe*, 552 U.S. at 371.

70.     Unless Defendants are restrained and enjoined from enforcing the newly created Labor Code § 2750.3 and Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, CTA members and other similarly situated motor carriers will suffer irreparable harm.  Under the new ABC test, CTA members and other similarly situated motor carriers that continue to engage owner-operators when needed to provide services to their customers face the prospect of the civil and

criminal penalties and enforcement actions authorized by the Labor Code and Wage Order No. 9, as well as costly litigation, including class-action worker-misclassification lawsuits initiated by private parties who claim to be improperly classified as independent contractors.  If motor carriers instead cease contracting with *bona fide* independent contractors like Plaintiffs SINGH and ODOM in order to avoid liability, that change to their business model will directly impact the types of services the motor carriers provide to their customers, the routes the drivers must take, and the prices that the motor carriers charge their customers for services.

71.     The threat that Labor Code § 2750.3 and Wage Order No. 9 as construed in *Dynamex* will be enforced against the CTA's members, and the fact that the ABC test is currently being used to challenge their use of independent contractors in private class actions, constitutes an irreparable harm that makes injunctive relief appropriate.

72.     Plaintiffs suffer irreparable harm from the existing and future enforcement of the ABC test.  Such irreparable harm to the CTA motor carriers includes, but is not limited to, civil and criminal liability authorized under the Labor Code and Wage Order No. 9, costly litigation, including class actions initiated by private parties who claim to be improperly classified as independent contractors, and being compelled to cease providing to their customers the trucking services which can be afforded only by specialized independent owner-operators.  The irreparable harm to Plaintiffs SINGH and ODOM, and other owner-operators who are similarly situated, is the loss of their respective businesses, their ability to operate and grow as independent small businesses providing trucking services, and the attendant loss of personal freedom and opportunity.

73.     Plaintiffs have no plain, speedy, and adequate remedy at law, making injunctive relief necessary.

**SECOND CLAIM FOR RELIEF**

**Commerce Clause of the United States Constitution,**

**Article 1, Section 8**

74.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

75.     The Commerce Clause of the United States Constitution, Article 1, section 8, protects the right to engage in interstate commerce free of undue burdens and discrimination by state governments.

76.     California's test for determining whether a worker is an employee or an independent contractor, as interpreted in *Dynamex* as to Wage Order No. 9 and now codified by AB-5, means that motor carriers must cease contracting with individual owner-operators to provide trucking services in California or face the risk of significant civil and criminal penalties arising from the violation of California law. Accordingly, the new ABC test deprives CTA's motor-carrier members, and other similarly situated motor carriers of the right to engage in interstate commerce—in particular, the interstate transportation of property—free of unreasonable burdens, as protected by the Commerce Clause.

77.     For example, in order to comply with the ABC test, motor carriers that contract with individual owner-operators to provide trucking services to customers for movements that originate in other states and terminate in California can no longer use that same individual owner-operator to perform the entire movement.  Instead, under the new ABC test, the motor carrier must terminate that movement by the individual owner-operator at the California border and arrange for the final leg of that movement within California by an employee driver entitled to the protections of the Labor Code and Wage Order No. 9.  Similarly, for movements that originate in California and terminate in a different state, the motor carrier cannot contract with an individual owner-operator for that entire movement but must instead employ a driver entitled to the protections afforded by the Labor Code and Wage Order No. 9 to

complete that first leg of the movement to the California border.

78.     The new ABC test is unlawful, and is void and unenforceable pursuant to the Commerce Clause of the United States Constitution as an unreasonable burden on interstate commerce.

79.     Individual Plaintiffs, CTA's motor-carrier members, and other similarly situated motor carriers will incur irreparable harm from this constitutional violation.

### THIRD CLAIM FOR RELIEF

#### Supremacy Clause, U.S. Const. art. VI, § 3,

#### Preemption Under 49 U.S.C. § 31141(a)

80.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

81.     The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of 49 U.S.C. § 31141, prohibit states from enforcing a law or regulation on commercial motor vehicle safety that the Secretary of Transportation has determined to be preempted.  49 U.S.C. § 31141 (a).

82.     At all relevant times, Plaintiffs, CTA members, and all others similarly situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are otherwise preempted by federal law.

83.     Pursuant to 49 U.S.C. § 31136, the Secretary of Transportation is responsible for promulgating regulations prescribing the minimum safety standards for commercial motor vehicles.  Among the regulations prescribed by the Secretary of Transportation are the federal Hours-of-Service ("HOS") regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA"), which are found at 49 C.F.R. §§ 395.1–395.13 and set forth various requirements for property-carrying drivers, including that a driver may drive a maximum of 11 hours after 10 consecutive hours off duty and may drive only if eight hours or less have passed

since the driver's last off-duty or sleeper berth period of at least 30 minutes.

84.   On December 21, 2018, the FMCSA issued an Order pursuant to 49 U.S.C. § 31141(a) granting petitions filed by industry trade associations representing motor carriers, concluding that: (1) the California's meal and rest period requirements under Wage Order No. 9 and the California Labor Code ("meal and rest period rules") are laws and regulations "on commercial motor vehicle safety," to the extent they apply to drivers of property-carrying commercial motor vehicles subject to the FMCSA's HOS rules; (2) the California meal and rest period rules are additional to or more stringent than the FMCSA's HOS rules; (3) the California meal and rest period rules have no safety benefit; (4) the California meal and rest period rules are incompatible with the FMCSA's HOS rules; and (5) enforcement of the California meal and rest period rules would cause an unreasonable burden on interstate commerce.

85.   The FMCSA Order ruled that California may no longer enforce the meal and rest period rules with respect to drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules.

86.   In accordance with the FMCSA Order issued pursuant to 49 U.S.C. 31141, the application of California's meal and rest period rules with respect to drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules is unlawful, void and unenforceable.

87.   Individual Plaintiffs, CTA's motor-carrier members, and other similarly situated motor carriers who employ, or are deemed to employ, drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules will incur, among other things, irreparable harm in lost and decreased productivity and increased administrative burdens and costs from any continuing enforcement of the California meal and rest period rules by Defendants.

/ / /

/ / /

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1.      This Court issue a declaration that, with respect to the trucking industry, the ABC test set forth in AB-5 and, before it, Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, are expressly and impliedly preempted by federal law;

2.      This Court issue a declaration that, with respect to the trucking industry, the ABC test set forth in AB-5 and, before it, Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, violate the Commerce Clause and is therefore unconstitutional;

3.      This Court issue a declaration that California's meal and rest period requirements are expressly preempted and may not be enforced with respect to drivers of property-carrying commercial motor vehicles subject to the federal HOS rules.

4.      This Court issue a preliminary and permanent injunction prohibiting Defendants, and any division, board or commission within such Defendants, from enforcing the ABC test set forth in AB-5 or Wage Order No. 9 as construed by the California Supreme Court in *Dynamex* and, pursuant to Labor Code § 2750.3(a)(3), issue a declaration that the determination of employee or independent-contractor status with respect to Plaintiffs ODOM and SINGH and drivers of property-carrying commercial motor vehicles performing trucking services for motor-carrier members of Plaintiff CTA shall be governed by the California Supreme Court's decision in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989).

5.      For an award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

/ / /

/ / /

6.      Such other relief as this Court deems just and proper.

DATED:  November 12, 2019          OGLETREE, DEAKINS, NASH, SMOAK &
                                   STEWART, P.C.


                                   By: /s/ Alexander M. Chemers
                                       Robert R. Roginson
                                       Spencer C. Skeen
                                       Alexander M. Chemers

                                   Attorneys for Plaintiffs
                                   CALIFORNIA TRUCKING ASSOCIATION,
                                   RAVINDER SINGH, and THOMAS ODOM

                                                        40697950.1