SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA 92122
Telephone: 858.652.3100
Facsimile: 858.652.3101

*[Additional Counsel on Following Page]*

Attorneys for Plaintiffs
RAVINDER SINGH, THOMAS ODOM and
CALIFORNIA TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM,<br><br>        Plaintiffs,<br><br>     v.<br><br>XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department,<br><br>        Defendants. | Case No. 3:18-cv-02458-BEN-BLM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       December 30, 2019<br>Time:      10:30 a.m.<br>Place:     Courtroom 5A<br><br>Complaint Filed: October 25, 2018<br>Trial Date:    None<br>District Judge:  Hon. Roger T. Benitez<br>                 Courtroom 5A, 221 W. Broadway, San Diego<br>Magistrate Judge: Hon. Barbara L. Major<br>                 11th Floor, 333 W. Broadway, San Diego |

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone:  213.239.9800
Facsimile:   213.239.9045

40897341_3.docx

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................ 6

II. FACTUAL BACKGROUND .......................................................... 7

    A. History Of Deregulation Of The Trucking Industry. .................... 7

    B. Independent Owner-Operators Are Integral And Essential To An Efficient And Deregulated Trucking Industry. .................. 8

    C. The Impact Of The ABC Test On The Trucking Industry. ............ 9

        1. Impact On Services. ..................................................... 9

        2. Impact On Routes. ..................................................... 11

        3. Impact On Prices. ..................................................... 11

III. LEGAL STANDARD .............................................................. 12

IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........ 12

    A. The FAAAA's Express Preemption Clause. ......................... 12

    B. The ABC Test Affects Motor Carrier Prices, Routes, And Services. ............................................................... 14

        1. The FAAAA Preempts Prong B Because It Prohibits Motor Carriers From Using Independent Contractors. ......................................................... 14

        2. Prong B Of California's ABC Test Is Preempted Whether Or Not It Is A "Law of General Applicability" (And It Is Not). .............................. 18

        3. The Effect Of The ABC Test On Prices, Routes, And Services. ......................................................... 20

            (a) Plaintiffs Are Likely To Prevail Based On The Deleterious Effect Of The ABC Test Alone. ......................................................... 21

            (b) Plaintiffs Have Shown The Impact Of The ABC Test On Prices, Routes, And Services. ........... 22

        4. AB-5's Harmful Effect Are Not Mitigated By The "Business-To-Business" Exception. ................. 23

Case No. 3:18-cv-02458-BEN-BLM

40897341_3.docx

C.    The ABC Test Is Preempted By The FAAAA Through
      Implied Preemption. ................................................................ 24

V.    THE DORMANT COMMERCE CLAUSE PREEMPTS THE
      ABC TEST .................................................................................. 26

VI.   THE REMAINING PRELIMINARY INJUNCTION ARE MET ........ 28

A.    Plaintiffs Will Suffer Irreparable Harm If The Court
      Denies Relief. ........................................................................... 28

B.    The Balance Of The Equities Tips Sharply In Plaintiffs'
      Favor. ....................................................................................... 29

C.    Granting Preliminary Injunctive Relief Is In The Public
      Interest. ..................................................................................... 30

VII.  CONCLUSION ........................................................................... 30

40897341_3.docx

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 31

*Alvarez v. XPO Logistics Cartage LLC*,
    2018 WL 6271965 (C.D. Cal. Nov. 15, 2018) ......................................... 19, 20, 23

*Am. Airlines, Inc. v. Wolens*,
    513 U.S. 219 (1995) ................................................................................ 22, 26

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) .................................................................. *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    569 U.S. 641 (2013) ................................................................................ 26

*Am. Trucking Ass'ns, Inc. v. Mich. Pub. Service Comm'n*,
    545 U.S. 429 (2005) ................................................................................ 28

*Am. Trucking Ass'ns, Inc. v. Scheiner*,
    483 U.S. 266 (1987) ................................................................................ 29

*B&O Logistics, Inc. v. Cho*,
    2019 WL 2879876 (C.D. Cal. Apr. 15, 2019) ........................................ 20, 21

*Bedoya v. American Eagle Express Inc.*,
    914 F.3d 812, 824 (3d Cir. 2019) ............................................................ 18

*Buckman Co. v. Plaintiffs' Legal Com.*,
    531 U.S. 341 (2001) ................................................................................ 27

*Cal. Trucking Ass'n v. Su*,
    903 F.3d 953 (9th Cir. 2018) .................................................................. 16, 18, 20, 22

*Chalk v. U.S. District Court* (*Orange Cty. Superin. of Schs.*),
    840 F.2d 701 (9th Cir. 1998) .................................................................. 14, 31

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ................................................................................ 27

*Dilts v. Penske Logistics, LLC*,
    769 F.3d 637 (9th Cir. 2014) .................................................................. 15, 20

*Henry v. Central Freight Lines, Inc.*
    2019 WL 2465330 (E.D. Cal. June 13, 2019) ........................................ 21

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) .................................................................. 32

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

40897341_3.docx

*Mass. Delivery Ass'n v. Healey*,
  821 F.3d 187 (1st Cir. 2016) ..................................................... 17, 26

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ............................................................ 30

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ......................................................... 15, 22, 31

*People v. Zook*,
  336 U.S. 725 (1949) .......................................................................... 28

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) .......................................................................... 28

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005) ............................................................ 32

*Rodde v. Bonta*,
  357 F.3d 988 (9th Cir. 2004) ............................................................ 32

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008) .................................................................*passim*

*Schwann v. FedEx Ground Package System, Inc.*,
  813 F.3d 429, 438 (1st Cir. 2016) ..................................................... 17

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990) ................................................ 30, 31, 32

*Valadez v. CSX Intermodal Terminals, Inc.*,
  2017 WL 1416883 (N.D. Cal. Apr. 10, 2017)................................... 27

*Valadez v. CSX Intermodal Terminals, Inc.*,
  2019 WL 1975460 (N.D. Cal. Mar. 15, 2019) ............................ 20, 23

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .......................................................... 31

*W. States Trucking Ass'n v. Schoorl*,
  377 F. Supp. 3d 1056 (E.D. Cal. 2019) ....................................... 19, 29

**California Cases**

*Dynamex Operations West v. Superior Court*,
  4 Cal. 5th 903 (2018) ...............................................................*passim*

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
  48 Cal. 3d 341 (1989) ..............................................................*passim*

**Other State Cases**

*Chambers v. RDI Logistics, Inc.*,
  476 Mass. 95 (2016) ........................................................... 18, 19, 23

4

40897341_3.docx

*In re Fed. Preemption of Provisions of the Motor Carrier Act,*
  223 Mich. App. 288 (Mich. Ct. App. 1997) ........................................................23

**Federal Statutes**

49 U.S.C. § 14501(c)(1) ............................................................................*passim*

Federal Aviation Act..................................................................................26

Federal Aviation Administration Authorization Act ..........................................8

Motor Carrier Act of 1980 .................................................................9, 10, 14

Pub. L. No. 103-305
  § 601(a)(1)(A)-(B), 108 Stat. 1569, 1605 ...........................................15

79 Stat. 793 ...........................................................................................9

**Other Authorities**

49 C.F.R. § 350 ....................................................................................25

49 C.F.R. § 390.11 ................................................................................25

Assembly Bill 5 ...............................................................................*passim*

Assembly Floor Session (Sept. 11, 2019)...............................................21

Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and
  the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J.
  115, 127 (2008)...............................................................................11

H.R. Conf. Rep. 83 ..............................................................................22

H.R. Rep. 103-677, 1994 U.S.C.C.A.N. 1715.................................13,15, 27

Petition for Determination of Preemption, 83 Fed. Reg. 67,470, 67,479
  (Dec. 28, 2018) ...............................................................................13

U.S. Const., Article VI, § 2..................................................................22

40897341_3.docx

## I.    **INTRODUCTION**

Motor carriers have relied for decades on independent owner-operators to transport cargo and other property throughout the United States. This critical, efficient, and federally recognized component of interstate commerce is threatened by Assembly Bill 5 ("AB-5"), which becomes effective January 1, 2020.[1] Because drivers are not "outside the scope" of a licensed motor carrier's business, AB-5 prohibits motor carriers from using independent contractor drivers. AB-5 mandates that such drivers be treated as employees for purposes of the California Labor Code, wage orders, and Unemployment Insurance Code, significantly impacting motor carriers' operations. AB-5 also imperils the livelihoods of independent owner-operators, the thousands of small business owners who operate their own trucks and who contract with motor carriers to transport property.

The Federal Aviation Administration Authorization Act ("FAAAA") categorically prohibits any state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). The FAAAA preempts AB-5 as applied to motor carriers, both expressly, because AB-5 will significantly affect the prices, routes, and services that motor carriers will offer their customers, and impliedly, because it will frustrate Congress' intent in enacting the FAAAA.

FAAAA preemption of AB-5's blanket prohibition on motor carriers using independent owner-operators to provide trucking services is clear. When a state requires that motor carriers "transition . . . from independent-contractor drivers to employees of each licensed motor carrier," the law is "highly likely to be shown to be preempted" and a preliminary injunction *must* be issued under binding precedent. *Am.*

---

[1] AB-5 expressly codifies and supplants the ABC test set forth in the California Supreme Court's decision in *Dynamex Operations West v. Superior Court*, 4 Cal. 5th 903 (2018). *See* AB-5, § 2 (Lab. Code § 2750.3(a)(1)).

*Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1049, 1056 (9th Cir. 2009) ("*ATA*") (reversing district court's denial of preliminary injunction).[2]

Further, California's ABC test, as codified by AB-5, violates the Dormant Commerce Clause. AB-5 exempts several in-state professions and industries from the ABC test. The law imposes increased burdens on motor carriers engaged in interstate commerce while disproportionately lowering the cost of doing business for intrastate businesses. There is no legitimate justification for the disparate treatment.

Here, as in *ATA*, the enforcement of AB-5 to motor carriers should be enjoined. Plaintiffs are highly likely to succeed on the merits. Both motor carriers and owner-operators will suffer irreparable injury absent a preliminary injunction, and Defendants will not suffer any harm by staying enforcement of an unconstitutional statute. ***The relief Plaintiffs seek is limited.*** Plaintiffs seek to enjoin AB-5 as it applies *to motor carriers and the independent owner-operators only*. The injunction will not prevent the balance of AB-5 from taking effect.

## II.    FACTUAL BACKGROUND

### A.    History Of Deregulation Of The Trucking Industry.

In 1980, Congress passed the Motor Carrier Act ("MCA"), which deregulated interstate trucking so the rates and services offered by licensed motor carriers would be set by the market rather than by government regulation. 79 Stat. 793. In 1994, to bolster deregulation, Congress included within the FAAAA a provision that expressly preempts state regulation of motor carriers. 49 U.S.C. § 14501(c)(1).

The deregulated trucking industry has relied on the owner-operator model for decades. Licensed motor carriers use independent contractors who own and operate

---

[2] The United States Department of Justice opined in *ATA* that an "attempt to shape the labor forces of motor carriers" by interfering with their utilization of independent contractors is precisely "the type of state economic regulation that Congress sought to preempt with the FAAAA." Brief for the United States of America as *Amicus Curiae* in Supp. of Reversal, 2008 WL 5053995, at *8 (Oct. 21, 2008).

their own trucks and transport property. Yadon Decl., ¶¶ 6-11.[3] Developing this system was an *express* goal of deregulation. When he signed the MCA, President Carter stated he was "particularly pleased that the bill will . . . enhance business opportunities *for independent truckers*."[4]

## B. Independent Owner-Operators Are Integral And Essential To An Efficient And Deregulated Trucking Industry.

Motor carriers offer many types of trucking services, including, among other types, conventional trucking, the transport of hazardous materials, refrigerated transportation, flatbed conveyance, intermodal container transport, long-haul shipping, movement of oversized loads, and less-than-truckload shipping. Yadon Decl. ¶ 5.

The majority of motor carriers in California do not own trucks or employ drivers. Rather, they contract with their customers to see that cargo is moved between two points, often crossing state lines. To do that, motor carriers rely on independent truckers (the owner-operators). *Id.* at ¶ 15; Husing Report p. 1.[5]

This owner-operator model is integral and essential to the trucking industry providing effective and efficient services to shippers seeking to transport goods. Demand for shipment of goods fluctuates depending on the season, domestic and international demand, natural disasters, and other factors.[6] Because demand for services fluctuates, sometimes widely, motor carriers—even those who own trucks that are driven by employees—need the ability to contract with owner-operators to satisfy customer demand. The ability to contract with owner-operators enables motor carriers to quickly scale up their operations in times of peak demand, to avoid idling

---

[3] The declarations of Shawn Yadon ("Yadon Decl."), Thomas Odom ("Odom Decl."), Greg Stefflre ("Stefflre Decl."), and John E. Husing, Ph.D. ("Husing Decl.") are filed concurrently with Plaintiffs' Motion.

[4] Motor Carrier Act of 1980: Statement on Signing S. 2245 Into Law, Pub. Papers of Jimmy Carter, May 24-Sept. 26, 1980 at 1266 (emphasis added).

[5] Attached to the Husing Declaration as Exhibit B.

[6] For example, California's sizable agricultural industry has much higher levels of activity during the harvest months (April through October), than during the winter months (December through March). Husing Report pp. 5-6.

40897341_3.docx

equipment and employees during periods of lesser demand, and to offer their customers specialized trucking services at sustainable prices by avoiding costs associated with purchasing and maintaining specialized equipment that is needed only periodically. Yadon Decl. ¶¶ 8-10; Stefflre Decl. ¶ 27; Husing Report pp. 4-10.

The benefits of FAAAA-mandated deregulation accrue to motor carriers and customers, and to owner-operators who typically work for themselves for a period of time to grow their experience and reputation in the industry. Many owner-operators invest in specialized equipment and obtain the skills to operate that equipment efficiently. Owner-operators like plaintiff Thomas Odom decide which motor carriers they will contract with, what loads to accept (often based on whether the rates are favorable), what days to work, and how to perform the services (including the route to take). Owner-operators also bid on jobs that require more than one truck, and then provide those services through subcontractors or their own employee-drivers. Yadon Decl. ¶¶ 12-14; Odom Decl. ¶ 9; Husing Report p. 1. "This freedom of choice is a core characteristic of the independent owner-operator and it is what gives independent owner-operators the chance to grow their business into greater prosperity, possibly more trucks, more drivers, and even their own operating authority down the road."[7]

### C. The Impact Of The ABC Test On The Trucking Industry.

Given the trucking industry's substantial reliance on owner-operators, AB-5 will have significant effects on motor carriers' services, routes, and prices.

### 1. Impact On Services.

Until now, motor carriers could choose between providing services with employee drivers *or* with independent owner-operators. No longer. The ABC prohibits use of independent contractors. Thus, the ABC test directly affects services "by eliminating one of the two primary ways in which these services have been

---

[7] Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115, 127 (2008). For example, plaintiff Thomas Odom built up a business from one truck to ten trucks, and now again operates a single truck, which he owns. Odom Decl. ¶¶ 3-4, 8.

provided." Yadon Decl. ¶ 19.

AB-5 will also constrict services in other ways as motor carriers respond to losing the owner-operator model. Some motor carriers will abandon California altogether (*id.* at ¶ 20), as some already have done.[8] Owner-operator Thomas Odom is already experiencing economic hardship because of motor carriers refusing to contract with California-based truckers. Odom Decl. ¶¶ 7-8, 11-13. Fewer motor carriers means reduced competition, higher prices, and fewer services in the California market.

Some motor carriers will obtain just enough equipment and employee drivers to meet the *average* demand for their particular type of trucking services. This will allow the motor carrier to keep its employees and trucks mostly engaged, but leave it unable to provide additional resources on short notice or deal with peak demand. This will cause services to not be provided, *e.g.*, growers in the Central Valley will face a shortage of refrigerated trucks to preserve and transport perishable goods. Yadon Decl. ¶ 21; Stefflre Decl. ¶ 27; Husing Report p. 6.

To continue providing the full panoply of services, a motor carrier would need to acquire enough trucks and drivers to meet *maximum* demand. This is impossible, since the motor carrier would incur huge costs idling drivers and trucks during periods of lesser demand—costs that would either drive the motor carrier out of business (further shrinking competition) or be passed on to customers (further increasing prices). Yadon Decl. ¶ 22. Even still, the motor carrier could not provide specialized equipment for one-off jobs. *Id.*

Any of these options results in the "significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtail[ed]

---

[8] This has occurred in response to *Dynamex* or in anticipation of AB-5 becoming law. *See, e.g.*, Todd Dills and James Jaillet, *Swift Reportedly Part Of Flight From Owner-Operator Leasing In California*, Overdrive (Feb. 22, 2019), available at https://www.overdriveonline.com/swift-reportedly-part-of-flight-from-owner-operator-leasing-in-california/; Clarissa Hawes, *Trucking Companies Move To Cut Ties With Independent California Drivers As Labor Law Looms*, Freight Waves (Nov. 15, 2019), available at https://www.freightwaves.com/news/california-owner-operators-weigh-options-as-ab5-deadline-looms.

expansion of markets" the FAAAA was intended to eliminate. H.R. Rep. 103-677 at p. 87 (1994) (Conf. Rep.), 1994 U.S.C.C.A.N. 1715, 1759; *see* Stefflre Decl. ¶ 29.

### 2. Impact On Routes.

Requiring motor carriers to treat drivers as employees will also directly affect the routes that motor carriers provide to the public for at least three distinct reasons.

*First*, motor carriers will be obliged to reconfigure routes to ensure that employee drivers can park the trucks legally and safely to take the meal and rest periods mandated by California law. Yadon Decl., ¶ 27; Stefflre Decl. ¶¶ 21-25; Husing Report pp. 13-16. *Second*, motor carriers that contract with owner-operators to provide interstate trucking services originating or terminating in other states will need to reconfigure their routes to arrange for the transfer and movement of cargo by employee drivers within California.[9] Yadon Decl. ¶ 26; Husing Report p. 16. *Third*, motor carriers will consolidate and may eliminate routes to reduce the higher costs of using employee drivers. This will mean fewer routes, and those that remain will need to offset, through increased efficiency and utilization, the decreased productivity, greater fuel consumption, and higher labor and equipment costs from using employee drivers.[10] Yadon Decl. ¶ 25; Stefflre Decl. ¶ 23.

### 3. Impact On Prices.

The prices that a motor carrier charges its customers will also be directly impacted by prohibiting independent contractor owner-operators. Because a motor

---

[9] Alternatively, motor carriers would need to treat independent contractor drivers as employees but *only* while making deliveries in California. For example, despite paying an owner-operator on a per-mile basis for driving throughout the United States, a motor carrier would need to additionally reimburse that owner-operator for any expenses incurred within California, separately pay for all hours worked, ensure meal periods and rest breaks were taken, etc. Yadon Decl. ¶ 26.

[10] The Federal Motor Carrier Safety Administration has recognized the impediments that California's regulations place on motor carriers, noting that the meal period and rest break rules alone "impose significant and substantial costs on interstate commerce] stemming from decreased productivity and administrative burden." California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers; Petition for Determination of Preemption, 83 Fed. Reg. 67,470, 67,479 (Dec. 28, 2018).

carrier incurs significantly more expenses maintaining a fleet of trucks and employee drivers than it does using individual owner-operators driving trucks they own, forcing motor carriers to cease using owner-operators will materially increase motor carriers' costs. Stefflre Decl. ¶¶ 10-17; Husing Report pp. 16-18. Replacing owner-operators with employee drivers would increase the costs to motor carriers by as much as 150% or more. Stefflre Decl. ¶ 17; Husing Report p. 18. These costs will be passed on to customers. For example, if costs associated with an employee-driver model increased a motor carrier's expenses by 150%, "the prices [it] would need to charge customers for trucking services would also increase significantly." Stefflre Decl. ¶ 17; *see also* Husing Report p. 19.

## III. <u>LEGAL STANDARD</u>

"The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. District Court* (*Orange Cty. Superin. of Schs.*), 840 F.2d 701, 704 (9th Cir. 1998). To obtain such relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *ATA*, 559 F.3d at 1052.

## IV. <u>PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS</u>

A preliminary injunction is necessary because Plaintiffs are highly likely to show that the ABC test is preempted through: (1) the FAAAA; (2) implied preemption; and (3) the Dormant Commerce Clause.

### A. <u>The FAAAA's Express Preemption Clause.</u>

Congress passed the MCA in 1980, in part, to reduce and eliminate the significant and inconsistent regulatory burdens that states had imposed on the motor-carrier industry. In 1994, it bolstered the MCA by passing the FAAAA. Recognizing that "[t]he sheer diversity" of state regulatory schemes" posed "a huge problem for national and regional carriers attempting to conduct a standard way of doing business," the FAAAA was intended to eliminate the patchwork of state regulations

that had bogged down the motor carrier industry. *See* H.R. Rep. 103-677, at p. 87, 1994 U.S.C.C.A.N. 1715, 1759. Congress' motivation included a 1993 *California* bill that discriminated against motor carriers "using a large proportion of owner-operators instead of company employees." *Id.*

Congress declared that state regulation of the trucking industry "imposed an unreasonable burden on interstate commerce" and "impeded the free flow of trade, traffic, and transportation of interstate commerce." FAAAA, Pub. L. No. 103-305, § 601(a)(1)(A)-(B), 108 Stat. 1569, 1605. To achieve its goal of replacing the patchwork of state and local regulations with *one* federal standard for motor carriers, Congress included within the FAAAA an express preemption clause. That clause prohibits states from "enact[ing] or enforce[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

The FAAAA's preemption clause was intentionally broad. By decreeing that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier," Congress "express[ed] a broad pre-emptive purpose" because the phrase "related to" is "deliberately expansive" and "conspicuous for its breadth." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–384 (1992) (interpreting identical preemption language in Airline Deregulation Act of 1978 ("ADA")). Thus, the FAAAA preempts any state law that affects motor carrier rates in anything other than a "tenuous, remote, or peripheral [] manner." *Id.* at 390. A law or regulation is "related to" prices, routes, or services if it has *any effect* on them—regardless of whether the "effect is direct or indirect." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 644-645 (9th Cir. 2014) (emphasis added); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008).

FAAAA preemption "occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives," which include ensuring that motor carriers' rates "reflect maximum reliance on competitive market

forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe*, 552 U.S. at 371.

**B.     The ABC Test Affects Motor Carrier Prices, Routes, And Services.**

The impact of California's ABC test on motor carriers is profound and direct. Pursuant to Prong B, a worker is considered an employee, not an independent contractor, unless the hiring entity establishes "that the person performs work that is outside the usual course of the hiring entity's business." AB-5, § 2 (Lab. Code § 2750.3(a)(1)(B)). Thus, the ABC test plainly and unambiguously prohibits the use of independent contractor owner-operators, "because, under the 'ABC' test, a worker providing a service within a motor carrier's course of business will never be considered an independent contractor." *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 964 (9th Cir. 2018) ("*Su*").

As numerous courts have found, the "mandate" imposed by Prong B is preempted by the FAAAA, since it forces motor carriers to utilize *only* employees to transport cargo, significantly affecting the services that a motor carrier provides, the prices of those services, and the routes through which services are accomplished.

**1.     The FAAAA Preempts Prong B Because It Prohibits Motor Carriers From Using Independent Contractors.**

Before *Dynamex*, no California court had applied an ABC test to distinguish between employees and independent contractors for purposes of California labor law. In adopting a new test, the California Supreme Court, and now the Legislature, imported "the Massachusetts version of the ABC test" which "permits the hiring entity to satisfy part B only if it establishes that the work is outside the usual course of the business of the hiring entity." *Dynamex*, 4 Cal.5th at 956 n.23.

Federal Circuit Courts agree that the version of the ABC test adopted in AB-5 is preempted by the FAAAA, because it effectively dictates that a motor carrier's services cannot be performed by independent contractors, which leads to both direct and indirect effects on motor carrier prices, routes, and services. In *Schwann v.*

*FedEx Ground Package System, Inc*., the First Circuit held that Prong B of Massachusetts' ABC test relates to routes and services because it "requires a court to . . . mandate that any services deemed 'usual' to" a motor carrier's "course of business be performed by an employee. Such an application of state law poses a serious potential impediment to the achievement of the FAAAA's objectives because a court, rather than the market participant, would ultimately determine what services that company provides and how it chooses to provide them." 813 F.3d 429, 438 (1st Cir. 2016). The court explained that Prong B's mandated employee relationship necessarily affects routes and services, thus triggering FAAAA preemption:

> [B]ecause Prong 2 would mandate that FedEx classify these individual contractors as employees, FedEx would be required to reimburse them for business-related expenses. ***The logical effect of this requirement would thus preclude FedEx from providing for first-and-last mile pick-up and delivery services through an independent person*** who bears the economic risk associated with any inefficiencies in performance. ***This regulatory prohibition would also logically be expected to have a significant impact on the actual routes followed for the pick-up and delivery of packages*** . . . . It is reasonable to conclude that employees would have a different array of incentives that could render their selection of routes less efficient, undercutting one of Congress's express goals in crafting an express preemption proviso.

*Id*. at 439 (emphases added); *see also Mass. Delivery Ass'n v. Healey*, 821 F.3d 187, 193 (1st Cir. 2016) (holding that application of Massachusetts' Prong B would necessarily "deprive [the motor carrier] of its choice of method of providing for delivery services and incentivizing the persons providing those services").

Like the First Circuit, the Massachusetts Supreme Judicial Court, the state's highest court, agrees that its version of the ABC test is preempted by the FAAAA: Prong B, "in essence, requires that motor carriers providing delivery services . . . use employees rather than independent contractors to deliver those services. As a result, motor carriers are compelled to adopt a different manner of providing services from what they otherwise might choose because prong two dictates the type of worker that will provide the services. This likely also would have a significant, if indirect, impact on motor carriers' services by raising the costs of providing those services."

*Chambers v. RDI Logistics, Inc.*, 476 Mass. 95, 102-103 (2016).

In *Su*, the Ninth Circuit likewise recognized the "***obvious proposition that an 'all or nothing' rule requiring services be performed by certain types of employee drivers . . . [is] likely preempted***" by the FAAAA. *Su*, 903 F.3d at 964 (emphasis added). There, the court distinguished between the traditional *Borello* worker classification test, which it held is not preempted, and the ABC test, which it strongly suggested would be preempted. The court explained that "the 'ABC' test may effectively compel a motor carrier to use employees for certain services because, under the 'ABC' test, a worker providing a service within a motor carrier's course of business will never be considered an independent contractor." *Id*. The Ninth Circuit's suggestion that the ABC test is preempted by the FAAAA follows its *ATA* decision, in which it noted that plans proposed by the Los Angeles-area ports to prohibit motor carriers from using independent contractors were "***highly likely to be shown to be preempted***" by the FAAAA. *ATA*, 559 F.3d at 1056 (emphasis added).

The Third Circuit's recent holding that New Jersey's version of the ABC test is *not* preempted by the FAAAA reinforces the conclusion that the California/ Massachusetts version *is* preempted. In *Bedoya v. American Eagle Express Inc.*, the Third Circuit determined that New Jersey's statutory ABC test is not preempted *precisely because* of its significant differences from the Massachusetts test, which render it less prone to force motor carriers to categorically abandon a business model of utilizing independent contractors. 914 F.3d 812, 824 (3d Cir. 2019). Specifically, Prong B of the New Jersey version of the ABC test provides that a worker is an employee unless she performs work "outside the [employer's] usual course of business . . . ***or [performs such service] outside of all the places of business of [the employer]***." *Id*. (quoting N.J. Stat. Ann. § 43:21-19(i)(6)(B)) (emphasis added).

The *Bedoya* court found the "or" clause critical to its determination. Because there is an "alternative method for reaching independent contractor status—that is, by demonstrating that the worker provides services outside of the putative employer's

'places of business,'" the New Jersey test is "unlike the preempted Massachusetts law at issue in *Schwann*." 914 F.3d at 824.

Prong B of California's test is identical to the preempted Massachusetts test because it does *not* provide for any alternative means of allowing use of an independent contractor driver. *Dynamex*, 4 Cal. 5th at 964; AB-5, § 2 (Lab. Code § 2750.3(a)(1)(B)). Both *Dynamex* and AB-5 prohibit use of independent contractors as drivers. The First Circuit's decisions in *Schwann* and *Healy*, the Massachusetts Supreme Court's holding in *Chambers*, and the Ninth Circuit's guidance in *Su* and *ATA* support preemption. So does the distinction noted in *Bedoya*.

Recognizing this, several federal district courts in California have followed *Schwann*'s lead in holding that Prong B of California's ABC test is preempted. In *Alvarez v. XPO Logistics Cartage LLC*, a Central District of California court found that applying Prong B "would require a court to look at a motor carrier's service, determine that the service is outside the carrier's usual course of business, and then bar the carrier from using workers as independent contractors to perform that service," which "pose[s] a serious potential impediment to the FAAAA's objectives." *Alvarez v. XPO Logistics Cartage LLC*, 2018 WL 6271965, *4 (C.D. Cal. Nov. 15, 2018) (quotations and citation omitted). The court adopted the Ninth Circuit's reasoning in *Su*—that California's "'ABC test may effectively compel a motor carrier to use employees for certain services because, under the ABC test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor.'"[11] *Id.* at *5. Likewise, a judge in the Northern District of

---

[11] A judge in the Eastern District of California came to a contrary conclusion in *W. States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056 (E.D. Cal. 2019). The court's decision, however, dismissed *Schwann* out of hand as out-of-jurisdiction authority, despite the fact that the First Circuit there applied U.S. Supreme Court precedent to a law that was substantively identical to California's ABC test. The court purported to rely on *Su*, which held that the multi-factor *Borello* test, which California had used to distinguish employees from independent contractors prior to *Dynamex*, was not preempted. The Eastern District court's analysis was faulty, though, because *Su* purposefully limited its holding to the specific nature of the *Borello* test, and in fact noted that the analysis under California's ABC test would likely lead to a contrary

40897341_3.docx

California has held that "application of Part B would require carriers to classify all workers who performed trucking work as employees, rather than independent contractors. In light of *Su*, that is impermissible." *Valadez v. CSX Intermodal Terminals, Inc.*, 2019 WL 1975460, *8 (N.D. Cal. Mar. 15, 2019).

> Reviewing the above authorities, a *third* district court concluded that: *Su*, [*ATA*], and *Schwann* collectively establish that the FAAAA preempts a state law that categorically requires a motor carrier to hire employees—and not independent contractors—as drivers. Here, the B prong of *Dynamex's* ABC test would require [the motor carrier] to reclassify [an independent-contractor driver] as an employee for the purposes of California's wage orders (which regulate, *inter alia*, minimum wages, maximum hours, and meal and rest breaks) because [a driver] performs work that is in the usual course of [the motor carrier's] business (*i.e.*, transporting property).

*B&O Logistics, Inc. v. Cho*, 2019 WL 2879876, at *3 (C.D. Cal. Apr. 15, 2019).

This Court should reach the same conclusion. As discussed in *Alvarez*, *Valadez*, and *B&O Logistics*, California cannot adopt a test mandating that motor carriers treat all drivers as employees, thereby prohibiting motor carriers from contracting with owner-operators.

### 2. Prong B Of California's ABC Test Is Preempted Whether Or Not It Is A "Law of General Applicability" (And It Is Not).

The State will likely argue that the ABC test is a "generally applicable" law not subject to preemption by the FAAAA. *Dilts*, 769 F.3d at 644. That argument is unpersuasive for at least two reasons: (1) AB-5 is not a law of general applicability and (2) even laws of general applicability are susceptible to preemption.

*First*, California's ABC test is not a law of general applicability. AB-5 itself exempts from application of the ABC test over a dozen specific professions. For instance, AB-5 exempts from the ABC test: construction contractors, freelance writers, fine artists, grant writers, graphic designers, podiatrists, doctors, dentists,

---

result. *Su*, 903 F.3d at 964. Finally, the court dismissed the preemption claim at the pleadings stage, and without giving the plaintiffs the opportunity to present—as Plaintiffs have done here—evidence illustrating the impact that the ABC test will have on "prices, routes, or services" so as to justify FAAAA preemption.

40897341_3.docx

lawyers, architects, accountants, engineers, insurance agents, investment advisers, hairstylists, barbers, and estheticians. *See* AB 5, § 2(b)-(h).[12]

The legislative history and text of AB-5—including the comments of its sponsor and its narrowly-drafted exemption for *construction* trucking only—demonstrate the *opposite* of a generally applicable law. The ABC test as applied by AB-5 affirmatively *targets* the motor-carrier industry specifically. The author of AB-5 confirmed that AB-5 seeks to eliminate longstanding relationships between motor carriers and owner-operators. *See, e.g.*, Remarks of Assembly Member Lorena Gonzalez, Assembly Floor Session, at 1:08:20-1:08:30 (Sept. 11, 2019) ("And let me talk for one minute ***about trucking*** . . . . We are [] getting rid of an outdated broker model that allows companies to basically make money and set rates for people that they called independent contractors . . . ."); AB-5, § 2 (Lab. Code § 2750.3(e)(8)) (exempting construction trucking businesses but not other motor carriers from ABC test).[13] Assembly Member Gonzalez even boasts that AB-5 seeks to "cure" the perceived evils resulting from federal deregulation, including the trucking industry's "outdated broker model" and use of owner-operators. While the California legislature may view state prohibition of owner-operators as good public policy, it is contrary to what Congress intended when it enacted the FAAAA and AB-5 is therefore "highly likely to be shown to be preempted." *ATA*, 559 F.3d at 1056 (addressing proposed rule prohibiting the use of independent contractors).

And *second*, even if the Court were inclined to conduct a "general applicability" analysis, that does not change the outcome. The Supremacy Clause does not allow

---

[12] The other outlier case finding California's ABC test not preempted by the FAAAA, *Henry v. Central Freight Lines, Inc.*, was wrongly decided and is distinguishable on these grounds. 2019 WL 2465330 (E.D. Cal. June 13, 2019). Specifically, the court in *Henry* concluded that the ABC test established in *Dynamex* was a "general classification test." *Id.* at *7. This logic does not apply to the ABC test codified through AB-5, with its more than twenty enumerated exceptions.
[13] Available at https://www.assembly.ca.gov/media/assembly-floor-session-20190911/video.

40897341_3.docx

states to supersede federal law if they do so "generally." *See* U.S. Const., art. VI, § 2 ("This Constitution, and the laws of the United States . . . shall be the supreme law of the land."). Faced with the preemption clause of the ADA,[14] the Supreme Court rejected the notion that "the ADA imposes no constraints on laws of general applicability," finding "irrational" the idea that "state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute." *Morales*, 504 U.S. at 386; *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 227–28 (1995) (finding that Illinois statute of general applicability was preempted by the ADA).

The Ninth Circuit is in accord, recognizing that a law's "general applicability is not dispositive" of the preemption question under the FAAAA. *Su*, 903 F.3d at 966. "What matters is . . . where in the chain of a motor carriers' business [the state] is acting to compel a certain result (*e.g.*, consumer or workforce) and what result it is compelling (*e.g.*, a certain wage, non-discrimination, a specific system of delivery, a specific person to perform the delivery)." *Id*. Because AB-5 "require[es] services be performed by certain types of employee drivers" and is "motivated by a State's own . . . goals" (*id*. at 964) to eliminate what it deems an outdated broker model, it is preempted even if is a law of "general applicability."

### 3.    The Effect Of The ABC Test On Prices, Routes, And Services.

The FAAAA preempts state laws having a significant impact on motor carriers' "prices, routes, or services." 49 U.S.C. § 14501(c)(1). Because the express preemption clause is worded in the disjunctive, Plaintiffs need show only a likelihood that the ABC test will have a more than tenuous impact on motor carriers' "services" *or* "routes" *or* "prices." Here, Plaintiffs are likely to establish all three.

---

[14] The FAAAA's preemption provision was modeled after—and is interpreted identically to—the ADA's preemption provision. *See Rowe*, 552 U.S. at 370 (when drafting § 14501(c), Congress "copied the language of the air-carrier pre-emption provision of the [ADA]"); *Schwann*, 813 F.3d at 436 ("FAAAA preemption is . . . informed by interpretations of ADA preemption"); H.R. Conf. Rep. 83.

20

Case No. 3:18-cv-02458-BEN-BLM
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Courts have regularly concluded that § 14501(c)(1) preempts any state requirement mandating the use of employee drivers. That is because "motor carriers are compelled to adopt a different manner of providing ***services*** from what they otherwise might choose . . . ." *Chambers*, 476 Mass. at 102-103 (emphasis added). Because of the "logical effect" of the ABC test on prices, routes, and services, the "impact need not b[e] proven by empirical evidence." *Schwann,* 813 F.3d at 437.

For example, after Michigan passed a provision requiring that motor carriers use employees "at all times" when operating vehicles in certain situations, the impact on services was "clear" to a state appellate court:

> [C]arriers operating in interstate commerce and using independent contractors as drivers have to make special arrangements to operate intrastate traffic in Michigan. A carrier handling traffic from a point outside Michigan to a point inside Michigan could not use the same vehicle (or at least not the same independent contractor as a driver) to transport property wholly within Michigan as part of a return trip. **Thus it is clear that [the statute] affects routes and services and most probably affects prices.**

*In re Fed. Preemption of Provisions of the Motor Carrier Act*, 223 Mich. App. 288, 308-309 (Mich. Ct. App. 1997) (emphasis added).

The Ninth Circuit has observed it "can hardly be doubted" that requiring motor carriers to use employees instead of independent-contractor drivers "relate[s] to prices, routes or services of motor carriers." *ATA*, 559 F.3d at 1053. Other courts have found the ABC test preempted *as a matter of law. See, e.g., Alvarez*, 2018 WL 6271965, at *5 (granting motion for judgment on the pleadings); *Valadez*, 2019 WL 1975460, at *8 (finding ABC test was preempted at the summary judgment stage).

Thus, the ABC test necessarily affects motor carriers' operations, including the manner in which they provide services. Based on the "logical effect" of the ABC test alone, Plaintiffs are entitled to a preliminary injunction.

(b)    Plaintiffs Have Shown The Impact Of The ABC Test On Prices, Routes, And Services.

The evidence accompanying this Motion establishes the negative effects that adoption of the ABC test will have—and is *already* having—on motor carriers' operations. While not intended to be exhaustive, the evidence at this preliminary stage illustrates the impact on prices, routes, and services:

- **Services:** AB-5 will significantly affect the services that motor carriers provide to their customers. If motor carriers cannot use independent contractors to provide trucking services, they cannot provide the services of certain trucks, trailers, drivers, and equipment, because it is cost-prohibitive for motor carriers to acquire every possible type of truck, trailer, and equipment that might be needed, especially those that are only utilized occasionally. Instead, motor carriers will need to scale back their service offerings to only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand. Yadon Decl. ¶ 23; Stefflre Decl. ¶ 28; Husing Report pp. 5-9.

- **Routes:** Effectively prohibiting motor carriers from contracting with individual owner-operators directly affects the routes that a motor carrier must use when providing services to its customers. Because of the ABC test, motor carriers will be required to reconfigure routes to ensure that drivers can legally and safely park the trucks to take the meal and rest periods mandated under California law; and they must reconfigure and possibly consolidate routes to minimize the effect of the higher fixed costs associated with owning vehicles and using employee drivers. Yadon Decl. ¶¶ 25-27; Stefflre Decl. ¶¶ 21-24; Husing Report pp. 13-16.

- **Prices:** Because a motor carrier incurs significantly more expenses maintaining a fleet of trucks and employee drivers than it does using individual owner-operators driving trucks that they own, forcing motor carriers to hire employees rather than contracting with independent contractors will materially increase motor carriers' costs. Further, because the demand for trucking services is

relatively inelastic, "[i]f motor carriers are required to exclusively provide services using employee drivers, the associated costs will be passed on directly to customers. . . ." Stefflre Decl. ¶ 17; Yadon Decl. ¶ 39; Husing Report pp. 16-19.

### 4. AB-5's Harmful Effect Are Not Mitigated By The "Business-To-Business" Exception.

The State may argue that the ABC test does not bar *all* independent contractors, since there is an exception for a "*bona fide* business-to-business contracting relationship" (the "B-to-B" exception). AB-5, § 2 (Lab. Code § 2750.3(e)). The B-to-B exception is a red herring. The exception was not intended to apply to motor carriers and does not obviate AB-5's impact on interstate commerce.

*First*, the B-to-B exception requires an independent contractor to satisfy *twelve* separate criteria, several of which cannot be met by motor carriers. AB-5, § 2 (Lab. Code § 2750.3(e)(1)(A)-(L)); Yadon Decl., ¶¶ 28-35.[15]

*Second*, the B-to-B exception is not available to motor carriers which contract with individual owner-operators. The exception "does not apply to an individual worker . . . who performs labor or services for a contracting business." AB-5, § 2 (Lab. Code § 2750.3(e)(2)).

*Third*, Assembly Member Gonzalez's comments that AB-5 would "get[] rid of an outdated broker model" confirm that motor carriers cannot rely on the B-to-B exception.[16] This is reinforced by the twelve criteria, including that the owner-

---

[15] For example, the B-to-B exception includes requirements that a contractor be free from "control" and "actually contracts with other businesses to provide the same or similar services and maintains a clientele *without restriction from the hiring entity*." AB-5, § 2(e)(1)(A) and (G). Such criteria are all but certain to conflict with federal safety regulation requirements. In complying with the Federal Motor Carrier Safety Administration Regulations ("FMCSRs") regarding equipment and driver safety, a motor carrier must exercise control to the extent the regulations command and the driver must accept such control. 49 C.F.R. § 390.11. This includes control related to licensure, equipment, registration, substance abuse, and hours of service. 49 C.F.R. § 350 *et seq.* In short, federal law expressly permits—and in fact requires—for safety purposes that a motor carrier exercise a degree of control, even under circumstances in which the owner-operator uses that vehicle to provide services to another motor carrier.

[16] *See also* Yadon Decl. ¶¶ 16-18 (no "exemption for the trucking industry was

operator "provid[e] services *directly to the contracting business* rather than to customers of the contracting business." AB-5, § 2 (Lab. Code § 2750.3(e)(1)(B)) (emphasis added). Under existing law, owner-operators can provide services directly to customers, including situations where a motor carrier arranges for an owner-operator to pick up or deliver goods at a customer's location. Thus, the *express* language of the B-to-B exception restricts the "services" that a motor carrier can "provide" with an owner-operator.

Ultimately, the B-to-B exception—with its many strictures—is unavailable to motor carriers and reinforces the conclusion that courts have reached in finding the ABC test is preempted. *See, e.g., Healey,* 821 F.3d at 193 (preemption shown where ABC test would "deprive [the motor carrier] of its choice of method of providing for delivery services and incentivizing the persons providing those services").[17]

## C.    The ABC Test Is Preempted By The FAAAA Through Implied Preemption.

In addition to being expressly preempted by Section 14501(c)(1) of the FAAAA, California's ABC test is impliedly preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *Valadez v. CSX Intermodal Terminals, Inc.*, 2017 WL 1416883, at *10 (N.D. Cal. Apr. 10, 2017) (finding California law preempted where it would conflict with regulations that "expressly contemplate" the availability of certain terms of the lessor-lessee relationship in motor carrier-independent contractor relationships).[18]

---

included in the final [AB-5] bill, despite [CTA's] ongoing and intense efforts to secure one").

[17] The Supreme Court has held that a variety of requirements are preempted under the FAAAA or the statute upon which it is modeled, the Federal Aviation Act. *See, e.g., Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013) (parking requirements preempted); *Rowe*, 552 U.S. at 372 (requirements imposed on shippers that were likely to trickle down to motor carriers preempted); *Wolens*, 513 U.S. at 228 (consumer fraud act preempted).

[18] "[N]either an express pre-emption provision nor a saving clause 'bar[s] the

The "overarching goal" of the FAAAA was "helping ensure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 378).

As with the state law in *Rowe*, which would "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)," the ABC test "produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Rowe*, 552 U.S. at 372. In other words, through the ABC test, the state controls how services are provided, instead of allowing that choice to flow from "competitive market forces," as Congress directed.

Likewise, allowing a "patchwork" of differing state regulations to flourish runs counter to Congress' goals in enacting the FAAAA and presents "a huge problem for national and regional carriers attempting to conduct a standard way of doing business." H.R. Rep. 103-677, at p. 87, 1994 U.S.C.C.A.N. 1715, 1759. Permitting California's unusually restrictive worker classification test to apply to the trucking industry could require a motor carrier contracting with a truck driver to classify that person as an employee for California's purposes but as an independent contractor for other states' purposes. "This relatively novel aspect of Prong [B] runs counter to Congress's purpose to avoid 'a patchwork of state service-determining laws, rules, and regulations' that it determined were better left to the competitive marketplace." *Schwann*, 813 F.3d at 438 (quoting *Rowe*, 552 U.S. at 373). Because the ABC test is a barrier to Congress' objectives in enacting the FAAAA, it is impliedly preempted.

---

ordinary working of conflict preemption principles.'" *Buckman Co. v. Plaintiffs' Legal Com.*, 531 U.S. 341, 352 (2001) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)). Thus, even if the Court does not find that the FAAAA expressly preempts the ABC test, it still may find that the test is preempted because it impedes Congress' objectives.

40897341_3.docx

# V. THE DORMANT COMMERCE CLAUSE PREEMPTS THE ABC TEST

While the Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States," the Dormant Commerce Clause restricts "a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Service Comm'n*, 545 U.S. 429, 433 (2005). Under the Dormant Commerce Clause, a law is invalid if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

"[T]he familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, state action is struck down, if the activity is one of predominantly local interest, state action is sustained." *People v. Zook*, 336 U.S. 725, 728 (1949). Given the FAAAA's explicit goal of removing burdensome state regulations on motor carriers, trucking is an area "thought" by Congress "to demand a uniform national rule."

Here, the ABC test imposes excessive burdens on motor carriers. To comply with AB-5, motor carriers must overhaul their business, including abandoning the efficient, effective, and federally recognized use of owner-operators to transport the nation's freight. Sometimes, motor carriers will no longer offer the same range of services as before to customers seeking to transport cargo into or out of California, or charging higher prices to do so. In other cases, motor carriers will be forced to abandon the California market entirely—thus introducing the very chilling effect on interstate commerce that the FAAAA prevented by prohibiting disparate regulation of the industry by different states. *See Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 286-287 (1987) (finding a "forbidden impact on interstate commerce" where an anomalous state trucking regulation "exert[ed] an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States'").

40897341_3.docx

AB-5's numerous exemptions also support preemption under the Dormant Commerce Clause. AB-5's exemptions undercut the putative state interest in an ABC test, which "presumptively considers *all workers* to be employees" unless the three prongs are met. *Dynamex*, 4 Cal.5th at 955 (emphasis added). By exempting so many categories of California workers, AB-5 does not actually serve this goal.

Because AB-5's exemptions benefit intrastate businesses and professions, the statute's imposition of the ABC test disproportionately burdens interstate businesses. Many exemptions are afforded to individuals licensed by the State of California, such as doctors, lawyers, and real estate agents. AB-5, § 2 (Lab. Code § 2750.3(b)(1-3) and (d)(1)). AB-5 also carves out the construction industry—including "construction trucking services"—thus protecting the inherently domestic activity of licensed construction contractors. AB-5 does not similarly protect motor carriers engaged in *interstate* business; rather, as Assembly Member Gonzalez's comments clarify, AB-5 improperly targets the motor carriers' reliance on a purported "outdated broker model" that depends on owner-operators.

Thus, by exempting *intrastate* businesses and applying the more stringent ABC test to interstate businesses like motor carriers, AB-5 imposes an excessive and disproportionate burden on those businesses. *Cf. WSTA*, 377 F. Supp. 3d at 1073-1074 (finding *Dynamex*'s ABC test permissible under the Commerce Clause because it "treat[s] in-state and out-of-state residents equally" by applying the same test to all workers operating in the state—unlike AB-5's version of the test).

In addition, AB-5 magnifies the ABC test's burden on interstate commerce far beyond the burden inflicted by *Dynamex* alone. *Dynamex* applied the ABC test as only one of three tests for employment status under California's wage orders only. Significantly, AB-5's version of the test establishes a *single* test, unless exempted under AB-5, for employment status under the California Labor Code, the wage orders and the California Unemployment Insurance Code. AB 5, § 2(a). Thus, AB-5's effects on interstate commerce even more greatly outweigh the putative local

40897341_3.docx

benefits of the law.

## VI. THE REMAINING PRELIMINARY INJUNCTION ARE MET

### A. Plaintiffs Will Suffer Irreparable Harm If The Court Denies Relief.

If this Court concludes that Plaintiffs are likely to succeed on one or more of their claims, the remaining preliminary injunction factors follow readily. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  These constitutional violations include through the FAAAA, since AB-5 "would cause irreparable injury by depriving [motor carriers] of a federally created right to have only one regulator in matters pertaining to rates, routes and services." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), *aff'd in part, rev'd in part sub nom.*, *Morales*, 504 U.S. 374 (1992).

The harms, however, extend far beyond constitutional violations. Plaintiff and owner-operator Thomas Odom describes the loss of his chosen profession, including no longer being able to contract with motor carriers "as I have done for decades" and "immediate financial harm to me because I will be obligated to continue incurring costs directly related to owning, storing, and maintaining my truck but I will not be able to use my truck in California to earn a living." Odom Decl. ¶ 11.

The actual harms extend to motor carriers too. If they wish to continue offering the same services to their customers using only employee drivers, motor carriers must acquire trucks, hire and train employees, and establish the administrative infrastructure to comply with AB-5. Motor carriers failing to do so face will either cease providing the services they have until now provided or face a significant risk of civil and criminal liability. *See* Yadon Decl. ¶¶ 36-40; Stefflre Decl. ¶ 29.

The Supreme Court and Ninth Circuit recognize this circumstance presents a "Hobson's choice" that necessitates immediate injunctive relief: motor carriers can either "continually violate the law and expose themselves to a potentially huge

40897341_3.docx

liability; or violate the law once and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381; *ATA*, 559 F.3d at 1057-1058 ("imminent harm" exists where motor carrier can either submit to a constitutional violation or "be forced to incur large costs which . . . will disrupt and change the whole nature of its business"). "Therefore, there is a likelihood of irreparable damages in this case." *ATA*, 559 F.3d at 1059.

Because of the prospect of these irreparable injuries, the need to "preserve the status quo pending a determination of the action on the merits"—the fundamental purpose of a preliminary injunction—is strong. *Chalk*, 840 F.2d at 704.

**B.** **The Balance Of The Equities Tips Sharply In Plaintiffs' Favor.**

The next factor considers "the balance of hardships between the parties." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011).

In contrast to Plaintiffs' many injuries, the State will suffer no harm from a preliminary injunction. "Since Congress expressly preempted this area of regulation, the states are not injured by the injunction." *Mattox*, 897 F.2d at 784; *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law.") (citations omitted). But even absent the constitutional command, the balance of harms tips in Plaintiffs' favor. While the State may cite the supposed harms from the misclassification of workers as independent contractors, California can *already* enforce its existing laws and penalize law-breakers through the long-standing test in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989). AB-5 *reaffirms* that the *Borello* test remains appropriate for determining whether many workers are properly classified, including for professions that fall within one of the bill's numerous carve-outs. *See, e.g.*, AB-5, § 1 (observing that the bill "would instead provide that these occupations are governed by *Borello*"). Thus, a preliminary injunction would simply put motor carriers and owner-operators *on the same footing* as the many professions and industries which secured express

exemptions in AB-5 from complying with the ABC test.

The balance of equities also favors litigants who seek only "to preserve, rather than alter, the status quo while they litigate the merits of th[eir] action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). Granting the relief sought will merely maintain the status quo while the case moves forward, which further "strengthens [Plaintiffs'] position" in the analysis of the equitable injunction factors. *Id.*

## C. Granting Preliminary Injunctive Relief Is In The Public Interest.

For similar reasons, granting preliminary injunctive relief before AB-5 takes effect on January 1, 2020, is plainly in the public interest. When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] *sharply* in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). Here, Plaintiffs seek to vindicate their rights under the Constitution. As the Ninth Circuit has clarified, "*all citizens* have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (emphasis added). Indeed, "Congress has declared that it is in the public interest" to avoid having businesses "subjected to the demands and criteria of numerous legislatures rather than being required to comply only with federal laws and regulations." *Mattox*, 897 F.2d at 784. The public interest tips sharply in Plaintiffs' favor. *Klein*, 584 F.3d at 1208.

## VII. CONCLUSION

Plaintiffs request that their Motion for Preliminary Injunction be granted.

DATED: December 2, 2019       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ Alexander M. Chemers
     Alexander M. Chemers
Attorneys for Plaintiffs RAVINDER SINGH, THOMAS ODOM, and CALIFORNIA TRUCKING ASSOCIATION

40897341_3.docx