SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA 92122
Telephone: 858.652.3100
Facsimile: 858.652.3101

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

Attorneys for Plaintiffs
RAVINDER SINGH, THOMAS ODOM and
CALIFORNIA TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department,<br><br>Defendants. | Case No. 3:18-cv-02458-BEN-BLM<br><br>**DECLARATION OF GREG P. STEFFLRE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 30, 2019<br>Time: 10:30 a.m.<br>Place: Courtroom 5A<br><br>Complaint Filed: October 25, 2018<br>Trial Date: None<br>District Judge: Hon. Roger T. Benitez<br>   Courtroom 5A, 221 W. Broadway, San Diego<br>Magistrate Judge: Hon. Barbara L. Major<br>   11th Floor, 333 W. Broadway, San Diego |

# DECLARATION OF GREG P. STEFFLRE

I, Greg P. Stefflre, declare as follows:

1. I am an officer for Rail Delivery Services, Incorporated ("RDS"), a motor carrier member of the California Trucking Association ("CTA"). I have firsthand and personal knowledge of the facts set forth in this declaration and if called to testify regarding them, I could and would do so competently and under oath.

2. I have been a lawyer since 1971 and practiced for thirty years, mostly in transportation law, before joining RDS. I have been vice-chairman of the Intermodal Policy Committee of the American Trucking Associations ("ATA"), the 1989-90 Chairman of ATA's Intermodal Council, a board member of ATA's Intermodal Conference, and a member of ATA's Policy & Finance Committee. I was vice-chairman of the California Trucking Association's Intermodal Steering Committee. I served on the board of the Intermodal Association of North America ("IANA") from 1991-97 and chaired IANA's By-Laws and Strategic Planning committees. I also chaired the Language Committee of IANA's Uniform Intermodal Interchange Agreement and served for twenty years on the Executive Committee for the Uniform Intermodal Interchange and Facilities Access Agreement. I have also served on Transportation Research Board committees and on the Goods Movement Advisory Committee of the Southern California Association of Governments.

## BACKGROUND ON RAIL DELIVERY SERVICE

3. RDS started in 1981 when federal motor carrier entry requirements were in the process of ending and filed rates were ended in favor of marketplace competition. At the same time, "intermodal" transportation was completing an administrative deregulation process that created a new business model for motor carriers to enter.

4. In the traditional trucking company model, there is a significant capital investment in trucks and trailers and the expense of hiring and supervising employee

drivers. The use of single truck owner-operators provided emerging companies the opportunity to expand without major capital investment thus enhancing their competitive strengths compared to traditional trucking companies burdened by large equipment investments and employee drivers.

5. From its first six contractors in 1981 until growing to a fleet of about fifty in 2008, each driver RDS contracted was a tractor-owning, experienced independent contractor. During that twenty-seven year period, RDS never owned a road-tractor or hired an employee driver to operate it. We did use employee drivers in company owned yard-spotters as discussed in paragraph 7(d) to operate off the road in distribution facilities.

6. RDS was founded on the principle of providing a good environment that is attractive to truck drivers. For that reason, some RDS drivers have worked as owner-operators for more than twenty years. Of course, some drivers join and are under contract for only a few weeks before they leave. Drivers come and go at their discretion, joining RDS as owner-operators and then leaving only to return later.

7. RDS today operates the following divisions: Intermodal, Cross-Dock, Dedicated, and Yard Management.

(a) The Intermodal Division is limited to southern California railroad ramps in Los Angeles, Long Beach, City of Industry, and San Bernardino. This division operates Monday to Friday, twenty-four hours and Saturday and Sunday for about eight hours per day. Owner-operators provide tractors and move containers on chassis owned by railroads and others between rail facilities and shippers and receivers. They also are utilized in the delivery of loads and empty containers on chassis to RDS facilities.

(b) The Cross-Dock Division does freight consolidation using both owner-operators with their own tractors and leased drivers (employed by agencies) in tractors leased by RDS. It is a weekday operation only, from 6:00 am to 6:00 pm. The use of leased drivers in this division was occasioned by the fact that owner-

operators found certain freight unprofitable and declined these loads so we chose agency-based employee drivers who could not decline loads to meet our customer's needs.  This resulted in higher costs and lower productivity but allowed us to meet our customer's overall requirements.

(c) The Dedicated Division consists of owner-operators performing local and regional delivery of retail goods between a retailer's distribution center to its retail stores in California, Nevada, and Arizona, Monday to Friday which often has drivers working outside of California for the majority of their trips.  That exposes them to the quandary of attempting to follow California's meal and rest breaks while in California, Nevada's when in that state and being left with just the federal regime while in Arizona which does not mandate meal and rest breaks by statute.

(d) Yard Management consists of drivers working at customer facilities operating yard spotters to rearrange trailers and containers on chassis in the customer facility.  All our drivers in this division are employees.  This is a Monday to Friday, 10-hour per day operation for one customer and a Saturday and Sunday two-shift operation for the other customer.  The work consists of frequent movement of loaded and empty road trailers and containers from and to loading and unloading doors at warehouses on tight receiving and shipping schedules under constant supervision.  In these assignments much effort is spent on increasing speed and productivity.

8. Our owner-operators have always been free to move between divisions and to "mix and match" among divisions, as well as to contract with other motor carriers if they so choose.  Owner-operators frequently work for multiple divisions at one time where there is an insufficient amount of freight to fill out a day in their principal division or where they want to drive longer or shorter distances.  Owner-operators who work for Dedicated or Cross-dock Monday to Friday have also moved to Intermodal to take advantage of weekend work.

## COMPARING EMPLOYEE FLEETS TO OWNER-OPERATOR FLEETS

9.  In the trucking industry, owner-operators amount to a form of risk-sharing between the motor carrier and its fleet. In exchange for rates that cover the costs of capitalizing, operating, and replacing equipment, the owner-operator bets that he can use his skills to transfer some of those costs to profit. In turn, the motor carrier pays higher rates than it would to an employee to avoid the risk of owning and maintaining the tractors. The relationship is mutually beneficial.

10.  Motor carriers incur significantly more expenses maintaining a fleet of company-owned trucks and employee drivers than they do using individual owner-operators who acquire, drive, maintain, and replace their own trucks.

11.  In my decades in observing and participating in the trucking business I have realized that, unlike the average employee driver, owner-operators take better care of their vehicles, exercise more preventative maintenance, and are far more motivated to work harder and smarter than employee drivers because their form of compensation—primarily by the job—rewards increased productivity.

12.  There are many reasons for the increased costs associated with employee drivers. One is that employee drivers have little motivation to report truck issues requiring preventative maintenance since if their truck fails, the motor carrier provides a replacement at no cost to the driver. In contrast, owner-operators own one truck. If it goes out of service, they cease receiving income until it can be returned to service. They can't work unless they rent a replacement truck, which is an unplanned and sometimes prohibitive cost. Owner-operators are thus far more motivated to keep their trucks in peak operating condition thereby improving their utility, increasing their capacity and offering expanding opportunity for profit.

13.  In addition, motor carriers with employee fleets must size their fleet in anticipation of trucks going down so, instead of one truck per driver, it is normally 1.25 to 1.5 trucks per driver. That alone makes the cost of an employee-based fleet significantly greater than owner-operators.

14. Beyond observing owner-operators' compliance with federal and state safety regulations, motor carriers do not manage owner-operators in the performance of their tasks while employee drivers have to be trained, retrained, disciplined, and directly observed as to how they follow company rules both generally and while on the road. Observation and rule enforcement require a layer of employee supervisors and managers adding expense not present in the owner-operator model.

15. Employee fleets materially increase motor carriers' costs above those of owner-operator fleets. Just the cost of worker's compensation insurance can add 15% to 20% to the cost of labor. The cost of purchasing or leasing an entire fleet of trucks may be beyond the reach of many smaller motor carriers resulting in some will being put out of business thereby reducing competition.

16. As a result of these and other factors, it is more expensive for a motor carrier to use employees to operate commercial trucks both due to the capitalization of the vehicles and the associated costs of operation, maintenance and in the recruiting, training, equipping and management of employee drivers.

17. If motor carriers are required to exclusively provide services using employee drivers, the associated costs will be passed on directly to customers because of the low profit margins in this industry. For example, if moving from an owner-operator model to an employee driver model increased RDS's expenses by 150% (and I expect the actual increase would be higher), the prices RDS would need to charge customers for trucking services would also increase significantly. Based on my experience with customers needing to move their freight, customers will bear the increased prices, particularly where the increases are applied throughout the industry.

18. As a practical matter, I expect that many motor carriers will not be able to convert to an employee-only driver model. This includes the significant costs that a motor carrier will incur buying a fleet of trucks (each of which can cost in excess of $100,000), to replace the vehicles previously supplied by owner operators. As a result, these motor carriers will cease operating, with reduced competition for

trucking services also serving to increase the costs of motor carriers' services.

19. Because they are operating in interstate commerce, owner-operators are expected to follow the Hours of Service requirements established by the federal Department of Transportation ("DOT"). These federal regulations create strict limits on the number of hours that owner-operators can work (both driving and non-driving) in a day and in a week. Drivers are limited to a maximum of 14 hours of driving and non-driving work in a day and 60 hours in a seven-day period or 70 in an eight-day period.

20. Much more restrictive rules apply to employee drivers under California law. This includes the requirement of "off-duty" meal periods lasting at least 30 minutes within the first five hours of work, a second meal period within the first ten hours of work, and rest breaks lasting at least 10 minutes for every four hours worked or major fraction.

21. Employee status affects routes because employee-related requirements such as California meal periods and rest breaks will force motor carriers to select often impractical routes so that drivers are better positioned to find safe parking to facilitate mandatory meal periods and rest breaks.

22. Safe parking for the large commercial motor vehicles ("CMVs") operated by drivers is not easy to find in southern California. Many California cities have enacted municipal ordinances that limit the times of CMV operation as well as which public roads may be transited. Likewise, it is normal for California cities to have strict truck parking limitations further exacerbating the shortage of available parking space.

23. Thus, to comply with California's meal period and rest breaks rules a motor carrier will have to engage in a protracted routing analysis of safe and legal routes rather than simply routing by the shortest possible legal route—which is today the process followed by motor carriers and owner-operators alike.

24. Routing in this manner increases the distance traveled which extends the

time required to make the appointment which lowers the number of deliveries that a truck can make in a legal workday. This will be the inevitable result of mandating a California-style meal period and rest break requirement on all drivers.

25. I submitted comments to the Federal Motor Carrier Safety Administration in connection with a Petition before it in which the FMCSA ultimately determined that its hours-of-service regulations preempted California's meal and rest break statutes[1]. Among other things, my comments explained the adverse economic effect on our company of being required to follow the California rule as follows:

> "We operate 120 trucks. The California rule would add 80 minutes of non-productive time to each on-duty cycle. Thus, each day we would lose 160 hours of productive time. That roughly translates to one to three less moves for each driver each day. Over a single year, adhering to California meal and rest breaks would cause our company to lose nearly 48,000 on-duty productive hours with the consequential negative effect on interstate commerce. We consider a CMV and driver to be a $100 per hour asset. Thus, the lost productive time would amount to $4,800,000. Of course, we would lose far more because of our resultant inability to deliver to our customer's schedules."

26. These factors also affect the availability of services. It is probable that many mandatory new routings are not feasible for some shipments and those services will be eliminated. Motor carriers and owner-operators accept shipments based on the rate paid, the compatibility with other pending shipments, and the resulting productivity.

27. Compelling the use of employees also affects services. The use of owner-operators permits expansion in times of plenty and contraction during shortages in business. Employee driver fleets cannot expand and contract as easily and certainly not as inexpensively as independent contractor fleets. To use employee drivers, one needs to acquire trucks. Even if leased, such leases require fixed terms

---

[1] California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers; Petition for Determination of Preemption, 83 Fed. Reg. 67,470 (Dec. 28, 2018).

when establishing price so the size of the fleet cannot be lowered without incurring penalties.  In owned fleets, the unused tractors become a completely non-productive asset and a drain on profitability.  Owner-operator fleets can relatively easily expand and contract.  When existing business goes to a competitor, the owner-operators working with the incumbent simply move to the successful bidder eliminating the drain that would occur with an employee fleet.  These factors will negatively impact RDS's services to its customers as well.

28. Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently.  Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies.  Therefore, an owner-operator fleet by definition consists of a variety of specialists who can bring on their specialized equipment as needed and, when the need abates, the owner-operator can move to another motor carrier where the equipment is needed.  In contrast, employee fleets cannot keep infrequently used, specialized equipment on hand because of the capital costs associated with acquiring this equipment.  As a result, employee-based motor carriers will be unable to offer services requiring such equipment—services currently available through owner-operator based motor carriers.

29. I have reviewed the Declaration of John Husing, Ph. D. filed concurrently, and I agree with the factual basis of his opinion.  Prong B of the ABC test will have a devastating effect on California's economy; individual owner-operators and the motor carriers employing their services.  RDS will have to restrict its services, re-plan its service areas, increase its capital base by millions of dollars to acquire trucks; acquire or lease additional facilities to park and maintain the large fleet we will need; hire additional supervisory staff to manage employee drivers and increase the rates that we charge our existing customers to a point where we will see

/ / /

/ / /

many leave us. Our productivity will decrease, and our competitiveness and our gross and net revenues will drop.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration was executed on this 27th day of November, 2019, at Fontana, California.

_____
Greg Stefflre

40892522.1