SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA 92122
Telephone: 858.652.3100
Facsimile: 858.652.3101

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

Attorneys for Plaintiffs
RAVINDER SINGH, THOMAS ODOM and
CALIFORNIA TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department,<br><br>Defendants. | Case No. 3:18-cv-02458-BEN-BLM<br><br>**DECLARATION OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 30, 2019<br>Time: 10:30 a.m.<br>Place: Courtroom 5A<br><br>Complaint Filed: October 25, 2018<br>Trial Date: None<br>District Judge: Hon. Roger T. Benitez<br>Courtroom 5A, 221 W. Broadway, San Diego<br>Magistrate Judge: Hon. Barbara L. Major<br>11th Floor, 333 W. Broadway, San Diego |

40849365_2.docx

# DECLARATION OF SHAWN YADON

I, Shawn Yadon, declare as follows:

1.      I am the Chief Executive Officer for the California Trucking Association ("CTA"), a plaintiff in the above-referenced matter.  I have firsthand and personal knowledge of the facts set forth in this declaration and if called to testify regarding them, I could and would do so competently and under oath.

2.      I have worked in Government Affairs for nearly 30 years, with much of that experience in the transportation industry, starting with FedEx in 1989.  I have been the CEO of the CTA since January 2014, and I have also served as the Chairman of the Board of Directors of Trucking Proud, Inc. since February 2019.

## BACKGROUND REGARDING CTA AND ITS MOTOR-CARRIER MEMBERS

3.      CTA is an industry trade association devoted to advancing the interests of its motor-carrier members who provide transportation services in California.  It is one of the largest transportation associations in California.  CTA promotes advocacy, safety, and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members operating in California.

4.      CTA members include licensed motor-carrier companies that manage, coordinate, and schedule the movement of property throughout California in interstate commerce through so-called "motor contract carrier permits" issued by the Federal Motor Carrier Safety Administration ("FMCSA"), a division of the U.S. Department of Transportation ("DOT")

5.      These motor carriers offer many types of trucking services including, but not limited to, conventional trucking, the transport of hazardous materials, refrigerated transportation, flatbed conveyance, intermodal container transport, long-haul shipping, movement of oversized loads, dedicated trucking, less-than-truckload shipping, and dump-truck haulage

/ / /

/ / /

## THE OWNER-OPERATOR MODEL

6.      Following passage of the Motor Carrier Act of 1980, motor carrier transportation has generally operated under a deregulated, highly competitive, smaller sized, open-entry business model.  A linchpin of this system is the owner-operator model—which involves the use by licensed motor carriers of independent contractors who own and operate their own trucks—to provide the transportation of property in interstate commerce.

7.      According to statistical analyses of nationwide data released by the DOT covering fiscal year 2019,[1] 40.6% of motor carriers operate six or fewer trucks and nearly three-fourths (71.9%) of the fleets have twenty or fewer trucks.  The statistics for fiscal year 2019 are similar for California, with 45.6% of California motor carriers operating six or fewer trucks and around three-fourths (76.1%) of the fleets having twenty or fewer trucks.

8.      A motor carrier's ability to contract with independent contractors is necessary because the demand for, duration of, and volume of trucking services provided by individual motor carriers fluctuates significantly.  In many segments of the national economy, the volume of trucking services needed varies over time based on numerous factors.  In the agricultural industry, for example, the demand for trucking services varies depending on the  time of year, the price at which the produce can be sold, the available markets (both foreign and domestic) for the produce, the length of the growing season, and the size of the crop, which itself varies based on the temperature, rainfall, and other factors.  Likewise, a motor carrier could have an abundance of jobs during the growing season, but a small number of such jobs during the winter months.

9.      In order to meet this fluctuating demand for highly varied services, motor carriers contract with owner-operators to provide trucking services.  Because

---

[1] *See https://ai.fmcsa.dot.gov/SafetyProgram/spRptReview.aspx?rpt=RVFS.*

the demand for shipment of goods fluctuates depending on the season, consumer demand, overseas orders, natural disasters, type of truck, and a multitude of other factors, many motor carriers depend on the use of individual owner-operators to provide consistent, uninterrupted, skilled, and specialized trucking services to their customers.  This allows motor carriers to quickly scale up their operations in times of peak demand, to avoid idling equipment and employees during periods of lesser demand, and to forego costs associated with purchasing and maintaining equipment that may be needed only periodically.

10.     Given the sizable investment that is necessary to acquire and maintain a truck, the fluctuating demand for trucking services generally, the sporadic demand for specialized trucking services in particular, and other related considerations, it would be extremely difficult if not impossible for a motor carrier doing business in California, particularly a smaller motor carrier, to own (or finance) and maintain a fleet of trucks operated by employee drivers that is sufficiently large to service their customers' needs for specialized trucking services or haulage during times of peak demand.

11.     As the DOT's statistics show, the lifeblood of the trucking industry is smaller and mid-sized motor carriers, many of which employ little-to-no employee drivers and who instead contract for trucking services with owner-operators.  It is also important to note that many of these motor carriers focus on specific industries and goods.  For example, there are hundreds, if not thousands, of motor carriers that service California's agricultural industry.  Many of these motor carries specialize in the transport of specific crops, *e.g.*, there are motor carriers that focus on the transport of citrus, or almonds, or grapes, or hay, etc.  This system is beneficial to customers, since they can partner with motor carriers who know their business, appreciate their specific needs (including periods of heightened demand), and can design pricing models that align with the goods being shipped.

12.     The benefits of deregulation also accrue to owner-operators.  Employing

a business model that is common both nationally and in California, individual owner-operators typically work for themselves for a period of time to build up their experience and reputation in the industry.  Owner-operators typically decide which motor carriers they will contract with, what loads to accept (often based on whether the rates are favorable), what days to work, and how to perform the services (including the route to take).

13.     When an owner-operator is ready to expand his or her business, that owner-operator will contract for or bid on jobs that require more than one truck.  At that time, the owner-operator will subcontract with one or more other owner-operators to complete the job.  Eventually, the owner-operator may have enough business to warrant hiring one or more drivers.  In this way, the owner-operator model enables small businesses to grow from one-truck, one-driver operations to larger fleets with multiple trucks and multiple drivers, which may include employee drivers.

14.     Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently.  Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies.  This can make them more attractive to other motor carriers that need to increase their freight-hauling capacity during the course of the year, because they can obtain the services of additional drivers and equipment without having to make large capital investments in either skilled operators or expensive equipment.

15.     Given the operational cost structure, cyclical nature, and ever changing logistical transport needs of the transportation industry, independent owner-operators are often the only driver resource relied upon by motor carriers in California and throughout the United States.

**AB-5 DOES NOT CONTAIN AN EXPRESS EXEMPTION FOR MOTOR CARRIERS**

16.     Over the last eighteen months, a major issue facing CTA's motor carrier members has been the California Supreme Court's decision in *Dynamex Operations West v. Superior Court* and now the enactment of Assembly Bill 5 ("AB-5").  Unless AB-5 is enjoined, it must be expected that AB-5 will have a significant impact on the prices, routes, and services offered by motor carriers.

17.     Because of its members' concerns with the impact of AB-5 on its motor carrier members and interstate commerce, CTA opposed the negative impacts of AB-5.  Since the time that AB-5 was introduced in Sacramento, CTA worked with stakeholders to fashion a final bill that would not eliminate or reduce the viability of the owner-operator business model.  This included submitting written comments and offering testimony related to AB-5's anticipated effects.

18.     Through the legislative process, CTA and other interest groups sought relief from AB-5's strict test for independent contractors.  This included CTA seeking an express exemption from AB-5 for the trucking industry.  No such express exemption from AB-5 for trucking was obtained.  As shown by the final version of AB-5, many other industries and professions were successful in obtaining exemptions from AB-5.  For example, the real estate industry received a carve-out for real estate agents, which allows real estate companies to continue contracting with agents through an independent contractor relationship.  No such exemption for the trucking industry was included in the final bill, despite our ongoing and intense efforts to secure one, which were supported by both motor carriers and owner-operators, and other stakeholders.

///
///
///
///
///

## THE IMPACT OF AB-5 ON PRICES, ROUTES, AND SERVICES

19.     Many of CTA's motor carrier members have historically contracted with owner-operators as independent contractors to provide interstate trucking services to their customers in and between several states, including California, and treat these owner-operators as independent contractors rather than employees.  It is my understanding that, effective January 1, 2020, AB-5 will prohibit motor carriers from engaging independent contractors to transport property.  Consequently, the ABC test directly impacts "services" by eliminating one of the two primary ways in which these services have been provided.

20.     AB-5 will also constrict services in other ways.  *First*, the ABC test could result in motor carriers abandoning California altogether or to substantially limit their offerings.  A shrinking number of motor carriers and services lessens competition and increase prices.

21.     *Second*, following AB-5, it is expected that some motor carriers will cease using independent owner-operators in California and, instead, use only employee drivers, including obtaining just enough equipment and employee drivers to meet the typical demand for its particular type of trucking services.  This might allow the motor carrier to keep its employees and trucks mostly engaged, but it could not provide additional resources to provide truck services during times of peak demand.  Thus, services would not be provided, such as growers in the Central Valley facing a shortage of refrigerated trucks to preserve and transport perishable goods.

22.     *Third*, a motor carrier could attempt to acquire a sufficient number of trucks and drivers to meet maximum demand.  This is not a realistic scenario given the costs associated with purchasing all of this equipment, and I am not familiar with any motor carriers who have adopted such a business model.  The motor carrier would incur huge costs idling drivers and trucks during periods of lesser demand, costs that would either drive the motor carrier out of business (further shrinking

DECL. OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

40849365_2.docx

competition) or be passed on to customers (further increasing prices).  And, while a motor carrier might attempt to purchase the equipment it could reasonably foresee using, it still could not provide specialized equipment for one-off jobs.

23.     Consequently, if motor carriers cannot use independent contractors to provide trucking services, they cannot, in turn, provide the services of certain trucks, trailers, drivers, and equipment, because it is cost-prohibitive for motor carriers to acquire every possible type of truck, trailer, and equipment that might possibly be needed at any given time, especially those that are only utilized occasionally. Instead, motor carriers will need to scale back their service offerings to only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand.

24.     Requiring that motor carriers treat drivers as employees also directly impacts the routes that a motor carrier must use when providing services to its customers.  This is true for at least three distinct reasons.

25.     *First*, motor carriers must reconfigure and consolidate routes to minimize, through increased efficiency, the effect of the higher fixed costs associated with owning vehicles and the decreased productivity, greater fuel consumption, and increased emissions in using employee drivers.

26.     *Second*, for motor carriers that contract with owner-operators to provide interstate trucking services originating or terminating in other states, such motor carriers must reconfigure routes to arrange for the transfer and movement of any cargo within California by local employee drivers.  Alternatively, motor carriers would need to treat independent contractor drivers like employees but only while making deliveries in California.  For example, despite paying an owner-operator on a per-mile basis for driving throughout the United States, a motor carrier would need to additionally reimburse that owner-operator for any expenses incurred within California (like fuel), separately pay for all hours worked, ensure meal periods and rest breaks were taken, etc.

DECL. OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

27.    *Third*, routes must be reconfigured by the motor carriers to ensure drivers are able to park the trucks legally and safely in order to take the meal and rest periods mandated by California law.

### The "Business-To-Business" Exception

28.    AB-5 contains a narrow exception for a "*bona fide* business-to-business contracting relationship" (the "B-to-B" exception).  As noted above, CTA attempted to secure an express exemption from AB-5 for the trucking industry.  Those efforts were not successful, and there is no reason to believe that the B-to-B exception was intended to provide motor carriers a viable alternative way of continuing to contract with independent owner operators for trucking services.

29.    The B-to-B exception requires that the independent contractor satisfy twelve separate criteria, including that it operate a "business location that is separate from the business or work location of the contracting business," "advertise[] and hold[] itself out to the public" to provide services, "negotiate its own rates," "set its own hours and location of work," and further that this exception "does not apply to an individual worker . . . who performs labor or services for a contracting business." AB-5, § 2(e)(1)-(2).

30.    These criteria do not align with how motor carriers and owner-operators contract with one another.  For example, many motor carriers provide owner-operators with rate sheets, and, in fact, such rate sheets are required by federal leasing regulations.  The B-to-B exception appears to contemplate that motor carriers and owner-operators must individually negotiate the rates for services.  Such an approach is both impractical and unnecessary.  The predominate way that owner-operators "negotiate" rates is by seeking out the motor carrier with the most favorable rate sheet.  Put differently, if a motor carrier is not offering a profitable rate for trucking services, an owner-operator will "vote with his feet" and contract with a different company.  This simplifies the process and increases the mobility of owner-operators between motor carriers.

40849365_2.docx
DECL. OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

31.    This is not to say that some motor carriers and owner-operators do not already negotiate with one another regarding rates.  That can and does happen.  The difference is that the B-to-B exception *requires* negotiation as a prerequisite for any contracting relationship.  Mandating these types of individualized negotiations interferes with how many motor carriers operate, and is inconsistent with an efficient and mobile marketplace for trucking services.

32.    Likewise, most owner-operators do not maintain a separate business location.  While they might park their vehicle at their personal residence or another location, the only "business location" visited by most owner-operators is that of motor carriers and those of the motor carriers' customers.  Because of the nature of the work, which is by definition performed *in transit*, owner-operators are unlikely to maintain a fixed location of business.  This differs from other types of small businesses, which may be located in a personal residence or shared office space.

33.    Relationships between motor carriers and owner-operators will also be upset by the B-to-B requirement that the independent contractor "actually contracts with other businesses to provide the same or similar services."  AB-5, § 2(e)(1)(G).  As a result, an owner-operator could no longer choose to provide services to the same motor carrier for an extended period, even if the owner-operator enjoys partnering with that motor carrier and even if that motor carrier is offering the most attractive rates for loads.  While there are many owner-operators who float between motor carriers, the B-to-B exception would ensure that no owner-operators consistently provide services for the same motor carrier.

34.    Another B-to-B criteria is that the owner-operator "provid[e] services *directly to the contracting business* rather than to customers of the contracting business."  AB-5, § 2(e)(1)(B) (emphasis added).  This requirement is vague but almost certainly precludes motor carriers from providing many services.  For example, a manufacturer (the customer) might hire a motor carrier to transport its product from its manufacturing plant in another state to a distribution center in

DECL. OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

California. Pursuant to federal transportation law, the motor carrier is permitted to contract with an owner-operator to make that delivery. That motor carrier could not satisfy the B-to-B exception, however, since the owner-operator would arguably be delivering the product to the customer's distribution center and thus providing services "directly" to the customer. This is unlike the example where the manufacturer might hire the owner-operator directly, which may meet the conditions of § 2(e)(1)(B).

35.   In an effort to satisfy the onerous B-to-B exception, motor carriers and owner-operators would be forced to instead undergo extensive business model changes. Satisfying the B-to-B exception would thus require the trucking industry to restructure its operations to an enormous degree—just as requiring them to use employees would do. Even still, motor carriers could not provide many of the services that they currently offer to shippers, including any situation where an owner-operator might be deemed to be providing services "to customers of the contracting business." These structural changes, together with wholesale elimination of many services, would have similar effects on services, routes, and prices as those discussed above.

### CTA's Members Will Be Harmed If AB-5 Is Not Enjoined

36.   Motor carriers (as well as owner-operators) will be harmed if AB-5 is permitted to take effect on January 1, 2020 and apply to motor carriers and independent owner-operator drivers. To the extent that a motor carrier continues contracting with owner-operators, it runs the risk of civil and criminal liability and enforcement by government or private actors, and despite my belief that AB-5 should be preempted because of the harmful effects—both direct and indirect—on interstate commerce.

37.   A motor carrier could also decide to lessen its risk from AB-5. One option would be to stop providing services in California, in which case its entire business operation would be disrupted and essentially made unworkable. There

DECL. OF SHAWN YADON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

would be an immediate financial harm from lost revenue.  The lost revenue would directly flow from a motor carrier being unable to offer intra-California services to its customers.  It would also indirectly flow from a motor carrier's shrinking customer base.  Because many customers need a motor carrier who can accomplish delivery throughout the United States, a motor carrier that can no longer deliver in California will be less marketable and likely to lose certain accounts, *i.e.*, the customer may transfer all of their business to another motor carrier who can provide comprehensive delivery services, not just the California work.

38.    Alternatively, a motor carrier could move to an employee-driver model in California.  As detailed above and in the other evidence submitted with Plaintiffs' Motion, motor carriers will suffer immediate harm through the need to make additional immediate outlays required for compliance with AB-5.  Motor carriers will have to expend significant amounts not only for new equipment and employees but with appropriate human resources consultants with respect to developing appropriate recruiting, screening, benefit, and retention programs for employee drivers, to provide guidance for developing compliance plans, other types of administrative costs (including payroll and timekeeping systems/vendors), and so forth.

39.    The trucking industry is a highly competitive industry with notoriously narrow profit margins. The huge labor and equipment cost increase described above would require motor carriers to significantly increase their rates to customers.  While there remain too many unknown variables to precisely predict the rate increases needed, it would be very substantial.

40.    This would result in immediate harm to motor carriers, including, but not limited to, costs associated with purchasing vehicles and other equipment, new payroll costs for employee drivers and managers, other costs associated with

/ / /

/ / /

1  administering an employee workforce, reduced efficiency, and lost revenue.

2      I declare under penalty of perjury under the laws of the United States and the

3  State of California that the foregoing is true and correct, and that this declaration was

4  executed on this twenty-seventh day of November, 2019, at Sacramento, California.

5

6  Shawn Yadon

7

8                                                                40849365.2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28