SPENCER C. SKEEN, CA Bar No. 182216
spencer.skeen@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA  92122
Telephone:  858.652.3100
Facsimile:   858.652.3101

ROBERT R. ROGINSON, CA Bar No. 185286
robert.roginson@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213.239.9800
Facsimile:   213.239.9045

Attorneys for Plaintiffs
RAVINDER SINGH, THOMAS ODOM and
CALIFORNIA TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department, <br><br> Defendants. | Case No. 3:18-cv-02458-BEN-BLM <br><br> **DECLARATION OF JOHN E. HUSING, PH.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:          December 30, 2019 <br> Time:         10:30 a.m. <br> Place:         Courtroom 5A <br><br> Complaint Filed: October 25, 2018 <br> Trial Date:      None <br> District Judge:   Hon. Roger T. Benitez <br> Courtroom 5A, 221 W. Broadway, San Diego <br> Magistrate Judge: Hon. Barbara L. Major <br> 11th Floor, 333 W. Broadway, San Diego |

40895628_1.docx

## <u>DECLARATION OF JOHN E. HUSING, PH.D.</u>

I, John E. Husing, Ph.D., declare as follows:

1.     I am a research economist who has specialized in the study of Southern California's growing economy since 1964.  For decades, I have produced city and county-specific economic development strategies for the region's local government. I have firsthand and personal knowledge of the facts set forth in this declaration and if called to testify regarding them, I could and would do so competently and under oath.

2.     I earned my Bachelor of Science, *cum laude*, in Classics & Economics from Saint Mary's College of California in 1962.  I then earned my Masters of Arts (in 1965) and my doctorate (in 1971) in Economics from Claremont Graduate University.  A true and correct copy of my *curriculum vitae* is attached as **Exhibit A**.

3.     I was retained by plaintiff California Trucking Association ("CTA") to examine and prepare a report on the potential impact on prices, routes, and services from the "ABC" test adopted by the California Supreme Court in *Dynamex Operations West v. Superior Court* and now codified by the California Legislature through Assembly Bill 5 ("AB-5") if it is determined that motor carriers can no longer engage independent contractor owner-operators to provide trucking services in California.

4.     My assessment is based on my decades of experience studying the California economy, including the role of the transportation industry in fueling California's economic growth and specifically the role played by owner-operators. This includes my own past studies of the transportation industry.  My assessment is also based on a review of available data related to the transportation industry, as well as other resources cited in my report.

5.     A true and correct copy of my report is attached as **Exhibit B**.  As set forth in my report, the owner-operator model contributes to California's economy and the state's ability to import and export billions of dollars of goods each year.  It

1

40895628_1.docx

1  also allows the transportation industry to operate more efficiently—the demand for

2  trucking services fluctuates widely and owner-operators allow motor carriers to

3  expand and contract their operations to provide the needed services.  These same

4  efficiencies cannot be achieve with an employee-driver model for a variety of

5  reasons.  Thus, my report concludes that prohibiting motor carriers from contracting

6  with owner-operators will have deleterious effects on services, routes, and prices.

7      6.      All of the statements and conclusions in my report attached hereto as

8  Exhibit B are true and correct to the best of my knowledge

9      I declare under penalty of perjury under the laws of the United States and the

10  State of California that the foregoing is true and correct, and that this declaration was

11  executed on this second day of December, 2019, at Redlands, California.

13  John E. Husing, Ph.D.

14                                                              40895628.1

12
15
16
17
18
19
20
21
22
23
24
25
26
27
28

40895628_1.docx

DECL. OF JOHN E. HUSING, PH.D., IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# EXHIBIT A

# RESUMÉ:  John E. Husing, Ph.D.

## HONORS
Selected by 2006 Los Angeles Times West Magazine as one of the 100 most influential people in Southern California.
2009, Arrowhead Distinguished Executive Officer, California State University San Bernardino

## EDUCATION

| | | | |
|---|---|---|---|
| B.S. *cum laude* | Saint Mary's College of California | Classics & Economics | 1962 |
| M.A., Ph.D. | Claremont Graduate University | Economics | 1965, 1971 |
| | Dissertation: Economic Impact of Defense Closures on the Inland Empire | | |

## RECENT CLIENTS HAVE INCLUDED:

| | |
|---|---|
| Majestic Realty | Hillwood Construction (©*A Perot Company*) |
| Lewis Operating Company | Watson Land |
| General Growth Properties | Forest City Development |
| Entrepreneurial Capital Group | KB Homes |
| Port of Los Angeles | Port of Long Beach |
| Yellow Freight Systems | March Inland Global Port |
| Southern California Metropolitan Water District | Southern California Association of Governments |
| Southern California Edison | Verizon |
| Granite Construction | Citizens Business Bank |
| Burlington Northern Santa Fe Railroad | City National Bank |
| Cambridge Systematics | Wilbur Smith Economic Consulting |
| Inland Empire Economic Partnership | Orange County Transportation Agency |
| Inland Valley Development Agency | Southern California Logistics Airport |
| Riverside County Transportation Commission | San Bernardino County Transportation Authority |
| Western Riverside Council of Governments | Coachella Valley Economic Partnership |
| GE Capital | California Speedway |
| San Bernardino County | Riverside County |
| Arrowhead Credit Union | Inland Empire Utilities Agency |
| San Bernardino Valley Municipal Water District | State of California |
| 40 Cities | Federal Railroad Administration |

## POSITIONS HELD

| | | | |
|---|---|---|---|
| Co-Owner | Economics & Politics, Inc. & predecessor | Economics & Finance | 1981-Present |
| Chief Economist | Inland Empire Economic Partnership | Economist | 2010-2018 |
| Editor/Writer | Inland Empire Quarterly Economic Report | Economic Research | 1988-Present |
| Weekly Commentator | KVCR FM | Economist | 2012-2018 |
| Executive Committee | CA Community College Strategic Plan | Community Colleges | 2005 |
| Columnist | The Business Press, Press Enterprise | Newspapers | 1998-2006 |
| Executive Committee | Inland Empire Economic Partnership | Economic Development | 1995-2003 |
| President | Inland Empire Economic Partnership | Economic Development | 1994 |
| Economist | CSU San Bernardino | Economic Research | 1990-1992 |
| Senior Consultant | California State Assembly Majority Services | Analyst | 1980-1984 |
| Assoc. Prof/Div. Chair. | San Bernardino Valley College | Business & Economics | 1964-1981 |

## Examples of Relevant Research

**1. Why the Inland Empire is the Strongest Logistics Market in the U.S., 2015-2019**

A series of reports on the extraordinary strength of the Inland Empire's logistics market that has seen in add 88,000 jobs from 2011-2019.  Reports have tracked the combination of port activity and ecommerce expansion for which the region has the country's strongest combination of location advantages for handling the cargo.

**2. Analysis of the Demand for Upscale Multitenant Housing in the Eastern Inland Empire Area, 2017-2019**

Look at the latest trends in single family and multitenant housing for client who has proposed, built and is expanding multitenant projects in the Inland Empire.

**3. Economic Impact of Logistics Projects on Various Cities, 2010-2018**

Several projects for major developers of logistics facilities throughout the Inland Empire.

**4. The Impact of the Great Recession and the Internet on Office Demand In the Inland Empire, 2018**

Why the combination of the Great Recession and internet activity has weakened the demand for Inland Empire office space.

**5. Construction Workers Are Being Priced Out of Affording the Single Family Homes They Build, 2018**

Analysis looked at the incomes of construction workers (*non-union & union*) in 50 different occupations in each of the counties in the Bay Area and Southern California and found that with few exceptions they cannot afford either the entry level or the median priced homes in the markets where they work.

**6. Review of Economic Conditions Potentially Affecting Harbor Drayage Firms Regarding A Change from IOO to Employee Drivers, 2017**

Report found that such a change to harbor carrier's business model from 2016 weighted prices would increase by 103% at a minimum.

**7. Cost Comparison Truck vs. Rail Drayage to the Inland Empire, 2016-2017**

Analysis of the relative cost of moving containers to the Inland Empire by truck and rail assuming the creation of an Inland Port or transloading facility in the area.  Work took into account the moving of containers off of ships, on to rail or trucks,movement to the Inland Empire, unloading off of trains, movement to local distribution facilities. Client: Port of Long Beach

**8. Net Income Comparison, CA Independent Owner Operator Truck Drivers to Company Drivers, 2015**

Reviewed public data on the earnings of company truck drivers in California and the U.S.  Reviewed the records of over 2,600 Independent Owner Operators to determine their gross income, costs of operations and net incomes.  Issue a report on the resulting comparison.  Client:  CA Trucking Association

**9. SCAG Regional Goods Movement Studies, 2008-2016**

Develop database of each distribution facility located in Southern California (*over 10,000*).  Developed GIS location of each facility.  Developed a classification system for each type of warehousing and trucking facility in collaboration with knowledgeable executives from logistics associations.  Extensively interviewed executives managing each type of facility.  Also interviewed executives of major firms building and leasing facilities as well as corporate supply chain managers.  Interviewed numerous commercial brokers attempting to lease facilities.

Held extensive meetings with planning directors of communities where warehousing facilities have been extensively located and where they are starting to locate.  Participated in several goods movement round tables made up of truckers, warehouse owners, supply chain managers, port and railroad executives, city planners and managers, state legislators, regional planners dealing with funding logistics infrastructure, environmentalists, and public health advocates.  Client:  Southern California Association of Governments.

**10. White Paper:  California's Regulatory Environment's Adverse Impact on Marginally Educated Workers, 2013**

White Paper written for Inland Empire Economic Partnership which has served as the basis for California wide discussion of the public health and social justice implications of California regulatory environment hindering the ability of the manufacturing, logistics, construction and mining sectors to create jobs.  The impact is cutting marginally educated workers off from accessing the middle class with deleterious impacts on their health.  A disproportionate share are Hispanic and African American with social justice implications.  Inland Empire Economic Partnership, 2013

**11. Economic Impact of Logistics, 2013**

Assisted several development clients in preparing economic impact of their projects as part of the permitting process in several Inland Empire cities.  2013 clients:  Hillwood @ Perot Company; Watson Land Company; McShane Development Company; TREH Partners

**12. Economic Development Strategy, Southern California, 2010-2012.**

Held lengthy one on one discussions with the entrepreneurs and executives in the sectors bringing money into the Inland Empire's economy.  Identified strategy lines for expanding those sectors as part of a Southern California economic development strategy.  Clients:  Southern California Association of Governments, San Bernardino County.

**13. Economic Analysis of the Clean Truck Program at the Ports of Los Angeles and Long Beach, 2007**

Analysis of the complex issues of the manner in which the Clean Truck Program would reorganize the movement of cargo from the ports into and through Southern California  This work involved extensive discussions with the individuals working

on the logistics issues surrounding the ports and movement of goods. These included ocean carriers, Pacific Merchants Shippers Association, trucking companies, supply chain managers of beneficial cargo owners (*e.g. retailers*), warehousing managers, railroads, National Resources Defense Fund, Southern California Air Quality Management District, California Air Resources Board, public health advocates, neighborhood associations, manufacturers of clean vehicles, business associations, regional planning groups, local and state political leaders, International Long Shore Workers Union, Teamsters, Change To Win. Client: Ports of Los Angeles and Long Beach.

**14. Multi-County Goods Movement Action Plan, Southern California, 2006-2007**

Develop model of sectors making up the goods movement "sector" and the occupations within each sector. Developed data on the pay for each occupation in each sector as well as the total payroll and employment in each sector. Developed data on educational level required for each occupation within each sector as well as the years of experience and created workforce ladders up which workers could progress. Created demand model for logistics sector and forecast of demand. This permitted creation of an economic impact model showing the effect of the logistics sector on of the sectors on Southern California's economy and the over all economic impact on the seven Southern California counties. Impact work included opening of upper mobility for blue collar workers as well as the dollar and overall job impacts given the labor force difficulties in principal alternative sectors: construction and manufacturing. Client: Seven Southern California Transportation Agencies, SCAG, CALTRANS

**15. Logistics & Distribution: An Answer to Regional Upward Social Mobility, 2004**

Analysis of Southern California's declining per capita income status, the need for a sector to replace manufacturing as a source of upward mobility for marginally educated workers, and the case why the logistics industry can play this role if its infrastructure issues are met. Client: Southern California Association of Governments

**16. Community College Role In Economic Development & Upward Social Mobility, 2001 & 2004**

Analysis of the changing education needs of entry-level and adult workers and the role of the community colleges, economic development community and business community in designing and implementing programs to fill them. Clients: San Bernardino Community College District; Chaffey Community College District.

**17. Economic Impact of Santa Fe Intermodal Rail Yards, 1995, 2001**

Researched the job and economic impact of developing a 500,000 lift capacity intermodal rail yard in the City of San Bernardino. Work explained the location advantage of intermodal rail for warehousing & manufacturing firms in an era County. Client: BNSF Railroad

**18. Economic Impact of Roadway Express cross docking facilities on the efficiency of goods movement in the I-10 Corridor of San Bernardino County, 1999**

Study of how locating Roadway's cross docks near to Burlington Northern Santa Fe Railroad intermodal yard, Ontario International Airport and the 200 million feet of industrial space developed since 1985 will forecast the efficiency, lower the cost and increase the competitiveness of the goods moving industry in that area. Client: Roadway Express

**19. San Bernardino County General Plan Update, Economic Background & Strategies, 2007**

440 page analysis of each of six economic zones in San Bernardino County looking at its history, demographics, housing, employment, retail trade, competitive location characteristic and quality of life indicators. Client: San Bernardino Co.

**20. Inland Empire Quarterly Economic Report, 1965-1969; 1988-present**

Author of the respected Inland Empire QER, a publication now in its 30th year that is distributed to 12,000 business and governmental leaders. The QER gives hard data on the Inland Empire economy, discusses the impacts of economic trends and governmental policies. Sponsors: Inland Empire Economic Partnership

40883199.1

# EXHIBIT B

# Economics & Politics, Inc.

**P.O. Box 8730**
**Redlands, CA 92375**
**(909) 307-9444 Phone**
**john@johnhusing.com**
**www.johnhusing.com**

## Impact of California Trucking Changes on Services, Routes, Rates

Licensed motor carriers arrange the transportation of goods (*or people*) by vehicle. This report focuses on motor carriers that are responsible for property-carrying vehicles and that are regulated by the federal Department of Transportation, including at Sections 395.1-395.15 of the Code of Federal Regulations.

Some motor carriers provide transportation services using their own trucks and employee drivers. Many motor carriers, however, contract with independent owner operator drivers (*IOOs*) to pick–up and deliver cargo. In some cases, a licensed motor carrier, despite having its own vehicles and employees, will contract with IOOs to deal with peak demand or to provide specialized services (*see below*).

The majority of motor carriers in California, however, are the functional equivalent of cargo delivery brokers. They do not own trucks. They do not employ drivers. What they do is contract with their customers to see that their customers' cargo is moved between two points, often crossing state lines. They exclusively use IOOs to pick–up the cargo and deliver it. The IOOs decide whether to accept a load. To maximize their profits, under the agreed upon prices for a delivery, the IOOs decide the routes they will take to deliver the goods. Subject to federal rules, the IOOs decide on whether and when they wish to take rest breaks.

This goods delivery model has been upset by the California Legislature's enactment of Assembly Bill 5 (*AB-5*), together with the previous ruling of the California Supreme Court in *Dynamex*. Under this new ABC test, it must be proven that independent contractors like the IOOs satisfy the following three criteria:

> A: that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

> B: that the worker performs work that is outside the usual course of the hiring entity's business; and

> C: that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

It is understood that, if the IOOs do not satisfy all of these criteria or fall within some exception to AB-5, then they cannot lawfully contract with a business as an independent contractor, but must instead be treated as an employee.

To the extent that motor carriers can no longer contract with IOOs, AB-5 and the previous Supreme Court opinion in *Dynamex* would compel these motor carriers to restructure their operations. They will ultimately have to gain access to trucks by buying, financing or leasing

---

them.  They might hire drivers who own trucks in the very short term, but that is not a long term solution as employee drivers will have no incentive to own, repair, and maintain expensive trucks.  All motor carriers will have to employ and manage drivers and be subject to California employment rules in doing so.  As much of the work done by the goods movement portion of the economy involves goods crossing state lines, the implications of such a change would appear to make California an outlier among states, since IOOs have historically provided many of the trucking services in California and throughout the United States. I have been asked for my opinion as to whether a rule largely foreclosing the use of IOOs in California would have an impact on motor carriers' services, routes or prices affecting the interstate movement of goods.

## Services

**California's Importance.**  Given that background, it is important to note that California plays a hugely significant role in the movement of goods across the United States.  The most recently available outbound domestic trade flow data by state showed that in 2017 a total of $527 billion was the value of all commodities leaving California by truck.[1]  This ranked first in the nation ahead of Texas (*$485.1 billion*).  In part, this was because the state is the leading manufacturer of U.S. goods whether measured by its share of the sector's gross product (*13.3%*), number of firms (*14.3%*) or number of employees (*10.4%*) (*Exhibit 1*).  On each measure, it ranks well ahead of second placed Texas (*10.4%; 7.0%; 6.9%*).

| State | Manufacturing Output (billions)_ | U.S. Share | Manufacturing Firms (2015) | U.S. Share | Manufacturing Employment (000) | U.S. Share |
|---|---|---|---|---|---|---|
| California | $288.98 | 13.3% | 36,117 | 14.3% | 1,284.1 | 10.4% |
| Texas | $225.78 | 10.4% | 17,594 | 7.0% | 848.1 | 6.9% |
| Ohio | $106.00 | 4.9% | 12,660 | 5.0% | 687.4 | 5.6% |
| Illinois | $100.39 | 4.6% | 12,453 | 4.9% | 571.8 | 4.6% |
| North Carolina | $99.78 | 4.6% | 7,821 | 3.1% | 460.2 | 3.7% |
| Indiana | $98.43 | 4.5% | 7,102 | 2.8% | 516.9 | 4.2% |
| Michigan | $93.55 | 4.3% | 11,386 | 4.5% | 598.8 | 4.8% |
| Pennsylvania | $84.96 | 3.9% | 12,466 | 5.0% | 566.0 | 4.6% |
| New York | $71.34 | 3.3% | 15,304 | 6.1% | 451.2 | 3.7% |
| Washington | $58.43 | 2.7% | 6,644 | 2.6% | 286.3 | 2.3% |

Exhibit 1.-Top Ten States, Shares of U.S. Manufacturing Output, Firms & Employment 2016

Source:  National Association of Manufactures, 2018

California is similarly the key player in the U.S. agricultural sector.  Its share of cash receipts from growing all commodities ranked first at $50.2 billion or 13.5% of U.S. sales, nearly double second placed Iowa (*$26.5 billion; 7.1%*).  It leads in the share of agricultural employment at 1,420,000 (*27.3%*).  That was more than triple that of Iowa at 440,000 (*8.4%*) (*Exhibit 2*).  The

---

[1] Freight Analysis Framework, Data Tabulation Tool (FAF4) Bureau of Transportation Statistics, 2017 https://faf.ornl.gov/faf4/Extraction2.aspx.  These data came from selecting "2017, "from California," "by Truck," "to All States" and *eliminating* goods staying in California.  The same was done for Texas.

breakout of 2017 agricultural products leaving each state domestically by truck placed that portion of California's trucked products at $46.9 billion, first ahead of Illinois (*$43.2 billion*).[2]

| Exhibit 2.-Top Ten States, Shares of U.S. Agricultural Output & Employment 2017 | | | | | |
|---|---|---|---|---|---|
| State | Receipts All Commodities | U.S. Share. | State | Employment | U.S. Share |
| California | $50,220,538 | 13.5% | California | 1,420,000 | 27.3% |
| Iowa | $26,520,949 | 7.1% | Iowa | 440,000 | 8.4% |
| Texas | $22,961,304 | 6.2% | Louisiana | 380,000 | 7.3% |
| Nebraska | $21,334,419 | 5.7% | Alabama | 340,000 | 6.5% |
| Minnesota | $17,121,208 | 4.6% | Florida | 230,000 | 4.4% |
| Illinois | $16,279,598 | 4.4% | Washington | 190,000 | 3.6% |
| Kansas | $15,733,655 | 4.2% | Arizona | 170,000 | 3.3% |
| North Carolina | $11,468,912 | 3.1% | Hawaii | 140,000 | 2.7% |
| Wisconsin | $11,365,634 | 3.1% | Idaho | 140,000 | 2.7% |
| Indiana | $10,612,469 | 2.9% | Colorado/Missouri/Tennessee | 120,000 | 2.3% |

Source:  U.S. Department of Agriculture, U.S. Bureau of Labor Statistics

Meanwhile, California's two custom's districts combined (*Los Angeles & San Francisco*) are the centers for the greatest share of imported trade valuation flowing into the U.S. (*16.3%*), exported trade valuation moving from the U.S. (*11.9%*) and combined two-way trade (*14.5%*) (*Exhibit 3*). Again, a large share of this trade is transported by truck from California to other states.

| Exhibit 3.-Import and Export Trade, Top 10 U.S. Customs District, 2017 | | | | | | |
|---|---|---|---|---|---|---|
| Customs District | Imports (millions) | U.S. Share | Exports (millions) | U.S. Share | 2-Way Trade | U.S. Share |
| Los Angeles, CA | $301,746 | 12.9% | $128,746 | 8.3% | $430,493 | 11.1% |
| New York City, NY | $227,992 | 9.8% | $136,577 | 8.8% | $364,569 | 9.4% |
| Laredo, TX | $176,195 | 7.6% | $126,007 | 8.1% | $302,202 | 7.8% |
| Chicago, IL | $175,565 | 7.5% | $48,097 | 3.1% | $223,662 | 5.8% |
| Detroit, MI | $134,520 | 5.8% | $128,900 | 8.3% | $263,419 | 6.8% |
| New Orleans, LA | $120,931 | 5.2% | $94,742 | 6.1% | $215,672 | 5.6% |
| Savannah, GA | $107,533 | 4.6% | $49,189 | 3.2% | $156,722 | 4.0% |
| Cleveland, OH | $102,525 | 4.4% | $41,302 | 2.7% | $143,827 | 3.7% |
| Houston-Galveston, TX | $82,658 | 3.5% | $109,244 | 7.1% | $191,902 | 4.9% |
| San Francisco, CA | $77,650 | 3.3% | $54,880 | 3.5% | $132,531 | 3.4% |
| Seattle | $69,469 | 3.0% | $80,245 | 5.2% | $149,714 | 3.9% |
| Miami | $48,529 | 2.1% | $59,177 | 3.8% | $107,706 | 2.8% |
| **California** | **$379,397** | **16.3%** | **$183,627** | **11.9%** | **$563,023** | **14.5%** |

Source:  U.S. Census Bureau, Foreign Trade, February 2018

Related to these trade figures, California's San Pedro Bay Ports (*Los Angeles, Long Beach*) have ranked first and second in imported container volumes for decades. In 2017, they handled 35.9% of all U.S. imported containerized cargo.  Including the eighth ranked Port of Oakland and three smaller ports, the 2017 share of imported containers handled by California's harbors was 9.4

---

[2] FAF4 site.  These data were determined by selecting "2017," "from California," "by Truck, "All Commodities involving agriculture," "to All States" and eliminating each food commodity group staying in California.  The same was done for Illinois.

million 20-foot equivalent containers (*teus*) or 40.2% of the U.S. total of 23.4 million teus (*Exhibit 4*).  It is a national economic imperative that the companies importing these goods have the ability to freely move them across the country.

This fact was emphasized by a November 2019 study showing the state by state impacts of tariffs on imported goods entering the U.S. through Los Angeles and Long Beach harbors.  Of the $158.7 billion in goods coming into the two ports that have been subjected to tariffs, $42.5 billion stayed in California (*26.8%*) and $116.3 billion were transported to other states (*73.2%*).[3]

| Exhibit 4.-Imported Containers, 2017 California Ports (teus) | | | |
|---|---|---|---|
| Rank of 63 | Port Name | Import TEUs | Share of U.S. |
| 1 | Los Angeles, CA | 4,590,451 | 17.2% |
| 2 | Long Beach, CA | 3,792,165 | 14.2% |
| 8 | Oakland, CA | 879,839 | 3.3% |
| 24 | San Diego, CA | 62,583 | 0.2% |
| 26 | Port Hueneme, CA | 57,474 | 0.2% |
| 47 | San Francisco | 62 | 0.0% |
| | *California* | *9,382,574* | *40.2%* |

Source:  U.S. Waterborne Foreign Container Trade by U.S. Customs Ports 2000 – 2017, Maritime Administration

Whether it is manufacturing, agricultural or imported goods, nearly everything that moves in California spends time in a truck.  Manufacturers tend to send their goods to customers, warehouses or to rail yards by truck.  There are some direct box loadings on adjacent rail spurs but the number of  box cars is declining[4] and rail spurs in California cities are generally discouraged.[5],[6]  Agricultural producers send their goods to customers, wholesale distributors, food manufacturers or warehouses by truck.  Domestic and imported goods arriving by air leave airports by truck to customers or distribution centers.  Of imported port containers arriving at Los Angles or Long Beach harbors, 72.5% is driven by truck to intermodal rail yards or distribution centers. The other 27.5% is the singular truck exception as it is loaded directly on-dock to trains.[7]

**Sizing Trucking Fleets.**  To serve the U.S. economy by handling such a major share of U.S. production and trade, much of which crosses state lines, California's goods movement sector has evolved a very flexible and efficient capacity to handle the annual ebb and flow of such activity.

---

[3] BY THE NUMBERS Jeopardizing the National Benefits of Trade Through America's Busiest Port Complex, BST Associates Commissioned by November 1, 2019, p. 29

[4] Boxcar fleets are shipping a decreasing number of shipments. In the last 10 years, rail ton-mile shipments have decreased 42% for lumber/wood, 42% for motor vehicles and parts, and 13.2% in pulp and paper. In addition, railroads find boxcars less attractive than unit trains, **What is a Box Car and Why are the Numbers Declining,** Steve Rietz, Director of Research, Transportfolio, October 15, 2015

[5] The California Public Utilities Commission has exclusive authority to abolish any crossing of a public or publicly used road or highway by a railroad or street railroad and of a street by railroad. Cal. Pub. Util. Code §§ 1201-1202 (2008)

[6] Citizen groups often line up against freight interests in the local planning process

[7] US West Coast ports drill down on rail efficiencies to protect share, Bill Mongolluzzo, Journal of Commerce, Sept. 28, 2018

However, that capacity will be expected to breakdown if California's ABC standard forces a slow, gradual or rapid fundamental reorganization of the state's trucking industry.

To satisfy Prong B of the ABC test, it must be shown that "the worker performs work that is outside the usual course of the hiring entity's business." For a motor carrier, the delivery of cargo goes to the heart of its business. I do not see how a motor carrier could successfully argue that what IOOs do is "outside the usual course" of its business.

If motor carriers are prohibited from providing trucking services with IOOs, firms that have historically relied on IOOs to provide services will have to quickly restructure their operations by acquiring trucks and hiring and retaining employee drivers to perform those same services. In 2016, there were a total of 290,905 registered truck tractors for pulling cargo in California.[8] A significant share of those were owned by the 81,704 California non-employer truckers that year.[9] A fleet of at least 81,704 trucks would thus have to be rapidly acquired by the newly constituted trucking firms. In the very short term, they might be able to do so by hiring the IOOs who own or are leasing trucks and have them make those available under some remuneration. Very quickly however, these motor carriers would have to acquire, finance or lease their own fleets as future workers would have no incentive to acquire trucks that cost $136,000 in 2016.[10],[11] Even in that very short run period, the motor carriers would still have to contract for truck parking facilities and create or contract for truck maintenance and repair.

In sizing their fleets, the new trucking industry would be expected to act in their own economic interest. Given the wide seasonality of demand for truck service in any month of a typical year, it would be irrational for them to create fleets large enough to handle their maximum monthly demand. If they did so, many of their expensive vehicles would sit idle during months of lower service demand. If they geared up for less than the anticipated volume in higher demand months, trucks would not be available to handle all of the cargo or its interstate flow of products in those peak periods. To cite a few examples:

- **Agriculture.** In the agricultural sector, the demand for trucking services would be expected to follow the seasonality of the sector's activity. Using December as a base, labor usage shows that in the harvest months from April through October, there would be high levels of activity. In colder seasons from November through March, demand would be unusually low (*Exhibit 5*).

---

[8] Federal Highway Administration, Office of Highway Information, Table MV-9, December 2017

[9] U.S. Census Bureau Non-Employer Statistics, 2016; A non-employer business is one that has no paid employees, has annual business receipts of $1,000 or more, and is subject to federal income taxes. Most are self-employed individuals operating very small unincorporated businesses. These data are for truck transportation

[10] Including the vehicle, taxes and licenses,  Interview with South Bay Trucking, November 2016

[11] CA Occupational Wage Survey, First Quarter 2018



The trucking industry might create a fleet capable of handling its underlined maximum capacity need in September (*140.7% of December level*).  If so, it could handle all of the annual cargo movements.  However, there would be idle trucks equal to significant shares of that maximum level.  These would be 0.1% of trucks idle in June but 40.7% to 46.7% of rigs idle from December through March (*Exhibit 6, blue bars*).

If the industry chose to create a trucking fleet equal to its average demand during the year (*119.1% of December*), it would have fewer idle trucks in the November to April period (*high: 25.2% in January, low: 3.3% in April*).  However, a significant amount of cargo demand would not be met due to lack of trucks in May (*-16.0%*), high in September (*-21.5%*), low in October (*7.8%*) (*Exhibit 6, green bars*).

In effect, the California agricultural trucking industry would not meet the demand for trucking services, including in the interstate flow of agricultural goods in all but the uneconomical case of always gearing up for maximum production.  This is in contrast to the IOO model where IOOs could take their trucks and work in agricultural when demand is strong and take time off or drive in other sectors when it is not.



---



- **Retailing.** In the retail sector, the demand for trucking services would also follow the seasonality of the sector's activity (*Exhibit 7*). Again, using December as a base, labor usage shows that in the build-up to the Christmas season, there are higher levels of activity. Once that season ends, activity slows. The trucking industry might create a fleet capable of handling its <u>maximum</u> capacity need in December (*100.0% of December level*). If so, it would find that it could handle all of the annual cargo movements. However, there would be idle trucks equal to significant shares of that maximum level in every other month. These would range from 2.1% of trucks idle in November (*low*) and up to 7.4% idle in April (*Exhibit 8, purple bars*).



If industry chose to create a trucking fleet equal to its average demand in a year (*94.4% of December*), it would have fewer idle trucks at: February (*1.4%*), a high in April (*1.8%*) to September (*0.5%*). However, a significant amount of retail cargo demand would not be met due to lack of trucks in October (*-0.2%*) through December (*-5.6%*) (*Exhibit 8, yellow bars*). In effect, California firms specializing in retail goods[12] would not meet the

---

[12] Organized through CA Trucking Association and Harbor Trucking Association

demand for trucking services, including in the interstate flow of goods across the country in all but the uneconomical case of always gearing up for December production. This is in contrast to the IOO model where IOOs could take their trucks and work in retail, driving when demand is strong and take time off or drive in other sectors when it is not.

- **Construction.** The construction sector demand for trucking would also follow its seasonality (*Exhibit 9*). Using a December base, activity in June to October would be high. In cold periods from January through April, it would be low. The trucking industry might created a fleet capable of handling its <u>maximum</u> capacity need in August (*103.6% of December level*). It could then handle all the annual cargo movements. However, there would be idle trucks equal to significant shares of that maximum level in every other month. These would range from 0.2% of trucks idle in September up to 8.5% in January (*Exhibit 10, blue bars*).



If motor carriers servicing the construction industry chose to create a trucking fleet equal to its average demand in a year (*100.0% of December*), it would have fewer idle trucks in the January (*4.9%*) to May (*0.5%*). However, a significant amount of construction cargo demand would not be met due to lack of trucks, reaching a peak in August (*-3.6%*) (*Exhibit 10, yellow bars*).



---

In effect, the California construction trucking industry[13] would not meet the demand for trucking services, including in the interstate flow of goods across the country in all but the uneconomical case of always gearing up for August production.  This is in contrast to the IOO model where IOOs could take their trucks and work in construction, driving when demand is strong and taking time off or driving in other sectors when it is not.



Given the ebbs and flows of the sectors of California's economy as a whole, seasonality also occurs.  It is seen in the constant cycling of data throughout each year (*Exhibit 11*).  A typical year begins with relatively weak activity starting in January.  It then grows to a peak in June.  In July it falls off again and then builds to a December peak before falling the next January.  For trucking operations serving all sectors of the economy and required to invest or lease their own fleets, sizing would again be a question of the share of maximum activity for which they wish to be prepared.

It would be unprofitable to buy fleets to handle the highest volume months, as they would have costly wasted capacity for much of the year.  If they moved to an average or some other share of monthly activity, some goods could not be moved in the highest volume months.

Today, the estimated 81,704 IOOs[14] found in 2016 have an investment in one or a few trucks. The IOOs decide for themselves the level of effort in which they wish to be engaged with their rig(s).  They can enter or leave any particular market as they see fit.  They can decide the times of the year in which they wish to be engaged.  Their behavior has allowed California's motor carriers to work with the IOOs to adjust the trucking sector's activity to adapt to the growth and seasonality of the various parts of its economy.

---

[13] Organized through the Western States Trucking Association, formerly the CA Construction Trucking Association

[14] U.S. Census Bureau Non-Employer Statistics, 2016 (see footnote 6)

If California uniquely requires IOOs to become employees, the state would eliminate this flexibility.  There will only be full fledged trucking firms, each with a heavy investment in the purchase, finance or leasing of rigs.  The IOOs will be hired workers.  Firms will size their fleets to maximize their investments.  They will manage their staffs to minimize their labor costs.  The result would be to inhibit national freight movements by limiting the trucking services provided to the nation from a key manufacturing, agricultural and trading state.

**26.6% More Drivers Needed.**  Another set of issues interfering with the delivery of services by California trucking firms is the fact that it will take roughly 26.6% more employee drivers to move the cargo now handled by the estimated 81,704 IOOs.  That was the conclusion of a study of six major licensed motor carriers conducted by this analyst in 2014 and again in 2017.  Its major calculations are shown in Exhibit 12 and explained below it.

| Exhibit 12.-Annual Driving Hours Available To Company Employees vs. IOOs | | |
|---|---|---|
| **Driver Time** | **IOO** | **Employee** |
| Annual Hours 52 weeks 5 days 8 hours | **2,080** | **2,080** |
| (Less) Vacation 10 days 8 hours | 40 | 80 |
| (Less) Holidays 10 days 8 hours | 80 | 80 |
| (Less) Downtime 10 days 80 hours | 80 | 80 |
| Straight Time Hours Available To Drive | **1,880** | **1,840** |
| Overtime Employee Hours (46 weeks 5 days 1 hour) | | 230 |
| Overtime IOO hours (47 weeks 5 days 2 hours) | 470 | |
| Working Hours Available | **2,350** | **2,070** |
| Non-Driving Time Required:  Hours Per Day | | |
| Pre-Trip Inspection, Fueling | 0 | -0.5 |
| Post-Trip Clean-Up, Incidental Repairs | 0 | -0.5 |
| Rest breaks on the road (three 10-minute rest breaks) | 0 | -0.5 |
| Lost Driving Time per Day | **0** | **-1.5** |
| Number of Days Driving Employees (46 weeks 5 days) | 0 | 230 |
| Lost Hours To Non-Driving Functions on Driving Days (*1.5 hours a day*) | **0** | **-345** |
| Hours of Driving Time Available To Company | **2,350** | **1,725** |
| Less Driving Time Per Year From EE compared to IOO | | **26.6%** |

Source:  Review of Economic Conditions Potentially Effecting Harbor Drayage Firms From Change From IOO To Employee Drivers, John E. Husing, Ph.D., 2014 & 2017.

- Employees tend to work for 1,840 straight time hours (*46 weeks, 5 days, 8 hours*) out of a total possible of 2,080 (*52 weeks, 5 days, 8 hours*) a year.  They do so due to 10 vacation days, 10 holidays and 10 days when cargo volumes are insufficient to employ them. IOOs tend to work 1,880 normal hours as they typically take 5 working days off for vacation per year.

- Employee drivers tend to work one overtime hour a day for the 46 weeks they drive or 230 hours.  IOOs tend to drive for 10 hours a day for the 47 weeks they drive to maximize their earnings.  That is the equivalent of two hours beyond an eight hour day or 470 hours.

- Altogether, employees work 2,070 hours.  IOOs are driving 2,350 hours.

- However, employee will spend approximately 1.5 hours per day not driving:

  o They must undertake pre-trip truck inspections and fuel them (*30 minutes*).

  o They must perform-trip clean-up and log book maintenance (*30 minutes*).

  o They must take three 10-minute breaks (*30 minutes*) if they work a ten-hour day not including the time to find a parking place for their rigs.

  o That is 90 minutes per day not spent driving (*1.5 hours*).

- For employees, 46 weeks a year of working, five days a week, is 230 days of work. Losing -1.5 hours a day to these function means a loss of -345 hours of driving per year.

  o This reduces the driving by an employee to 1,725 hours a year.

| Exhibit 13.-Hours Worked Per Day, 2015 | |
|---|---|
| **Time Worked** | **Share** |
| Less than 6 | 0.4 |
| 7–8 | 0.7 |
| 8–9 | 2.2 |
| 9–10 | 9.3 |
| 10–11 | 15.6 |
| 11–12 | 16.3 |
| 12–13 | 14.4 |
| 13–14 | 22.2 |
| More Than 14 | 14.4 |
| **Average** | **11hours, 55 minutes** |

Source: Surveying the Impact of Work Hours and Schedules on Commercial Motor Vehicle Driver Sleep, Occupational Safety and Health Research Institute, June 2015

- Driving hours by IOOs tend to reflect the drivers profit motive and desire to increase revenue.  In fact, there has been a tendency to excessive driving.  As a result, a 2011 federal law lowered the time drivers could spend behind the wheel to 11-hours a day and mandated a 30-minute break after 8-hours.[15]  To enforce these rules, on the road computer monitoring of trucks was mandated in 2017.[16]  A health study of drivers conducted in 2015 found that 11 hours and 55 minutes a day was the average work day for drivers including on and off road time, with 82.9% working ten hours or longer (*Exhibit 13*).  In addition, the study found that 23.8% of drivers worked beyond federal

---

[15] Drivers may drive a commercial motor vehicle only if 8 hours or less have passed since the end of the driver's last off-duty or sleeper-berth break period of at least 30 minutes. Federal Motor Carrier Safety Administration (*FMCSA*) did not specify when drivers must take the 30-minute break, but the rule requires that they wait no longer than 8 hours after the last off-duty or sleeper-berth period of that length or longer to take the break.  The current 11-hour driving limit remains in effect.

[16] An electronic log monitor devices are required that synchronizes with a vehicle engine to automatically record driving time, for easier, more accurate hours of service recording

daily hourly maximum.  An average of ten hours day driving is a reasonable conclusion or 2,350 hours a year.[17]

- To match the time IOOs are driving will thus take 26.6% more employees.

- To replace an estimated 81,704 IOOs, it will take 103,464 employee drivers or an increase of 21,730.

The increase of 21,730 drivers and their trucks will have two consequences for the delivery of services under California's new rules:

- To move the same amount of cargo, it will add to the truck congestion already occurring on California freeways during peak travel times.  This will reduce the ability of the state's trucking companies, including those crossing state lines, to serve their clients by moving goods in a timely manner.

- In 2015 the U.S. Department of Transportation Jason's Law survey of truck parking found California with the second greatest problem behind tiny Rhode Island.[18]  Adding 103,464 drivers needing to find legal truck parking for two 10 minute break periods and 21,730 additional drivers needing a 30 minute meal break will further overwhelm an already overburdened system.[19]  This will further reduce the ability of trucking firms to provide on-time service to their cargo clients, including those requiring interstate moves. The issue has become a major problem for truck drivers.[20]

**<u>Driver Shortage</u>.**  The need for California trucking companies to find 21,730 more employee drivers comes at a time when the trucking industry's number one problem is a lack of available drivers.  Annual research by the non-profit American Trucking Research Institute (*ATRI*) put the shortage of drivers at 38,000 in 2014.  This went to 45,000 in 2015 and 36,500 in 2016.  By 2017, it was up to 51,000 with the forecast for 2018 at 60,000.  Based upon the demographics of

---

[17] "In addition to being on the road for such lengthy periods, the majority of drivers (82.9%) reported working on average ≥ 10 hours/day (mean = 11 hours, 55 minutes), which included both driving and non-driving duties," Surveying the Impact of Work Hours and Schedules on Commercial Motor Vehicle Driver Sleep, Occupational Safety and Health Research Institute, June 2015

[18] Federal truck ranked California second in lack of truck parking:  1) **Rhode Island** 31.4 spaces per 100 kilometers of vehicle miles traveled. 2.) **California** 53.7 spaces per spaces per 100 kilometers of vehicle miles traveled. Federal Highway Administration, Jason's Law Truck Parking Survey Results and Comparative Analysis, 2015

[19] Additional breaks would be required on shifts over 10 hours, including a second 30 minute meal break and a third 10 minute rest break

[20] The American Transportation Research Institute recently reported that drivers are spending on average about one hour of drive time per day looking for a safe place to park. That time results in $4,600 in lost wages annually. The ATRI study also found that between the hours of 4 pm and 11:59 pm — when many drivers are ready to park for the evening, 63% of drivers are taking 15 minutes or more to look for parking.  Dealing With The Truck Parking Problem, Fleet Owner, Steve Vaughn, April 2, 2018

---

drivers, high turnover rates and economic growth, the number is anticipated to continue growing from there.[21]

Given today's shortage, it will be difficult for motor carriers to find the extra employee drivers needed to provide their current services to their customers, including those whose goods cross state lines.  With the continued growth in demand for trucking services as the U.S. economy grows and consumers increasingly demand or need goods from sectors like international trade, manufacturing, agriculture and e-commerce, the driver shortage will become increasingly acute.  The inefficiencies introduced by California's effort to eliminate IOOs and allow only employee drivers will exacerbate the driver shortage and increase the difficulty for the trucking industry to meets its service requirements.

## Routes

AB-5 will also have a major impact on the routes by which cargo moves in interstate commerce.  If IOOs are prohibited and instead all drivers must be treated as employees, then such employee drivers will need to repeatedly pull off highways to find places to park and rest to comply with California's meal and rest period requirements.  Instead of driving directly along their routes, IOOs must repeatedly change their routes to find one of the limited places where they are legally allowed to park.  As also indicated, truck parking already puts a heavy burden on drivers.  ATRI recently reported that drivers are spending on average about one hour of drive time per day looking for a safe place to park.[22]

This is a particular problem in California.  As discussed, in 2015 the U.S. Department of Transportation Jason's Law survey of truck parking found California with the second fewest locations per 100 kilometers of driving behind tiny Rhode Island.  The truck parking problem will be exacerbated since the inefficiencies of requiring 81,704 IOOs to become employees under state's worker rules mean 26.6% more employees or 21,730 drivers will be needed to accomplish the IOO's former workload.  All 103,464 of these drivers would now need to find legal truck parking for two to three 10 minute break periods.  The added 21,730 employee drivers would also need to park for a 30 minute meal break.  Together, these facts will further overwhelm the already overburdened truck parking capacity.  Routes would be extended to include their repeated search for parking.

These requirements would inject three levels of inefficiency into the system.

- **Route & Parking Restrictions**. First, heavy duty trucks cannot just be driven off freeways and parked anywhere.  Municipalities and counties have very specific rules defining the routes large trucks can take on their streets and in their neighborhoods as well as restrictions on where they can park.  Typical of the rules found in cities and counties along major freeways in Southern California are:

---

[21] Truck Driver Shortage Analysis, Bob Costello, Chief Economist, American Trucking Research Institute reports 2015-2018

[22] See footnote 14

✓ **Moreno Valley (*I-215; SR-60*)**

12.38.020 Parking prohibitions or restrictions.

o  B.  It is unlawful to park or leave standing any commercial vehicle, truck, trailer or semi-trailer having a manufacturer's gross vehicle weight rating of ten thousand (10,000) pounds or more as described in the following:

1. On any highway, street, road, alley or private property within any residential district within the city;

2. On any vacant lot or unimproved nonresidential property in the city;

3. On any nonresidential property so that any part of such vehicle is within one hundred (100) feet of any human dwelling;

4. Within one hundred fifty (150) feet of any driveway opening;

5. Within any commercially zoned property for the purpose other than doing business at the site, or for the purpose not related to such business operation, or remaining parked or standing for longer than reasonably appropriate to do such business or acts related to such business operations;

6. On any nonresidential property so that any part of such vehicle is within fifteen feet of the property line, a public sidewalk, or of a public or private roadway edge;

7. On any alley within the city;

8. On any highway, street or road which is adjacent to a parcel upon which there exists a public facility. Within the meaning of this subsection, "public facility" includes, but is not limited to, parks, schools and civic buildings;

9. Any unattached semi-trailer on a public highway, street, road or alley within the city.

o  C.  While adjacent to a developed residential area within the city, the operator shall not idle the vehicle's engine for longer than five minutes.

✓ **Rialto (*I-10, I-210*)**

10.28.293  Requirements for the parking or storing of commercial vehicles on city streets.

•  A. The parking or storing of trucks, delivery vans, moving vans, tractors, backhoes or other commercial vehicles used primarily in a trade or business and which have a one-ton or more rated carrying capacity or having a maximum gross vehicle weight exceeding ten thousand pounds on city streets is prohibited. If such parking occurs, then, pursuant to California Vehicle Code Section 22651(n), the police department may cause such vehicle to be towed away or otherwise removed and stored or otherwise disposed of in a manner permitted by law.

✓ **Fontana (*I-10, I-210, I-5*)**

Sec. 17-426. Designation and penalties.

(a) Whenever the city council, by ordinance, designates and describes any street or portion thereof as a street the use of which is permitted by any commercial vehicle exceeding a manufacturer's gross vehicle weight rating of 10,000 pounds, the city engineer or city traffic engineer is authorized and directed to erect appropriate signs indicating the streets affected by the ordinance or not affected by the ordinance.

(b) When such commercial vehicle routes are established and designated by appropriate signs, the operator of any commercial vehicle exceeding a manufacturer's gross vehicle weight rating of 10,000 pounds shall drive on such routes and none other, except as otherwise provided in section 17-427. Appropriate signs may be erected for streets or portions thereof, as the city engineer or city traffic engineer determines will best serve to give notice of the prohibition of commercial vehicles exceeding a manufacturer's gross vehicle weight rating of 10,000 pounds.

✓ **Redlands (*I-10*)**

10.54.020: Use Of Truck Routes:

Whenever truck routes are established and designated by appropriate signs, the operator of any vehicle exceeding a maximum gross weight limit of five (5) tons shall drive on such routes and none other; provided, however, the provisions of this chapter shall not prohibit the operator of any vehicle exceeding a maximum gross weight of five (5) tons from having ingress and egress by direct route to and from restricted streets when necessary for the purpose of making pickups or deliveries of goods, wares and merchandise from or to any building or structure located on such restricted streets or for the purpose of delivering materials to be used in the actual or bona fide repair, alteration, remodeling or construction of any building or structure upon such restricted streets for which work a building permit has previously been obtained, subject to the restrictions of section 10.54.040 of this chapter. (Ord. 2097 § 1, 1989)

✓ **San Bernardino County (*I-10, I-15, I-215, I-210, I-40*)**

52.0128  Restriction or Prohibition of Parking of Commercial Vehicles.

(a) Whenever the Board determines that it is necessary to prohibit stopping, standing or parking of commercial vehicles having a manufacturer's gross vehicle weight rating exceeding 10,000 pounds on certain residential district streets, portions thereof, or with a limited access residential community at all or certain hours of the day, the Board shall, by resolution, direct the Road Commissioner to place appropriate signs specifying applicable prohibitions on such streets or entrances to the limited access residential communities thereof.

- **Time Off.**  Second, required rest and meal breaks will take significant time beyond the required break periods when cargo is not moving.  When drivers find they must stop for a breaks, they must exit the freeway and follow routes set by local jurisdictions and find a place where parking of heavy duty trucks is allowed.  When their break time is over, they must move back along city or county streets to the freeway.  As they make this circuit, they must deal with local traffic, signals and stop signs.  As indicated, the process of getting to and from their break can take as much as an hour (*page 12*).  Routes are effectively extended to include the paths taken to accommodate the required break rules.

- **Out of State Firms.**  Much of the truck traffic moving into and out of California is managed by motor carriers headquartered outside the state.   If California requires employee drivers, and an out of state driver brings goods to the state, the state is likely to expect that driver to be subject to the state's labor and employment rules while they are inside its jurisdiction.  This could impact the routes along which goods move in one of two ways:

  - Cargo would have to be handed off to a local employee driver at the state line, interfering with the routes by which firms can arrange for cargo to move.

  - Out of state drivers would have to also find places to take required rest and meal breaks, changing their routes and the timing of cargo movements in the same way that applies to state drivers.  This does not seem like a practical solution, since the out of state drivers will be IOOs who are not subject to employee rules in any other jurisdiction.  Yet, during the limited time that such an IOO is in California, he or she would need to record all hours worked (and receive overtime according to California's method), record and take meal periods, take rest breaks, be reimbursed for business expenses.  Because the out of state firm does not typically employ this person (or perhaps any drivers), it would not have the necessary systems or policies needed to comply with California law.

In effect, by California uniquely requiring that all drivers become employees, the state will be requiring changes to the routes by which freight moves and slow the speed at which deliveries can be made.  This would directly impact routes by making them less efficient and less direct, including deviations for more frequent break times.  It could also result in certain routes not being offered by motor carriers, since they will no longer be profitable or worth retaining a full-time employee to service.  Interstate commerce would be affected as California's large economy plays such a major role in manufacturing, growing, trading and movement of goods.  In addition, the confusion introduced with regards to the route requirements for out of state drivers is precisely the situation that the interstate commerce system is designed to avoid.

## Prices

As discussed, under the current model, "trucking" companies negotiate with cargo owners to move their goods.  They contract with IOO drivers to pick-up and deliver the merchandise.  Those contracts include a supplement if diesel prices rise above certain levels.  As entrepreneurs,

the IOOs own or lease their trucks, handle their own servicing and maintenance, decide how often they will drive, how long they drive on an average day and take breaks as they must.

If the IOOs are required to become employees, motor carriers will no longer pay a fuel supplement. Motor carriers will pay an hourly wage or other sufficient compensation to drivers to pay for all hours worked and be subject to state employment rules for minimum wage, meal and rest period requirements, reimbursement for expenses and the full panoply of labor and employment rights. Motor carriers will also be required to find storage facilities for a trucking fleet, set-up a trucking maintenance and repair operation and hire staff to oversee their workers and their trucking fleets.

This change will increase the cost and decrease the efficiency of the goods movement process and force increases in prices of transporting goods. As so much of California's trade is with the balance of the U.S., it will raise the prices at which interstate trade is conducted (*see inelasticity discussion below*).

| Exhibit 14.-Time of Work & Pay, California, 2018 | | | | |
|---|---|---|---|---|
| | **Weeks** | **Days** | **Hours** | **Straight Time** |
| Full Time | 46 | 5 | 8 | 1,840 |
| Vacation (2 weeks) | 2 | 5 | 8 | 80 |
| Holidays (10 days ) | 0 | 10 | 8 | 80 |
| Business Cycle Down | 2 | 5 | 8 | 0 |
| **Total Hours** | **50** | | **1,800** | **2,000** |
| Median Pay in CA | | | | $21.84 |
| **Straight Time Pay** | | | | **$43,680.00** |
| **Overtime Hours** | 45 | 5 | 1 | 225 |
| Time & one-half | | | | $32.76 |
| **Over Time Pay** | | | | **$7,371.00** |
| **Total Pay** | | | | **$51,051.00** |

Sources: CA Labor and Workforce Agency; CA Employment Development Department

The hourly cost of an employee at California's median pay for heavy and tractor trailer truck drivers in first quarter 2018 was $21.84 per hour. After eight hours in a day, that rises to $32.76.[23] A typical driver will be paid 2,000 hours straight time including 1,840 hours driving, 80 for two weeks paid vacation, 80 for ten annual holidays. They will not drive for two weeks due to the annual business cycle for cargo. Straight time, they will earn $43,680. Usually, they will work one hour of overtime per day or 225 days a year for $7,371 per year. The total compensation will be $51,051 (*Exhibit 14*).

In addition, employers are required to cover a variety of benefits for the employees including unemployment insurance, workers compensation insurance, health insurance and the employer's share of social security. These total a cost of $17,596 for an employee at the median pay scale (*Exhibit 15*). Together, the pay and benefits for the median paid employee would total $68,647.

---

[23] This assumes that the driver is not exempt from overtime under the FLSA and California state law.

| Exhibit 15.-Benefit & Overhead &Total Costs, California | |
|---|---|
| Maximum Applicable for UI | $7,000 |
| Percent Required | 3.40% |
| **Unemployment Insurance** | **$238** |
| Cost Per 100 Dollars | $511 |
| Hartford Accident & Indemnity, 2017 | 15.75 |
| **Workers Compensation Insurance** | **$8,041** |
| Kaiser PPO | $6,521 |
| Worker Pays 17% | $1,109 |
| **Health Insurance** | **$5,412** |
| Total Hourly Compensation | $51,051 |
| Employer SSI Share | 7.65% |
| **Social Security Employer's Share** | **$3,905** |
| **Benefit Costs** | **$17,596** |
| **Hourly Compensation (*Exhibit 11*)** | **$51,051** |
| **Total Cost Employee Costs** | **$68,647** |
| **Personnel & Truck Maintenance Overhead** | **10%** |
| **Overhead Cost Per Employee Worker** | **$6,865** |
| **Grand Total Cost Per Employee** | **$75,512** |
| **Replace Lost Driving Time (*Exhibit 12*)** | **26.6%** |
| **Cost To Replace Lost Driving Time** | **$20,083** |
| **Cost Per Employee Driver Including Extra Cost Of Replacing Lost Work** | **$95,595** |

Over and above the direct employee costs, an employer would also have to set up and staff a personnel department, set up or contract for truck maintenance and repair and truck parking, pay vendors for timekeeping and payroll services, and incur other administrative costs associated with having employees. Conservatively, this would add an estimated 10% per worker or $6,865 to the cost of conversion to employees, for a total of $75,512.

Given the cost of $75,512 per employee driver and adding the 26.6% of time that must be made up from not using IOOs (*see Exhibit 12*), means an additional cost of $20,083 to offset the lost IOOs. Altogether, the cost per driver of the conversion to employee drivers would be $95,595 (*Exhibit 15*).

Research by this economist using data on 2,648 IOOs showed them earning a net of $59,478 per year in 2013 working in the goods movement sector.[24] Adding 11.3% to that amount for Southern California inflation from 2013-2018 would raise that to $66,178. That is far below the equivalent cost of $95,595 that employee drivers would cost the goods movement system. Given the "inelasticity of demand" for trucking services by customers, an increase at that scale must cause an increase in the price of moving goods in cases where California firms are involved, including those involved in interstate commerce.

---

[24] Exhibit 5. Median & Mean Performance, 2,648 IOOs, 2013, Owner Operator Driver Compensation, 2015, John E. Husing, Ph.D.

**Inelasticity.**  Motor carriers have the ability to pass cost increases on to their customers through higher prices because trucking services are a "necessity" to the overwhelming share of their clients.  Thus, importers face penalties if they do not get containers off of docks and airports and on to warehouses.  Farmers need their products removed from the fields and brought to buyers while they are still fresh.  In an era of just-in-time inventory controls, manufacturers are under intense pressures to get their products to customers in a timely fashion because today's firms tend to hold down costs by keeping their inventories very lean.  Wholesalers and retailers are under pressure to get their products to buyers at ever increasing speeds with some even promising same day deliveries.

In this economic environment, a given percentage increase in the price of trucking rates will result in a smaller percentage decrease in demand.  That is the very definition of "inelastic."  It means that when costs go up, motor carriers will be able to pass a significant share off the cost on to their clients via higher prices without suffering a commensurate loss of demand.  Rising labor costs to California motor carriers will thus increase prices in intra and interstate commerce.