STACEY M. LEYTON (SBN 203827)
Email: sleyton@altber.com
ANDREW KUSHNER (SBN 316035)
Email: akushner@altber.com
ELIZABETH VISSERS (SBN 321365)
Email: evissers@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Attorneys for Intervenor-Defendant
International Brotherhood of Teamsters

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department. <br><br> Defendants, <br><br> and <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS, <br><br> Intervenor-Defendant. | Case No. 3:18-cv-02458-BEN-BLM <br><br> **INTERVENOR-DEFENDANT'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER** <br><br> Hearing Date: TBD <br> Time: TBD <br> Courtroom: 5A <br> Judge: Honorable Roger T. Benitez <br> Action Filed: October 25, 2018 <br> Trial Date: Not set |

**INTRODUCTION**

The application by Plaintiffs California Trucking Association ("CTA"), Ravinder Singh, and Thomas Odom (collectively, "Plaintiffs") for the extraordinary relief of a temporary restraining order ("TRO") is premised on a non-existent emergency. Assembly Bill 5 ("AB 5"), which takes effect January 1, 2020, merely codifies a test for employee status that has been the law of California for almost 20 months. Not surprisingly, despite numerous opportunities to do so, Plaintiffs fail to demonstrate any irreparable harm that will ensue upon the effective date of that codification.

Even if the codification of a longstanding test for employee status could somehow result in irreparable injury, Plaintiffs' application would require them to show that unless this Court issues a TRO enjoining the State from enforcing AB 5 they will face that irreparable injury *during the 13 days* after January 1, 2020 and before this Court has the opportunity to hear their preliminary injunction motion on the January 13, 2020 hearing date. Dkt. 66-1.[1] But despite Intervenor's specific request that they identify *any* enforcement action that would take place during those 13 days, Plaintiffs identify *nothing whatsoever* that will actually occur during the relevant 13-day period—much less something that would irreparably injure them or their members. *See infra* at 4 & n.3.

The sole "purpose of a TRO is to preserve the status quo and prevent irreparable harm." *Jones v. H.S.B.C. (USA)*, 844 F.Supp.2d 1099, 1100 (S.D. Cal. 2012). But as Intervenor and State Defendants pointed out in opposing Plaintiffs' preliminary injunction motion, *e.g.*, Dkt. 58 at 9-10, Plaintiffs are seeking preliminary relief to *modify* the status quo. The status quo for the past nearly 20 months has been that the "ABC test" (which Plaintiffs seek to enjoin) is the legal test to determine whether individuals working in California are entitled to certain

---

[1] Plaintiffs originally noticed their motion to preliminarily enjoin the State from enforcing AB 5 on December 30, 2019, but this Court moved that hearing to January 13, 2020. Dkt. 61.

employment law protections.[2]  Plaintiffs could have sought preliminary injunctive relief any time during those 20 months but failed to do so.  And even if it could somehow be argued that the codification of that ABC test resulted in additional harm, Plaintiffs could have moved for injunctive relief at any time after AB 5's enactment on September 18, 2019.  Instead, Plaintiffs waited to notice their motion for the last possible hearing date in 2019.

Having sat on their rights, Plaintiffs should not be rewarded for a self-proclaimed emergency of their own making.  Although Intervenor and State Defendants pointed this out in opposing Plaintiffs' preliminary injunction application, *e.g.*, Dkt. 55 at 17-19, Dkt. 58 at 7-11, Plaintiffs do not even attempt to explain why, if the adoption of the ABC test constitutes an emergency, they did not seek relief after the California Supreme Court adopted the very same test 20 months ago.  Instead, they offer an unpersuasive defense of the timeliness of requesting injunctive relief *two and one-half months after* AB 5's enactment, on the last possible date they could have done so, without even acknowledging that the status quo has been the same since April 30, 2018.  *See* Dkt. 66-1 at 16-17.

Finally, even if Plaintiffs could show irreparable injury, they cannot demonstrate likely success on the merits or the other equitable factors, which are indispensable requirements to obtain a TRO.  *See Los Angeles Unified Sch. Dist. v. United States Dist. Court,* 650 F.2d 1004, 1008 (9th Cir. 1980).

## BACKGROUND

On April 30, 2018, the California Supreme Court held that the "ABC test" is the applicable legal standard to determine whether an individual worker is an employee or independent contractor for purposes of California's Wage Orders. *Dynamex,* 4 Cal.5th at 955-56.  After the *Dynamex* decision, Plaintiffs filed this

---

[2] AB 5, which takes effect January 1, 2020, codified the California Supreme Court's April 2018 decision in *Dynamex Operations West, Inc. v. Superior Court,* 4 Cal.5th 903 (2018), which held that workers who qualify as employees under the "ABC test" are entitled to certain employment law protections, including minimum wages, meal and rest breaks, and expense reimbursement.

lawsuit to challenge the ABC test. Dkt. 1. On August 5, 2019, this Court stayed this case pending resolution of an appeal raising the same issue (in a case in which the district court had *rejected* the trucking industry's challenge to the ABC test). Dkt. 43. On September 11, 2019, the California Legislature adopted AB 5, which codified use of the ABC test to distinguish between employees and independent contractors for purposes of California's Wage Orders, Labor Code, and Unemployment Insurance Code. The Governor signed AB 5 into law on September 18, 2019.

After the appeal raising the same issue was voluntarily dismissed, this Court lifted its stay of this case on September 16, 2019. Shortly thereafter, on September 24, 2019, the Court dismissed Plaintiffs' First Amended Complaint with leave to amend in light of AB 5's enactment. Dkts. 44-46. Plaintiffs waited *49 days* following that dismissal to file their Second Amended Complaint, Dkt. 47, and then *three more weeks* to move for a preliminary injunction, noticing their motion for December 30, 2019—*two days* before AB 5 takes effect. Dkt. 54. On December 20, 2019, this Court continued the hearing for Plaintiffs' preliminary injunction motion to January 13, 2020. Dkt. 61.

## ARGUMENT

Interim relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As with a motion for a preliminary injunction, plaintiffs must establish that absent a TRO they are (1) *likely* to suffer irreparable harm, (2) *likely* to succeed on the merits, and that (3) the balance of equities and (4) public interest both favor preliminary relief. *Id*. at 20. Absent a "*clear showing*" on *all* factors, Plaintiffs' request must be denied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Plaintiffs cannot establish any of these factors, let alone make a "clear showing" as to all of them.

## I.    Plaintiffs' showing of irreparable harm is wholly inadequate.

For purposes of Plaintiffs' TRO request, the relevant time period is the 13 days after AB 5 takes effect and before the hearing on their preliminary injunction motion.  But despite Intervenor's specific e-mailed request, Plaintiffs have failed to identify *a single* enforcement action by Defendants against any CTA member company (or any other trucking company) that could possibly result in any injury (irreparable or otherwise) during the first 13 days of 2020.[3]  That alone disposes of plaintiffs' claim of imminent, irreparable injury.

Plaintiffs assert that the threat of criminal prosecution fulfills the requirement that they demonstrate imminent irreparable injury.  Dkt. 66-1 at 12-13.  But Plaintiffs acknowledge that this purported threat of criminal prosecution has existed since April 2018 when *Dynamex* was decided, because violations of the California's Wage Orders are also criminal misdemeanors.  Dkt. 66-1 at 8.  It is black letter Ninth Circuit law that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution" suffices to seek pre-enforcement injunctive relief.  *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).  Instead, preliminary relief requires "a 'genuine threat of *imminent* prosecution.'" *Id*. (emphasis added).  But Plaintiffs fail to identify *any* criminal prosecution of *any* company, during the 20 months since *Dynamex*, much less any threat of imminent prosecution against any CTA member.

It has been the status quo since April 2018 that any worker who is an employee under the ABC test enjoys employment protections including mandated

---

[3] Plaintiffs sent an e-mail at 4:41pm on December 20, 2019 asking whether State Defendants and Intervenor would agree to a TRO pending the January 13 hearing.  Declaration of Stacey M. Leyton in Opposition to TRO ("Leyton Decl.") ¶2.  Intervenor's counsel responded at 5:15pm that day, "Can you please identify any specific state enforcement proceedings that you contend will take place between January 1 and January 13, to inform our consideration of your request?" *Id*. ¶2.  Plaintiffs never responded to that inquiry or otherwise identified *any* enforcement proceedings that could occur before the preliminary injunction hearing.  *Id*. ¶3.  Their TRO application mentions no such ongoing proceeding.  *See* Dkt. 66-1 at 13 (asserting "serious risk of civil investigations and enforcement actions" but failing to identify any such proceedings).

meal and rest breaks, minimum wage guarantees, and reimbursement for expenses. Plaintiffs are now seeking an impermissible TRO to *alter* that status quo. *See Jones*, 844 F.Supp.2d at 1100. Nothing will change on January 1 that could justify the emergency preliminary relief plaintiffs seek.

Moreover, any supposed "emergency" in this case would be entirely of Plaintiffs' own making. Plaintiffs could have moved to enjoin enforcement of the ABC test at any point after *Dynamex* was decided in April 2018. Or, setting that aside, they could have moved for such relief shortly after Governor Newsom signed AB 5 on September 18, 2019. But Plaintiffs did neither. Instead, Plaintiffs made no request for injunctive relief after filing this case in October 2018. And after this Court dismissed their First Amended Complaint with leave to amend to address AB 5's enactment, Plaintiffs waited *49 days* to file their Second Amended Complaint, Dkts. 46-47, and then another *three weeks* to file their motion for a preliminary injunction, which they noticed for a hearing on December 30, 2019— the last possible hearing date on this Court's calendar before AB 5 takes effect. Dkt. 58. Thus, Plaintiffs noticed a motion that could have been brought any time after April 2018 (or certainly any time after September 18, 2019) for a hearing at a time with *less than 40 hours to go before AB 5 becomes effective*. Having sat on their rights and then gambled on obtaining a hearing during a holiday week, Plaintiffs cannot now claim that an emergency requires this Court to enjoin the State pending the hearing that Plaintiffs could have obtained long ago.

In any event, even if Plaintiffs could show imminent enforcement actions, and even if they had requested injunctive relief at the earliest possible time, Plaintiffs have not shown that enforcement of AB 5 will injure them at all. As explained in Intervenor's preliminary injunction opposition, Plaintiffs' asserted injury rests on the contention that they will be harmed if the ABC test rather than the multi-factor test set forth in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rel.*, 48 Cal.3d 341 (1989), determines whether a worker enjoys California's

employment protections. Dkt. 58 at 4-5. But Plaintiffs have not shown that that *any* CTA member will actually be affected by which test is used to determine employee status. To establish injury as a result of the ABC test, CTA would have to demonstrate that at least one of its members is a business whose workers are (1) *subject to* California's employment laws under the ABC Test; but (2) *exempt from* those laws under the *Borello* standard. CTA has not, and there is good reason to doubt that CTA could make such a showing given that the California Department of Labor Standards Enforcement found in *97% of cases* that drayage drivers were misclassified even under the *Borello* standard. *See* Dkt. 58 at 5-6.[4]

Nor do Plaintiffs even respond to the showing by Intervenor and the City of Los Angeles that they could avoid any purported injury through AB 5's "business-to-business" exception, Cal. Lab. Code §2750.3(e). That exemption allows owner-operators to continue to contract as independent contractors if they are actually independent businesses. *See* Dkt. 58 at 18-19 & n.15; Dkt. 64-2 (Proposed Amicus Br. of L.A. City Att'y). Although both Intervenor and the Los Angeles City Attorney *amicus* brief identified this flaw in Plaintiffs' argument, Plaintiffs do not mention the business-to-business exception *a single time* in their TRO application.

Finally, even if Plaintiffs could establish injury due to the change from *Borello* to the ABC test the supposed harmful effects about which they complain have been the law *for over one-and-a-half years*. Yet Plaintiffs fail to show irreparable injury to a single member during this time period. In such circumstances, courts are rightfully doubtful of claims of irreparable harm. *See,*

---

[4] Plaintiffs also ignore Intervenor's showing that their assertion that the ABC test requires motor carriers to "acquire trucks, hire and train employees," Dkt. 66-1 at 13, is wholly without merit. Even if their drivers are classified as employees under the applicable legal test, motor carriers will still be free to contract with drivers who own their own trucks on a short-term or seasonal basis. *See* Dkt. 58 at 8-9. All that California law requires is that, if an owner-operator on a particular job meets the ABC test, he or she be paid in accordance with California's minimum wage rules, provided with meal and rest breaks, and reimbursed for costs incurred in operating his or her truck during the job. *Id.* Instead of offering a reasoned response to Intervenor's showing, Plaintiffs merely repeat their unsupported assertion.

*e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (delay in seeking emergency relief "undercut" plaintiff's claim of irreparable harm); *see also* Dkt. 58 at 9-10 (citing other cases).

If this Court denies Plaintiffs' requests for a TRO and preliminary injunction (as it should), moreover, nothing would preclude any CTA member facing an enforcement action from raising Plaintiffs' challenges to the ABC test as defenses to that enforcement action, which would be the ordinary procedure for adjudicating Plaintiffs' federal law challenges to that test. In such a proceeding, a court could, based on the specific facts of the case, determine whether applying the ABC test would even matter (or, instead, if the workers at issue would be employees under *Borello* so that either test would produce the same outcome).

In fact, it appears that one CTA member is currently involved in such a proceeding where the State Superior Court has indicated in a tentative ruling that the ABC test is *not* preempted by federal law. *See* Dkts. 64-2 at 14-15, 64-3, 64-5 at 22. The timing of Plaintiffs' preliminary injunction motion (filed *long* after the enactment of AB 5 but just one week after the Los Angeles Superior Court's tentative ruling) would suggest that Plaintiffs are motivated less by any actual change in the law in 2020 than by the desire to obtain a favorable ruling from a federal court on important California law issues (such as the application of the business-to-business exemption, Cal. Lab. Code §2750.3(e)) without full briefing and before a state court has the opportunity to issue any decision in the state court proceeding. *See* Dkt. 64-2 at 14-15; *see also Railroad Comm. of Tex. v. Pullman Co.*, 312 U.S. 496, 499-500 (1941) (because state courts have "last word on the meaning of" state law, federal courts "should not decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication"). That rush to obtain a favorable ruling, in the absence of any irreparable harm showing, would be an improper basis to award a TRO.

## II.    Plaintiffs fail to satisfy the other temporary restraining order factors.

A TRO requires the same showing as a preliminary injunction, so Plaintiffs must not only demonstrate that they are (1) *likely* to suffer irreparable harm (which they fail to do) but also that they are (2) *likely* to succeed on the merits, and that (3) the balance of equities and (4) public interest both favor preliminary relief.  *See Winter*, 555 U.S. at 20; *Los Angeles Unified Sch. Dist.*, 650 F.2d at 1008.  Plaintiffs fail to make that showing.

Plaintiffs do not demonstrate likely success on the merits of their claims.  As explained in Intervenor's preliminary injunction opposition (which is included as an appendix to this brief), Plaintiffs lack standing even to assert these claims.  Dkt. 58 at 4-7.  And binding Ninth Circuit precedent establishes that the substantive California law requirements that attach as a result of the ABC test are neither preempted by the Federal Aviation Administration Authorization Act nor invalid under the dormant Commerce Clause.  *See* Dkt. 55 at 6-17; Dkt. 58 at 11-24.[5] Plaintiffs' contrary arguments depend on their erroneous assertion that the ABC test precludes motor carriers from contracting with independent truck drivers who own and operate their own trucks.  *See* Dkt. 58 at 8-9.[6]

_____

[5] The dormant Commerce Clause cases that Plaintiffs cite for the first time in their TRO application, Dkt. 66-1 at 11-12, are inapposite because they address direct, specific regulations of the means of interstate commerce.  *See Southern Pac. Co. v. Arizona*, 325 U.S. 761, 764 (1945) (state statute making it unlawful to operate "train of more than fourteen passenger or seventy freight cars"); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 521-22 (1959) (state statute "requiring the use of a certain type of rear fender mudguard on trucks and trailers"); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 430 (1978) ("administrative regulations … governing the length and configuration of trucks").  By contrast, the California employment laws that Plaintiffs challenge are generally applicable regulations that apply to *all* employers, which Ninth Circuit precedent holds survive challenge under the dormant Commerce Clause.  *See* Dkt. 58 at 21-22 (citing *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011)).

[6] Plaintiffs contend that Intervenor's arguments ignore the "combined" impact of California's employment law requirements.  Dkt. 66-1 at 14 (emphasis omitted).  To the contrary, Intervenor's argument relies on Ninth Circuit precedent holding that, *as a general matter*, labor law requirements are not preempted because, unlike regulations that define a motor carrier's relationship with its customers, laws that define "the relationship between a motor carrier and its workforce ... are several steps removed from prices, routes, or services."  Dkt. 58 at

Plaintiffs also cannot demonstrate either that the balance of hardships tips in their favor or that an injunction would be in the public interest.  Plaintiffs fail to identify *any* pending enforcement actions that could result to injury to them, so a TRO would serve only to create confusion and harm workers' and the State's interest in effectively addressing the misclassification of workers and the public consequences of such misclassification.  *See* Dkt. 58 at 24-25; *see also, e.g.*, *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("'Faced with … a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' request for a temporary restraining order should be denied.


Dated:  December 26, 2019                          Respectfully submitted,

                                                   STACEY M. LEYTON
                                                   ANDREW KUSHNER
                                                   ELIZABETH VISSERS
                                                   Altshuler Berzon LLP

                                                   By:    */s/ Stacey M. Leyton*
                                                          Stacey M. Leyton

                                                   Attorneys for Intervenor-Defendant
                                                   International Brotherhood of
                                                   Teamsters

13-14 (quoting *California Trucking Ass'n v. Su*, 903 F.3d 953, 963 (9th Cir. 2018)).

# Appendix

STACEY M. LEYTON (SBN 203827)
Email: sleyton@altber.com
ANDREW KUSHNER (SBN 316035)
Email:  akushner@altber.com
ELIZABETH VISSERS (SBN 321365)
Email: evissers@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Attorneys for Intervenor-Defendant
International Brotherhood of Teamsters

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; JULIE SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, PATRICK HENNING, in his official capacity as the Director of the Employment Development Department.<br><br>Defendants,<br><br>and<br><br>INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>Intervenor-Defendant. | Case No. 3:18-cv-02458-BEN-BLM<br><br>**OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Date: December 30, 2019<br>Time: 10:30am<br>Courtroom: 5A<br>Judge: Honorable Roger T. Benitez<br>Action Filed: October 25, 2018<br>Trial Date: Not set |

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION .................................................................................. 1

BACKGROUND ................................................................................... 2

ARGUMENT ....................................................................................... 3

I.  Plaintiffs lack standing to obtain injunctive relief ................................ 3

      A.     Plaintiff CTA lacks standing ............................................ 4

              1.     CTA lacks associational standing ............................... 4

              2.     CTA fails to establish standing for pre-enforcement relief ...... 6

      B.     Plaintiff Odom does not have standing and cannot seek relief except as applied to him ................................................................ 7

II.  Plaintiffs fail to establish that they will suffer irreparable injury ....................... 7

III. Plaintiffs cannot demonstrate a likelihood of success on their claims .............. 11

      A.     Plaintiffs are unlikely to succeed on their FAAAA claim ................. 11

              1.     The ABC test is not itself a substantive requirement ............... 12

              2.     Ninth Circuit precedent establishes that the FAAAA does not preempt California labor law's substantive requirements ........ 13

              3.     Plaintiffs misrepresent AB 5's effects ..................................... 16

               4.     Plaintiffs rely on inapposite and unpersuasive case law .......... 19

      B.     Plaintiffs are unlikely to succeed on their dormant Commerce Clause claim ...................................................................... 21

IV. The balance of the equities tips in defendants' favor ....................................... 24

V.  Granting preliminary injunctive relief is not in the public interest ................... 25

# <u>TABLE OF AUTHORITES</u>

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am. v. City and Cty. of San Francisco*,
   266 F.3d 1064 (9th Cir. 2001) .................................................................... 14

*Alaska Airlines, Inc. v. City of Long Beach*,
   951 F.2d 977 (9th Cir. 1991) .............................................................. 22, 23

*Alvarez v. XPO Logistics Cartage LLC*,
   2018 WL 6271965 (C.D. Cal. 2018) ................................................... 12, 21

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ............................................................ 13, 19

*American Trucking Associations, Inc. v. Scheiner*,
   483 U.S. 266 (1987) ........................................................................... 22, 23

*B&O Logistics, Inc. v. Cho*,
   2019 WL 2879876 (C.D. Cal. 2019) ........................................................ 21

*Bedoya v. American Eagle Express Inc.*,
   914 F.3d 812 (3d Cir. 2019) ..................................................................... 20

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018) ............................................................................. 25

*California Drive-In Rest. Ass'n v. Clark*,
   22 Cal.2d 287 (1943) ................................................................................ 24

*California Tow Truck Ass'n v. City and Cty. of San Francisco*,
   693 F.3d 847 (9th Cir. 2012) .................................................................... 13

*California Trucking Ass'n v. Su*,
   2017 WL 6049242 (S.D. Cal. 2017) .................................................. 12, 16

*California Trucking Association v. Su*,
   903 F.3d 953 (9th Cir. 2018) ............................................................*passim*

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
   152 F.3d 1184 (9th Cir. 1998) .................................................. 15, 16, 17, 20

*Chambers v. RDI Logistics, Inc.*,
   65 N.E.3d 1 (Mass. 2016)..................................................................20

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .........................................................................7

*Conn v. Gabbert*,
   526 U.S. 286 (1999) .........................................................................7

*Dep't of Rev. of Ky. v. Davis*,
   553 U.S. 328 (2008) .........................................................................21

*DiFiore v. American Airlines, Inc.*,
   646 F.3d 81 (1st Cir. 2011) .............................................................20

*Dilts v. Penske Logistics, LLC*,
   769 F.3d 637 (9th Cir. 2014)....................................................*passim*

*Dynamex Operations West, Inc. v. Superior Court*,
   4 Cal.5th 903 (2018)..............................................................*passim*

*Elrod v. Burns*,
   427 U.S. 347 (1976) .........................................................................11

*Estrada v. FedEx Ground Package Sys., Inc.*,
   154 Cal.App.4th 1 (2007)..................................................................8

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015).........................................................10

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008).......................................................24

*In re Federal Preemption of Provisions of the Motor Carrier Act*,
   223 Mich. App. 288 (Mich. Ct. App. 1997).................................19, 20

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009).......................................................25

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010)...........................................................4

*Lopez v. Heckler*,
   713 F.2d 1432 (9th Cir. 1983).......................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 7

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984)................................................ 10

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012)................................................... 7

*Massachusetts Delivery Association v. Healey*,
    821 F.3d 187 (1st Cir. 2016) ................................................. 20

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................. 3

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................ 11

*Mendis v. Schneider Nat'l Carriers Inc.*,
    2016 WL 6650992 (W.D. Wash. 2016) .................................. 24

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .............................................................. 11

*Nat'l Ass'n of Optometrists & Opticians v. Brown*,
    567 F.3d 521 (9th Cir. 2009)................................................. 23

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985)........................................... 1, 10

*Pharm. Research & Mrfs. of Am. v. Alameda County*,
    768 F.3d 1037 (9th Cir. 2014)............................................... 22

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ......................................................... 22, 24

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005)........................................... 25, 26

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ........................................................ 11, 13

*S.D. Myers, Inc. v. City and Cty. of San Francisco*,
    253 F.3d 461 (9th Cir. 2001)................................................. 22

*San Diego Cty. Gun Rights Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) ........................................................... 6

*Schwann v. FedEx Ground Package Sys., Inc.*,
    813 F.3d 429 (1st Cir. 2016) .................................................... 20, 21

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Rel.*,
    48 Cal.3d 341 (1989) .............................................................. *passim*

*Sullivan v. Oracle Corp.*,
    662 F.3d 1265 (9th Cir. 2011) ...................................................... 9, 22

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................... 4, 5

*Thomas v. Anchorage Equal Rights Com'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) .......................................... 6

*Valadez v. CSX Intermodal Terminals, Inc.*,
    2019 WL 1975460 (N.D. Cal. 2019) ............................................... 21

*Viceroy Gold Corp. v. Aubry*,
    75 F.3d 482 (9th Cir. 1996) ............................................................. 7

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................ 5

*Western States Trucking Ass'n v. Schoorl*,
    377 F.Supp.3d 1056 (E.D. Cal. 2019) .................................... *passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... *passim*

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983) ........................................................... 7

**Federal Statutes**

29 U.S.C. §213 .................................................................................. 14

49 U.S.C. §14501(c)(1) ..................................................................... 11

**California Statutes and Regulations**

Cal. Code Regs., tit. 8, §11090 ................................................................. 2

Cal. Lab. Code §90.5(a) ........................................................................ 23

Cal. Lab. Code §512(b) ......................................................................... 14

Cal. Lab. Code §2750.3(e) ................................................................. 18, 19

**Other Authorities**

Analysis of SB 1402, Cal. Senate Committee on Appropriations
(May 7, 2018) ...................................................................................... 5

1

## **INTRODUCTION**

2       Misclassification of "workers as independent contractors rather than

3   employees is a very serious problem," *Dynamex Operations West, Inc. v. Superior*

4   *Court*, 4 Cal.5th 903, 913 (2018), and the trucking industry is no exception.  The

5   California Supreme Court addressed this "very serious problem" *over 19 months*

6   *ago* when it held in *Dynamex* that workers who qualify as employees under the

7   "ABC test" are entitled to certain employment law protections, including minimum

8   wages, meal and rest breaks, and expense reimbursement.  The California

9   Legislature subsequently codified the ABC test in Assembly Bill 5 ("AB 5").

10      Now, *over a year* after filing this action challenging the ABC test, Plaintiffs

11  California Trucking Association ("CTA"), Ravinder Singh, and Thomas Odom

12  (collectively, "Plaintiffs") suddenly contend that an emergency requires enjoining

13  use of the ABC test to determine truck drivers' employment status.  Dkt. 54-1

14  ("PI").  But Plaintiffs' claims of imminent, irreparable injury mischaracterize and

15  exaggerate the effect of a test that has been in place for 19 months.  Plaintiff CTA

16  does not establish that a single member has actually been injured by the ABC test

17  during this time period.  Plaintiffs also lack standing to obtain the injunctive relief

18  they seek, and their request to enjoin the status quo cannot be accepted because of

19  their "long delay before seeking a preliminary injunction."  *Oakland Tribune, Inc.*

20  *v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

21      Further, Plaintiffs fail to satisfy the remaining requirements for a preliminary

22  injunction.  Plaintiffs cannot demonstrate likely success because AB 5's definition

23  of "employee" (like other tests that predated *Dynamex* and AB 5) does not impose

24  any substantive requirements.  Instead, it merely determines *whether* a worker is

25  covered by the same substantive employment law requirements that the Ninth

26  Circuit has already held are *not* preempted and *can* be enforced against trucking

27  companies (including, most recently, when it rejected CTA's prior preemption

28  challenge to California's labor laws).  Because binding appellate precedent holds

1    that federal law does *not* exempt trucking companies from complying with the

2    requirements of those laws, Plaintiffs' challenge to AB 5 necessarily fails.

3           Finally, Plaintiffs cannot establish that the balance of equities or public

4    interest support injunctive relief, given their non-existent showing of irreparable

5    injury and weak merits arguments, and the injury to workers that would result from

6    deprivation of important employment protections they have enjoyed for 19 months.

7                                   **<u>BACKGROUND</u>**

8           On April 30, 2018, the California Supreme Court held that the "ABC test"

9    determines whether an individual worker is an employee or independent contractor

10   for purposes of California's Wage Orders. *Dynamex*, 4 Cal.5th at 955-56.[1]  Thus,

11   since April 2018, it has been established that any worker who is an employee under

12   the ABC test enjoys certain protections, including the right to minimum wages

13   (Cal. Code Regs., tit. 8, §11090, Parts 4-5), meal and rest breaks (*id*., Parts 11-12),

14   provision of or reimbursement for work-required tools (*id*., Part 9(B)).[2]

15          After the *Dynamex* decision, trucking industry associations sued to challenge

16   application of the ABC test to motor carriers in July (*Western States Trucking*

17   *Ass'n v. Schoorl*, 377 F.Supp.3d 1056 (E.D. Cal. 2019) ("*WSTA*")) and October

18   2018 (this action).  After motions to dismiss were fully briefed in this case, the

19   *WSTA* court dismissed with prejudice the same Federal Aviation Administration

20   Authorization Act ("FAAAA") and dormant Commerce Clause claims Plaintiffs

21   raise here.  377 F.Supp.3d at 1071-74 (relying on Ninth Circuit's rejection of

---

22
23          [1] The Wage Orders are constitutionally authorized, quasi-legislative regulations
     of work conditions with the force of law.  *Id.* at 914 n.3.  "The ABC test
24   presumptively considers all workers to be employees" unless three conditions are
     each shown: "(a) that the worker is free from the control and direction of the hirer
25   in connection with the performance of the work, both under the contract for the
     performance of the work and in fact; *and* (b) that the worker performs work that is
26   outside the usual course of the hiring entity's business; *and* (c) that the worker is
     customarily engaged in an independently established trade, occupation, or business
27   of the same nature as that involved in the work performed."  *Id.* at 955-56.
          [2] This last requirement does *not* oblige trucking companies to purchase trucks
28   for their employees.  Instead, they can reimburse drivers for expenses incurred in
     the use of employee-owned trucks.  *See infra* at 8.

1    Plaintiff CTA's *prior* challenge to California's employment laws in *California*
2    *Trucking Association v. Su*, 903 F.3d 953 (9th Cir. 2018) ("*CTA II*")).  WSTA
3    appealed, and this Court stayed the instant case pending that appeal.  Dkt. 43.

4         On September 5, 2019, the Ninth Circuit granted WSTA's motion to dismiss
5    its appeal.  The California Legislature then adopted (on September 11, 2019) and
6    the Governor signed (on September 18, 2019) AB 5, which codified use of the
7    ABC test to distinguish between employees and independent contractors for
8    purposes of California's Wage Orders, Labor Code, and Unemployment Insurance
9    Code.  Despite Plaintiff CTA's lobbying, AB 5 included no express exemption for
10   the trucking industry.  Dkt. 54-3 ("Yadon Decl.") ¶18.

11        This Court lifted the stay of this case and dismissed, with leave to amend,
12   Plaintiffs' First Amended Complaint.  Dkts. 44-46.  *Forty-nine* days later,
13   Plaintiffs filed their Second Amended Complaint ("SAC").  Dkt. 47.[3]  Three weeks
14   later, Plaintiffs moved for a preliminary injunction, noticing their motion for *two*
15   *days* before AB 5 takes effect.  Dkt. 54.

16                              **ARGUMENT**

17        Preliminary injunctive relief "is an extraordinary remedy never awarded as
18   of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs
19   must establish that absent injunctive relief they are (1) *likely* to suffer irreparable
20   harm, (2) likely to succeed on the merits, and that (3) the balance of equities and
21   (4) public interest both favor injunctive relief.  *Id.* at 20.  Absent a "*clear showing*"
22   on *all* factors, injunctive relief must be denied.  *Mazurek v. Armstrong*, 520 U.S.
23   968, 972 (1997) (emphasis in original).  Plaintiffs' motion fails because they lack
24   standing to seek injunctive relief and cannot establish any of the factors.

25   **I.    Plaintiffs lack standing to obtain injunctive relief.**

26        At the preliminary injunction stage, a plaintiff must make a "clear showing"

27
28   _____
     [3] This Court granted a stipulated extension giving defendants until December 20
     to respond to the SAC.  Dkt. 53.  Intervenor-Defendant's forthcoming motion to
     dismiss will expand on the merits arguments discussed in this opposition.

of standing to seek injunctive relief (as opposed to other forms of relief, like damages). *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 22). That requires a "clear showing" of "'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

As an initial matter, the requested injunction to prevent "State Defendants … from enforcing AB-5," Prop. Order at 2, would not redress Plaintiffs' alleged injuries because *Dynamex* and the ABC test it adopts would still be the law. Moreover, private plaintiffs could still bring lawsuits based on AB 5, so trucking companies would still have to follow AB 5 or raise preemption as a defense to those suits. Those dispositive points aside, even if Plaintiffs had sought an injunction against the ABC test, and even if that injunction could bind non-parties, Plaintiffs still would lack standing. Plaintiff CTA fails to establish that AB 5's definition of "employee" affects any CTA member at all, let alone that any such injury is imminent. And Plaintiff Odom could seek preliminary injunctive relief only for himself, not all owner-operators in California or any member of CTA.

## A. Plaintiff CTA lacks standing.

### 1. CTA lacks associational standing.

Plaintiff CTA has not shown that any single member will be injured by use of the "ABC" test to determine whether drivers are employees. If use of that test were enjoined, employment status would be decided based on the multi-factor test set forth in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rel.*, 48 Cal.3d 341 (1989). But CTA submits *no* evidence that its members' drivers are *not* employees under *Borello*, so there is no evidence that the ABC test affects a single CTA member. In fact, Plaintiff CTA argued in its earlier, unsuccessful challenge to *Borello* that the *Borello* standard "compel[led] the use of employees," *CTA II*, 903 F.3d at 964, the

1  *exact* alleged injury it asserts here, *see* PI at 28.

2      An association has standing to represents its members' interests only when

3  "at least one identified member had suffered or would suffer harm." *Summers*, 555

4  U.S. at 498.  Mere "speculation" or "statistical probabilities" does not suffice.  *Id*.

5  at 498-99.  And this requirement is no mere technicality.  If an association does not

6  identify an affected member, a court cannot "satisfy [itself] that the plaintiff has

7  'alleged such a personal stake in the outcome of the controversy' as to warrant"

8  Article III jurisdiction.  *Id*. at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99

9  (1975)).  Here, CTA must submit evidence demonstrating that a member will be

10  affected by use of the ABC test rather than *Borello*—i.e., a business whose

11  workers are (1) *subject to* California's employment laws under the ABC Test; but

12  (2) *exempt from* those laws under the *Borello* standard.

13      The Stefflre declaration does not suffice.  Dkt. 54-2 ("Stefflre Decl.").  That

14  declaration identifies Rail Delivery Service ("RDS") as a CTA member but its

15  description of RDS's business, *id*. at ¶¶3-8, fails to show that RDS's drivers would

16  be exempt from California's employment laws under *Borello*.

17      Indeed, it is far from certain that *any* CTA member would be affected by

18  invalidation of the ABC test.  Since 2010, the California Department of Labor

19  Standards Enforcement ("DLSE") has adjudicated over 1,150 misclassification

20  complaints involving drayage drivers.  *See* Analysis of SB 1402, Cal. Senate

21  Committee on Appropriations (May 7, 2018).[4]  Even before *Dynamex*, the DLSE

22  found in *97%* of those cases that the hiring entity had misclassified the driver as an

23  independent contractor.  *Id*.  In fact, the trucking industry's lack of success under

24  *Borello* led CTA to challenge *Borello* as preempted under the FAAAA (which the

25  Ninth Circuit rejected).  *CTA II*, 903 F.3d 953.  Because so many trucking

26  companies have been found to misclassify their workers even under *Borello*, this

27

28      [4] *Available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient
.xhtml?bill_id=201720180SB1402.

1    Court cannot simply assume that AB 5 will affect RDS or any other CTA member,

2    and Plaintiffs' evidence is insufficient to provide assurance that CTA has standing.

3             2.    <u>CTA fails to establish standing for pre-enforcement relief.</u>

4          Even if CTA had standing to challenge AB 5, this Court would lack

5    jurisdiction to grant its pre-enforcement request for injunctive relief.   "[N]either

6    the mere existence of a proscriptive statute nor a generalized threat of prosecution"

7    establishes Article III standing to seek pre-enforcement injunctive relief. *Thomas*

8    *v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

9    To demonstrate the injury-in-fact required for such standing, a plaintiff must allege

10   and establish "a 'genuine threat of imminent prosecution.'" *Id*.  Whether such a

11   threat is genuine depends on "whether the plaintiffs have articulated a 'concrete

12   plan' to violate the law in question, whether the prosecuting authorities have

13   communicated a specific warning or threat to initiate proceedings, and the history

14   of past prosecution or enforcement under the challenged statute." *Id*. (quoting *San*

15   *Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)).

16         Thus, CTA must identify a member company with a "concrete plan" not to

17   comply with California's labor laws, and allege sufficient facts (such as a "specific

18   warning or threat to initiate proceedings") to establish that the ABC test will be

19   imminently used in enforcement proceedings against that company.  *See Thomas*,

20   220 F.3d at 1139.  CTA does neither.  It asserts that its members "risk … civil and

21   criminal liability," Yadon Decl. ¶36, but it identifies *no* member threatened with

22   enforcement under the ABC test since *Dynamex* was decided *over 19 months ago,*

23   *see Thomas*, 220 F.3d at 1140-41 (lack of past prosecution cuts against pre-

24   enforcement relief).  And, of course, any CTA member could raise the Plaintiffs'

25   challenges to AB 5 as defenses in an enforcement action.

26         Rather than submit such evidence, CTA offers injury-in-fact theories that are

27   foreclosed by precedent.  CTA asserts that motor carriers will need to spend money

28   to comply with AB 5.  Yadon Decl. ¶38.  But absent an imminent enforcement

threat, legal compliance costs do not establish standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).  CTA also submits no evidence that its members have spent money to comply with the ABC test in place *for 19 months*.

CTA also asserts that a motor carrier "*could* … decide to ... stop providing services in California."  Yadon Decl. ¶37 (emphasis added).  Among other flaws, Plaintiffs fail to identify any CTA member that is even *considering* ceasing operations in California despite *Dynamex* being decided over a year and a half ago.  Besides, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).  CTA therefore lacks standing to seek injunctive relief.

### B.  Plaintiff Odom does not have standing and cannot seek relief except as applied to him.

Plaintiff Odom does not establish that he will suffer harm from AB 5 because *Dynamex* has been the law for 19 months.  Even if Odom had standing, without a certified class he could obtain injunctive relief only as applied to him, not others.  *See M.R. v. Dreyfus*, 697 F.3d 706, 738-39 (9th Cir. 2012) (absent certified class, injunctive relief appropriate only "as to the named Plaintiffs").  This is so because even a court with "jurisdiction … may not attempt to determine the rights of persons not before the court."  *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).[5]  Further, as an owner-operator, Odom cannot seek relief for motor carriers.  *See Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999) (plaintiff "must assert his own legal rights"); *see also Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489 (9th Cir. 1996) (employer cannot assert employees' rights).

## II.  Plaintiffs fail to establish that they will suffer irreparable injury.

Plaintiffs' preliminary injunction request rests on a manufactured emergency.  Having lost their lobbying battle to secure an exemption from AB 5,

---

[5] Thus, even if CTA had standing it could not obtain relief beyond its members.

Plaintiffs ask this Court to urgently enjoin a test for employee status that has been in place for 19 months.  For several reasons, Plaintiffs do not show they will "likely" suffer irreparable harm without preliminary relief.  *Winter*, 555 U.S. at 20.

As an initial matter, Plaintiffs' showing of harm rests on legal and factual misrepresentations.  Plaintiffs contend that AB 5 "prohibit[s] motor carriers from contracting with owner operators," and forces them to "acquire every possible type of truck, trailer, and equipment that might be needed."  PI at 18, 22.  But Plaintiffs mistakenly assume that the only two hiring alternatives are (1) contracting with owner operators with compensation and conditions that violate California law; or (2) full-time employment with legal compliance.  Yet nothing in AB 5 precludes a motor carrier from hiring an independent owner-operator for individual jobs or assignments.  Businesses subject to California's employment laws are *not* required to reimburse workers for the acquisition costs of their vehicles.  *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal.App.4th 1, 24-25 (2007) (employers may require "employees to provide their own vehicles as a condition of employment" so long as they "'reimburse the employee for all the costs incurred by the employee in the operation of the equipment'") (quoting DLSE Opinion Letter No. 1991.08.30).  AB 5 simply requires that, if an owner-operator on a particular job meets the ABC test, he or she be paid in accordance with California's minimum wage rules, provided with meal and rest breaks, and reimbursed for costs incurred in operating his or her truck during the job.

Plaintiffs' expert makes the same mistaken assumption about AB 5's effect. *See* Dkt. 54-5, Ex. B ("Husing Rep.") at 5 (ABC test "prohibit[s]" motor carriers from contracting with owner operators, so they will have "to quickly restructure their operations by acquiring trucks and hiring and retaining employee drivers," and will be unable to hire individual drivers to meet seasonal demand).  Dr. Husing's reasoning is riddled with errors, as explained in the expert reports of Drs. Michael Belzer and Steve Viscelli submitted with this opposition:

- Owner operators who own their own truck and are free to contract with different motor carriers are a *very small* minority (roughly 10%) of truck drivers currently classified as independent contractors. The remaining 90%—called "lease operators"—lease their truck (typically from the motor carrier for which they perform services) and are under long-term contracts with a single motor carrier. Belzer Rep. at 2-3; Viscelli Rep. at 1-2.

- Lease operators behave just like employee drivers. They haul the loads that the motor carrier they work for contracts to move, work for a fixed rate of pay (either by mile or a percentage of the load revenue), and do not typically choose among loads. Accordingly, the vast majority of owner operators are *not* free to "enter or leave any particular market as they see fit," Husing Rep. at 9, and have no more flexibility than would full-time employee drivers. Belzer Rep. at 2-3; Viscelli Rep. at 2-3.

- Nothing in AB 5 or California's employment laws requires a motor carrier to rely only on full-time employees. Instead, a motor carrier could simply hire owner-operators for individual assignments so long as it guarantees them minimum compensation and workplace protections that comply with California law. Belzer Rep. at 3-4. Indeed, Intervenor represents owner-operators who are classified as employees under California's employment laws and can contract with multiple motor carriers. *See* Decl. of Eric Tate in Opposition to Preliminary Injunction ("Tate Decl.") ¶¶6-9.

Indeed, even Plaintiffs recognize that AB 5 does not require the wholesale changes asserted in their motion. Although they complain that AB 5 will force interstate motor carriers to rely exclusively on full-time drivers in California, they also *concede* that such companies could also simply "reimburse … owner-operator[s] for any expenses incurred within California, separately pay for all hours worked, ensure meal periods and rest breaks were taken, etc." PI at 11 n.9.

Plaintiffs also assert that AB 5 will preclude contracting "with California-based truckers," PI at 10, but that rests on a fundamental misunderstanding. California's employment laws apply to work performed in California regardless of the worker's state of residence. *See Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1196-97 (2011). AB 5 therefore applies to any worker who drives in California.

Moreover, any claim that Plaintiffs will be irreparably harmed absent immediate injunctive relief is undercut by the fact that the *Dynamex* decision adopted the ABC test for purposes of the Wage Orders *over 19 months ago*. *The ABC test is the status quo.* So even if Plaintiffs could establish injury due to the

change from *Borello* to the ABC test (*but see supra* at 4-6), the supposed harmful effects about which they complain—including mandated meal and rest break periods—have been the law for over one-and-a-half years.[6]  *See, e.g.*, Stefflre Decl. ¶¶20-24.[7]  Plaintiffs do not show they will suffer *any* new injury on January 1, 2020, when a test in place for over 19 months is statutorily codified.  *Cf.* Odom Decl. ¶¶7-8, 10 (suggesting that *Dynamex* decision caused the alleged harms).

In such circumstances, courts are rightfully doubtful of claims of irreparable harm.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (delay in seeking emergency relief "undercut" the plaintiff's claim of irreparable harm); *Oakland Tribune, Inc.*, 762 F.2d at 1377 ("long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm").  Because "the basic function of a preliminary injunction is to preserve the *status quo ante litem* pending a determination of the action on the merits," a court is not required to issue a preliminary injunction against an ongoing practice "[w]here no new harm is imminent, and where no compelling reason [for the delay] is apparent."  *Id.* (internal quotation marks omitted).  "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action."  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quotation marks omitted).

If the ABC test truly caused Plaintiffs imminent and irreparable harm, they could have moved for relief long ago, after *Dynamex* was decided in April 2018.  And if Plaintiffs were correct that application of the ABC test would wreak havoc on the trucking industry, they should be able to present concrete facts showing that

---

[6] Even Plaintiffs' expert acknowledges that he was "retained . . . to examine and prepare a report on the potential impact on prices, routes, and services *from the "ABC" test adopted by the California Supreme Court* in *Dynamex Operations West v. Superior Court* and now codified by the California Legislature through Assembly Bill 5."  Husing Decl. ¶3 (emphasis added)).

[7] To the extent that the Federal Motor Carrier Safety Administration has already determined that its regulations preempt California's meal and rest break statutes, those statutes cannot apply to truck drivers and thereby cause Plaintiffs any harm, much less irreparable harm.  *See* Stefflre Decl. ¶25.  Plaintiffs do not seek an injunction based on their FMCSR claim.  *See* PI at 6-7.

1   those harms have occurred over the 19 months following *Dynamex*.  The lack of

2   any such evidence reveals that Plaintiffs' claims of irreparable harm are merely

3   speculative and therefore insufficient.  *See Winter*, 555 U.S. at 22 (preliminary

4   injunction must be based on probability, not "possibility," of irreparable harm).

5          Lacking evidence of concrete irreparable harm, Plaintiffs assert that

6   "deprivation of constitutional rights" automatically suffices.  PI at 28.  But

7   Plaintiffs' cases are inapposite.  They address individual and fundamental

8   constitutional rights.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

9   (motorists alleging racial profiling and unlawful detention, in violation of Fourth

10  and Fourteenth Amendments; record showed Plaintiffs "faced a real possibility that

11  they would again be stopped or detained and subjected to unlawful detention"); *see*

12  *also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) (First Amendment

13  rights).  Unlike the situations there, enforcement of a state statute that is allegedly

14  preempted does not impose irreparable dignitary harms.

15  **III.   Plaintiffs cannot demonstrate a likelihood of success on their claims.**

16         **A.     Plaintiffs are unlikely to succeed on their FAAAA claim.**

17         The FAAAA preempts state laws "having the force and effect of law related

18  to a price, route, or service of any motor carrier ... with respect to the transportation

19  of property."  49 U.S.C. §14501(c)(1).  This includes state laws that "aim directly

20  at the carriage of goods" or have a "'*significant* impact' on" —not a "tenuous,

21  remote, or peripheral" connection to—"carrier rates, routes, or services."  *Rowe v.*

22  *N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375-76 (2008) (quoting *Morales v. Trans*

23  *World Airlines, Inc.*, 504 U.S. 374, 390 (1992)) (emphasis in original).[8]

24         Under binding Ninth Circuit precedent, California's labor laws have only a

25  "tenuous, remote, [and] peripheral" relationship to motor carriers' rates, routes, or

26

27         ───────────────

28   [8] Plaintiffs contend "*any effect*" establishes preemption, PI at 13 (emphasis in original), but their own cases show otherwise.  *See Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 645 (9th Cir. 2014) (only "'*significant* impact'" establishes preemption) (quoting *Rowe*, 552 U.S. at 375) (emphasis in original).

1    services, and so are not preempted.  Because AB 5 merely establishes the test used

2    to determine whether those laws apply to a particular worker, necessarily, then,

3    AB 5 itself cannot be preempted.

4              1.    The ABC test is not itself a substantive requirement.

5         Plaintiffs argue that the FAAAA preempts using the ABC test to determine

6    which workers are subject to California's employment laws.  PI at 14.  But the

7    ABC test itself imposes no legal obligations.  Rather, the test merely "determine[s]

8    whether and how California's labor laws (which are not pre-empted by the

9    FAAAA) apply to a worker."  *California Trucking Ass'n v. Su*, 2017 WL 6049242,

10   at *3 (S.D. Cal. 2017) ("[T]he determination of whether a worker is an employee is

11   merely an element of (or prerequisite for) a claim for violation of the labor laws,

12   not a . . . claim itself.") ("*CTA I*"), *aff'd* 903 F.3d 953 (9th Cir. 2018).  The

13   question for purposes of Plaintiffs' FAAAA preemption claim is thus whether

14   California's employment laws that attach through the ABC test are preempted.

15        They are not, under binding precedent.  *See CTA I*, 2017 WL 6049242, at *3

16   (under Ninth Circuit authority, "if the labor laws themselves are not preempted

17   because they do not relate to rates, routes, or services, California's determination

18   as to which truck drivers are protected by such laws necessarily does not relate to

19   rates, routes or services either").  Even if AB 5 subjected *every* trucking company

20   to those requirements, the FAAAA challenge would still fail because the Ninth

21   Circuit has held that those requirements are not preempted.  *See infra* at 13-14.

22        Plaintiffs cite *Alvarez v. XPO Logistics Cartage LLC*, 2018 WL 6271965

23   (C.D. Cal. 2018), PI at 17, which concluded that the analysis focuses on the ABC

24   test rather than the underlying substantive requirements.  *Id.* at *5.  But *Alvarez* is

25   inconsistent with binding FAAAA precedent.

26        "[W]hen preemption is claimed, a court must pay careful attention to the

27   *particular provisions* that a state or local entity seeks to impose upon motor

28   carriers."  *California Tow Truck Ass'n v. City and Cty. of San Francisco*, 693 F.3d

847, 861 (9th Cir. 2012) ("*CTTA*") (quoting *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1054 (9th Cir. 2009) (emphasis added) ("*ATA*")). In *CTTA*, the plaintiff challenged a "comprehensive regulatory regime" for tow trucks as preempted by the FAAAA.  *Id.* at 851.  After the district court enjoined enforcement of the entire regime as applied to certain tow truck companies, the Ninth Circuit reversed with instructions that the district court analyze "each provision [of the law] individually."  *Id.* at 856-57, 862.  It did so even though the plaintiff, like Plaintiffs here, styled its claim as a challenge to the entire regulatory regime.  *Id.* at 856 ("CTTA does not specifically seek to invalidate particular aspects of the Permit System" but "seeks, on behalf of its members, to operate in San Francisco without municipal towing permits at all").

　　*CTTA* requires that this Court analyze the *substantive provisions* that apply due to application of the ABC test to decide whether AB 5 is preempted.  It makes no sense to focus instead on the elements of the ABC test itself, because that test affects trucking companies only to the extent that it requires them to comply with California's employment laws.  Only those substantive requirements could possibly have a "'*significant* impact' on carrier rates, routes, or services," *Rowe*, 552 U.S. at 375 (emphasis in original), so the focus of the FAAAA analysis must be on those requirements, not on the test to determine whether they apply.[9]

## 2.　Ninth Circuit precedent establishes that the FAAAA does not preempt California labor law's substantive requirements.

　　That the FAAAA does not preempt California's employment laws was recently reaffirmed by the Ninth Circuit when it rejected CTA's previous attack on California's employment laws.  *See CTA II*, 903 F.3d at 963 (holding FAAAA does not preempt "generally applicable labor laws").  The court rejected the argument that the FAAAA preempts use of the *Borello* standard to determine

---

[9] Plaintiffs implicitly concede as much by arguing they are injured by the meal and rest break requirements that attach as a result of the ABC test.  *See* PI at 22.

whether a worker enjoys the protections of California's labor laws, reasoning that, unlike regulations that define a motor carrier's relationship with its *customers*, laws that define "the relationship between a motor carrier and its workforce ... 'are several steps removed from prices, routes, or services.'" *Id.* (quoting *Dilts*, 769 F.3d at 646). Because they are but one among many variables that determine prices, routes, or services, generally applicable labor laws do not "'compel[] or bind[] [motor carriers] to a particular price, route, or service.'" *Id.* (quoting *Air Transp. Ass'n of Am. v. City and Cty. of San Francisco*, 266 F.3d 1064, 1074 (9th Cir. 2001)). Thus, under Ninth Circuit precedent, California's substantive employment protections are generally applicable workforce-related obligations "several steps removed from prices, routes, or services," *id.*, and not preempted.

Plaintiffs erroneously contend that California's employment laws are not "generally applicable." PI at 18-20. But Plaintiffs address whether *AB 5* is generally applicable. Preemption analysis focuses on California's employment laws, which binding Ninth Circuit FAAAA precedent establishes *are* generally applicable, not on AB 5 itself. *CTA II*, 903 F.3d at 963 (describing such laws as "generally applicable"); *Dilts*, 769 F.3d at 647 (same). Even if AB 5 were the focus, moreover, Plaintiffs would still be wrong. They note that AB 5 exempts certain workers but cite no authority that a generally applicable law must apply uniformly in *all* cases, without exception. For good reason; the substantive provisions of California's employment laws (like their federal equivalent, *e.g.*, 29 U.S.C. §213) contain many exceptions for specific professions, yet the Ninth Circuit has held that those obligations are generally applicable. For example, the "generally applicable" meal and rest break requirements, *Dilts*, 769 F.3d at 647, do not apply to several different types of workers, *see* Cal. Lab. Code §512(b)(2)-(f). California's employment laws are "generally applicable" for FAAAA purposes because they "are normal background rules for <u>almost</u> *all* employers doing business in the state of California," and AB 5's discrete exceptions do not compel a

1    different result.  *Dilts*, 769 F.3d at 647 (underline added and italics in original).[10]

2         Moreover, the Ninth Circuit has held that the specific legal requirements

3    about which Plaintiffs complain are not preempted.  Plaintiffs complain first and

4    foremost about "the meal and rest periods mandated by California law."  PI at 11.

5    But the Ninth Circuit has squarely held the FAAAA does not preempt California's

6    meal and rest break laws "even if employers must factor those provisions into their

7    decisions about the prices that they set, the routes that they use, or the services that

8    they provide," noting they "plainly are not the sorts of laws 'related to' prices,

9    routes, or services that Congress intended [the FAAAA] to preempt," but are

10   "generally applicable background regulations that are several steps removed from

11   prices, routes, or services ...."  *Dilts*, 769 F.3d at 641-42, 646-47.  *Dilts* forecloses

12   any claims based on the effects of California's meal and rest break provisions.

13        The Ninth Circuit has also made clear that the FAAAA does not preempt

14   minimum wage rules.  *See* SAC ¶¶39-40 (alleging that minimum wage rules will

15   affect motor carriers).  *Californians for Safe & Competitive Dump Truck Transp. v.*

16   *Mendonca*, 152 F.3d 1184 (9th Cir. 1998), rejected a similar challenge to

17   California's Prevailing Wage Law, which, like minimum wage rules, prescribe

18   minimum rates of compensation for workers in the transportation industry.  *Id*. at

19   1189.  The *Mendonca* businesses asserted that complying with the law would

20   increase their labor costs.  *Id*.  The Ninth Circuit held that this kind of effect is

21   "indirect, remote, and tenuous" and does not "frustrate[] the purpose of

22   deregulation by *acutely* interfering with the forces of competition," so the FAAAA

23   does not preempt the law.  *Id.* (emphasis in original).[11]  Under *Mendonca*,

24

25        [10] Whether a state law is "generally applicable" is not "dispositive," PI at 20, but
     that question "will likely influence whether the effect on prices, routes, and
26   services is tenuous or significant."  *CTA II*, 903 F.3d at 966.  The discussion of the
     trucking industry in AB 5's legislative history does not show the law is not
27   generally applicable, PI at 19, because AB 5 applies beyond trucking companies.
        [11] The Ninth Circuit has affirmed that recent U.S. Supreme Court jurisprudence
28   does not "call [*Mendonca*] into question."  *Dilts*, 769 F.3d at 645; *see also CTA II*,
     903 F.3d at 963 n.7 (same).

1   Plaintiffs' unsupported assertions that AB 5 will increase motor carriers' costs

2   establishes, at most, an "indirect, remote, and tenuous" effect on prices. *Id*.[12]

3          The Ninth Circuit has also rejected a preemption challenge to the mandate

4   that transportation companies reimburse workers for the operating costs of worker-

5   owned vehicles, which is all that a business needs to do to comply with the

6   requirement that the business provide and maintain any tools and equipment that

7   are necessary for the worker's performance of the job.  *CTA II*, 903 F.3d at 965

8   (FAAAA does not preempt law requiring "reallocation of truck maintenance

9   costs," which is "indistinguishable from those [laws] recognized as permissible in

10  *Dilts* and *Mendonca*"); *see also supra* at 8; PI at 11 n.9.  The court reasoned that

11  even if the reimbursement requirement were to result in "increases in business

12  costs" for motor carriers, it still would not "bind[] motor carriers to specific

13  services, [thereby] making the continued provision of particular services essential

14  to compliance with the law, or interfer[e] at the point that a carrier provides

15  services to its customers."  *Id*. (quoting *Dilts*, 769 F.3d at 649).

16                    3.    Plaintiffs misrepresent AB 5's effects.

17          Plaintiffs' contrary argument about AB 5's effect, besides being irrelevant,

18  rests on erroneous assumptions.  Plaintiffs contend that AB 5 "prohibit[s] motor

19  carriers from contracting with owner operators," PI at 18, forcing them to "acquire

20  every possible type of truck, trailer, and equipment that might be needed," *id*. at

21  22.  But AB 5 sets "no such requirements."  *See CTA I*, 2017 WL 6049242, at *4.

22  Trucking companies "are free to use independent contractors or employees."  *Id*.

23  Whatever model they choose, however, just as any other California employer, they

24  must abide by California's "generally applicable background regulations"

25  regarding working conditions.  *Dilts*, 769 F.3d at 646; *see also supra* at 7-9.

26          Accordingly, motor carriers will *not* have to transition to an all-full-time

27

28  ─────────────────
    [12] The same is true for any overtime pay requirements, which also result in, at
    most, an "indirect, remote, and tenuous" effect on prices via increased labor costs.

employee operation with "scale[d] back … service offerings" of "only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand."  PI at 22.  Instead, they can meet peak demand by simply hiring owner-operators for short-term assignments and, if those owner-operators qualify as employees under AB 5, paying them in accordance with California's wage rules, providing them meal and rest breaks, reimbursing them for wear and tear on their truck, and otherwise complying with California employment law during the duration of the short-term assignment.  While such compliance may "increase motor carriers' cost," *id.*, binding Ninth Circuit precedent establishes that this is insufficient for FAAAA preemption.  *Dilts*, 769 F.3d at 646 (employment "laws are not preempted even if they raise the overall cost of doing business"); *Mendonca*, 152 F.3d at 1189.  As the *WSTA* court put it, nothing "precludes a motor carrier from hiring an independent contractor for individual jobs or assignments; instead, all that is required if a carrier chooses to so hire is that the [operative legal] requirements be satisfied.  The mere fact that increased costs may result does not trigger preemption."  377 F.Supp.3d at 1072.

Dr. Husing's additional assertions about AB 5's effects are also flawed:

- The assertion that motor carriers will require 27% more employee drivers to perform the same work as independent contractors, Husing Rep. at 10, is based on non-public, non-peer reviewed information that is inconsistent with empirical research demonstrating that employee drivers work more per week than independent contractors.  Belzer Rep. at 5; Viscelli Rep. at 3.[13]

- Dr. Husing wrongly contends there is a truck driver shortage and that AB 5 will exacerbate the shortage.  Belzer Rep. at 5; Viscelli Rep. at 5-6.

- The contention that it would cost motor carriers nearly $30,000 more to treat a driver as an employee rather than an independent contractor, Husing Rep. at 18, is riddled with flaws, including:

  o The wage calculations are based on the *median* hourly rate for

---

[13] Intervenor-Defendants asked Plaintiffs for the non-public resources on which Dr. Husing relies, but received those studies just before the close of business the business day before this filing was due.  *See* Declaration of Andrew Kushner in Opposition to Preliminary Injunction ¶3.

California truck drivers, not the *minimum* wage required under California law, which is substantially lower.  Belzer Rep. at 6.

o   Dr. Husing includes in his calculations the costs of *many things not required under California's employment laws*, including health insurance, Social Security, paid vacation, paid holidays, and company costs "to set up and staff a personnel department" and "contract for truck maintenance and repair and truck parking."  Husing Rep. at 22. *None* of these are required under California law.  Belzer Rep. at 6.

o   Dr. Husing's assumption that employees are 27% less productive than independent contractors lacks credible support.  Belzer Rep. at 5-6; Viscelli Rep. at 2-3.

For this reason as well, Plaintiffs fail to establish that AB 5 impermissibly affects services or prices.  PI at 22-23.  And *Dilts expressly* rejects Plaintiffs' argument that AB 5 impermissibly affects motor carriers' routes because they "will be required to reconfigure routes to ensure that drivers can legally and safely park the trucks to take the meal and rest periods mandated under California law," *id*. at 23.  *See* 769 F.3d at 649 (rejecting argument "that the requirement that drivers pull over and stop for each break period necessarily dictates that they alter their routes").  "To the extent that compliance with California law requires drivers to make minor deviations from their routes, such as pulling into a truck stop, … this is [not] the sort of 'route control' that Congress sought to preempt."  *Id*.[14]

Finally, Plaintiffs fail to establish that motor carriers cannot avail themselves of AB 5's business-to-business ("B-to-B") exemption.  AB 5, §2; Cal. Lab. Code §2750.3(e).  Plaintiffs argue that the B-to-B exemption is unavailable to individuals, PI at 23, but it explicitly applies to "sole proprietorship[s]."  Cal. Lab. Code §2750.3(e)(1).[15]  And Plaintiffs' interpretation of the exemption's various

---

[14] Moreover, Dr. Husing exaggerates the impact of complying with California law's meal and rest break requirements, which, at most, add two brief additional stops to each truck driver's day.  Belzer Rep. at 6.

[15] The language Plaintiffs quote in part provides that the exemption does not directly "apply to an individual worker, *as opposed to a business entity*, who performs labor or services for a contracting business."  *Id.* §2750.3(e)(2) (emphasis added).  Indeed, contrary to Plaintiffs' claim, *see* PI at 23, Assembly Member Gonzalez stated that the B-to-B exception can apply to a truck driver "if [they]

requirements rests on pure speculation, as no state court or state agency has interpreted the exemption.[16]  Thus, even if Plaintiffs had made an adequate showing of the ABC test's effect on rates, routes, and services, they did not establish that AB 5's B-to-B exemption would not mitigate those effects.

4.   Plaintiffs rely on inapposite and unpersuasive case law.

Because AB 5 does not compel motor carriers to use full-time employees but instead permits them to contract with individual owner operators, the cases cited in Plaintiffs' motion are inapposite, unpersuasive, or both.

First, because the ABC test does not preclude contracting with individual owner-operators, Plaintiffs' cases are irrelevant. PI at 21.  The regulation at issue in *ATA* explicitly "mandate[d] the phasing out . . . of independent contractors," thereby binding motor carriers to use certain types of workers.  559 F.3d at 1053-55.  Similarly, *In re Federal Preemption of Provisions of the Motor Carrier Act*, 223 Mich. App. 288 (Mich. Ct. App. 1997), addressed a regulation that permitted motor carriers to lease trucks only to their employees.  *Id*. at 308.  By contrast, AB 5 does not preclude motor carriers from hiring owner-operators for individual jobs.

Second, Plaintiffs cite out-of-circuit authority whose approach to FAAAA preemption is incompatible with the Ninth Circuit's.  *See* PI at 15 (citing *Schwann*

_____

become a legitimate small business, in which case [they] can directly contract with a business."  Assembly Floor Session (Sept. 11, 2019), at 1:07:38-1:07:49.

[16] For example, Plaintiffs have not established that federal safety regulations preclude them from meeting the control factor (and would likely make the opposite argument if they were attempting to qualify as independent contractors under the *Borello* standard, under which control is one of the most important factors).  *See* PI at 23 n.15, Cal. Lab. Code §2750.3(e)(1)(A).  Similarly, nothing prevents motor carriers from having drivers "provid[e] services directly to [Defendants] rather than to [Defendants' customers]."  Cal. Lab. Code §2750.3(e)(1)(B); *see* PI at 23-24.  Motor carriers could handle communications with their customers, including with regard to pricing, billing, and scheduling of deliveries, such that truck drivers would have essentially no interaction with those customers.  And contrary to the improper legal conclusions in the Yadon Declaration, the B-to-B exemption does not "*require*[] negotiation as a prerequisite for any contracting relationship," *see* ¶31; it simply requires that the business service provider "*can* negotiate its own rates," Cal. Lab. Code §2750.3(e)(1)(J) (emphasis added).  Ability to negotiate is not the same as actually negotiating, and is not necessarily inconsistent with the use of rate sheets.

1    *v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016) (holding B

2    prong of Massachusetts' ABC test preempted)).  In direct contrast to the Ninth

3    Circuit, the First Circuit has held that generally applicable employment laws *are*

4    preempted in this context.  *See WSTA*, 377 F.Supp.3d at 1072 n.5 (holding that

5    *Schwann* "is contrary to the Ninth Circuit's FAAAA preemption decisions in *Dilts*

6    and *Mendonca*").[17]  This approach cannot be squared with that of the Ninth Circuit,

7    which has repeatedly held the FAAAA does not preempt generally applicable

8    employment laws and that causing prices to increase does not trigger preemption.

9         Other aspects of *Schwann* are similarly incompatible with Ninth Circuit law.

10   *Schwann* relied heavily on the reasoning that the ABC test differed from employee

11   status tests used by other states and federally, causing a "patchwork of state

12   service-determining laws, rules, and regulations."  813 F.3d at 438.  But the Ninth

13   Circuit has held that the "fact that laws may differ from state to state is not, on its

14   own, cause for FAAAA preemption" so long as the laws are not "significantly

15   'related to' prices, routes, or services."  *Dilts*, 769 F.3d at 647-48.

16        Third, Plaintiffs cite district court decisions holding that the B prong of the

17   ABC test is preempted by the FAAAA.  PI at 17-18.  But those decisions all make

18   the same critical mistake as Plaintiffs: construing the ABC test to preclude motor

19   carriers from contracting with independent drivers for individual assignments.  *See*

20

21        [17] *Schwann* relied on *DiFiore v. American Airlines, Inc.*, 646 F.3d 81, 84, 88-90
     (1st Cir. 2011), which held that the Airline Deregulation Act ("ADA") preempted
22   Massachusetts' generally applicable tipping statute because prohibiting airlines
     from charging $2 per customer for curbside check-in might cause airlines to raise
23   their fares.  *Schwann*, 813 F.3d at 439-40; *DiFiore*, 646 F.3d at 89.  *Massachusetts
     Delivery Association v. Healey*, 821 F.3d 187 (1st Cir. 2016), simply applies
24   *Schwann*.  *Id.* at 189.  And *Bedoya v. American Eagle Express Inc.*, 914 F.3d 812,
     822 (3d Cir. 2019), merely summarizes *Schwann's* holding as part of its survey of
25   relevant case law.  *Chambers v. RDI Logistics, Inc.*, 65 N.E.3d 1 (Mass. 2016), like
     *Schwann*, is incompatible with Ninth Circuit law:  Its holding that the B prong of
26   Massachusetts' ABC Test had a significant impact on motor carriers' services
     because it would "'requir[e] that employers pay employees minimum wage,'" *id.* at
27   9, is plainly at odds with *Mendonca*, which held that minimum wage requirements
     are not preempted because they have only an "indirect, remote, and tenuous" effect
28   on prices, routes, or services.  152 F.3d at 1189.

1    *Alvarez*, 2018 WL 6271965 at *4 (ABC test "bar[s] the carrier from using workers
2    as independent contractors"); *Valadez v. CSX Intermodal Terminals, Inc.*, 2019
3    WL 1975460, *7 (N.D. Cal. 2019) (test "prevent[s] a motor carrier … from hiring
4    independent contractors"); *B&O Logistics, Inc. v. Cho*, 2019 WL 2879876, at *3
5    (C.D. Cal. 2019) (test "categorically requires a motor carrier to hire employees—
6    and not independent contractors—as drivers").[18]  But AB 5 does not preclude
7    contracting with independent drivers for individual assignments.  *See supra* at 8-9.

8        Finally, *CTA II* is not to the contrary.  There, the Ninth Circuit merely
9    explained why *Schwann*'s analysis of the Massachusetts version of the ABC test
10   would not apply to California's *Borello* test and expressly declined to reach the
11   question whether the FAAAA would preempt use of the ABC test to enforce
12   California's employment laws, because the issue was not presented.  *CTA II*, 903
13   F.3d at 964 & n.9; *see also WSTA*, 377 F.Supp.3d at 1071 (rejecting plaintiff's
14   reliance on *CTA II*, which "dealt with the different question of whether the
15   common-law *Borello* standard for determining independent contractor status is
16   foreclosed by the FAAAA").

17
18     **B.**    **Plaintiffs are unlikely to succeed on their dormant Commerce Clause claim.**

19       Ninth Circuit precedent forecloses Plaintiffs' dormant Commerce Clause
20   claim.  The dormant Commerce Clause prohibits "regulatory measures designed to
21   benefit in-state economic interests by burdening out-of-state competitors."  *Dep't*
22   *of Rev. of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quotations omitted).  A law
23   like California's employment laws that "applies … without respect to …
24   geographic location … provides no geographic advantages."  *Pharm. Research &*
25   *Mrfs. of Am. v. Alameda County*, 768 F.3d 1037, 1042 (9th Cir. 2014).  This "holds
26   true even where"—as is *not* the case here—"the ordinance *only* affects interstate

27
28       [18] Although *Alvarez* held the entire ABC test preempted, it did so only on the basis that "the *Dynamex* ABC test is not codified by statute such that it would be severable," a rationale that does not apply to AB 5.  2018 WL 6271965, at *5 n.2.

1   commerce due to an absence of intrastate businesses." *Id.* (emphasis added). As
2   Plaintiffs recognize, PI at 26, *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)
3   provides the relevant test, under which a law that "effectuate[s] a legitimate local
4   public interest" must be upheld "unless the burden imposed on such commerce is
5   clearly excessive in relation to the putative local benefits." *Sullivan v. Oracle*
6   *Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (citing *Pike*).

7       *Sullivan* held that "*[t]here is no plausible Dormant Commerce Clause*
8   *argument*" against California's Labor Code, which applies "equally to work
9   performed in California, whether that work is performed by California residents or
10  by out-of-state residents." 662 F.3d at 1271 (emphasis added). *Sullivan* forecloses
11  Plaintiffs' challenge to the same legal requirements that apply as a result of AB 5.
12  For that reason alone, Plaintiffs cannot demonstrate any likelihood of success.[19]

13      Plaintiffs' authority is not to the contrary. PI at 26. *American Trucking*
14  *Associations, Inc. v. Scheiner*, 483 U.S. 266 (1987), struck down a truck taxation
15  scheme not under the *Pike* test (not cited a single time) but on the basis that the
16  taxes were "plainly discriminatory" because "they impose a cost per mile on [out-
17  of-state] trucks that is approximately five times as heavy as the cost per mile borne
18  by local trucks." *Id.* at 286. Here, AB 5 applies equally to motor carriers based in
19  Sacramento or Reno if they employ drivers performing services in California, so
20  *Scheiner* is inapposite. *See WSTA*, 377 F.Supp.3d at 1074 (holding *Dynamex* and

21

22      [19] Even if this Court were deciding the issue without the assistance of controlling
23  precedent, the *Pike* standard is very difficult to meet: "For a facially neutral statute
    to violate the commerce clause, the burdens of the statute must so outweigh the
    putative benefits as to make the statute *unreasonable or irrational*." *Alaska*
24  *Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991) (emphasis
25  added). A substantial burden must be shown *on interstate commerce itself*—not
    simply a burden on particular companies. *See S.D. Myers, Inc. v. City and Cty. of*
26  *San Francisco*, 253 F.3d 461, 471 (9th Cir. 2001). Plaintiffs' argument about
    motor carriers needing to cease contracting with owner-operators, PI at 26, thus
27  does not suffice. In addition, even Plaintiffs acknowledge the factual deficiencies
    of their argument. *See supra* at 8-9; *see also* PI at 11 n.9 (conceding that motor
28  carriers could contract with owner-operators and pay them in accordance with
    California law "while making deliveries in California").

1   California's employment laws are "generally applicable requirements that apply

2   equally to in-state, multi-state, and out-of-state employers within California").

3          Plaintiffs also argue that AB 5 discriminates against interstate commerce

4   because it exempts "*intrastate* businesses." PI at 27 (emphasis in original). But

5   the exemption of certain workers (such as lawyers or certain construction truck

6   drivers) from AB 5 applies whether those individuals reside in or out of California,

7   just as the workers subject to AB 5 (including other truck drivers) are subject to

8   AB 5 regardless of residence. That AB 5 treats lawyers (wherever they reside)

9   differently from most truck drivers (wherever they reside) is irrelevant for purposes

10  of the Commerce Clause.[20]  Plaintiffs cite no contrary authority.

11         Even if AB 5 did impose a substantial burden upon interstate commerce, the

12  benefits of California's employment laws would not be "so outweigh[ed] as to

13  make the statute unreasonable or irrational." *Alaska Airlines*, 951 F.2d at 983.

14  The California Legislature cited the importance of "the basic rights and

15  protections" those laws guarantee. AB 5 §1(e). And *Dynamex* explained:

16         The basic objective of wage and hour legislation and wage orders is to
           ensure that such workers are provided at least the minimal wages and
17         working conditions that are necessary to enable them to obtain a subsistence
           standard of living and to protect the workers' health and welfare.
18
    4 Cal.5th at 952; *see also* Tate Decl. ¶4.[21]  Thus, California's employment laws

19

20         [20] Even if this Court were to conclude that AB 5 treats "inherently domestic
    activity" differently than interstate activity (which it does not), PI at 27,
21  discrimination against interstate commerce for purposes of the dormant Commerce
    Clause requires disparate treatment of "similarly situated" entities, *Nat'l Ass'n of*
22  *Optometrists & Opticians v. Brown*, 567 F.3d 521, 525-26 (9th Cir. 2009). The
    workers exempt from AB 5 are not "similarly situated" with those subject to the
23  law. *See id.* at 527 (disparate treatment of opticians, optometrists, and
    ophthalmologists justified based on differences in professions).
24
           [21] *See also, e.g.*, Cal. Labor Code §90.5(a) ("It is the policy of this state to
25  vigorously enforce minimum labor standards in order to ensure employees are not
    required or permitted to work under substandard unlawful conditions or for
26  employers that have not secured the payment of compensation, and to protect
    employers who comply with the law from those who attempt to gain a competitive
27  advantage at the expense of their workers by failing to comply with minimum
    labor standards."); *California Drive-In Rest. Ass'n v. Clark*, 22 Cal.2d 287, 302
28  (1943) ("The Constitution authorizes the Legislature to provide a minimum wage
    for women and minors and for the comfort, health, safety and general welfare of

1    easily survive *Pike*'s deferential review.  *See WSTA*, 377 F.Supp.3d at 1074 (so

2    holding).

3    **IV. The balance of the equities tips in defendants' favor.**

4        As the Supreme Court has explained, "courts of equity should pay particular

5    regard for the public consequences in employing the extraordinary remedy of

6    injunction."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted).  Here, an

7    injunction would have significant public consequences by preventing California

8    from enforcing its laws and addressing the widely recognized problem of

9    misclassification of employees in the trucking industry, depriving workers of the

10   protections of the Labor Code to which they are entitled.  *See supra* at 23; *see also*

11   Tate Decl. ¶4.  For the last 19 plus months, truck drivers have benefitted from a

12   clear test for whether they enjoy the protections of California employment laws.

13   Enjoining enforcement of AB 5, even during the pendency of this lawsuit, would

14   disrupt this certainty and threaten those protections.  Economic impacts to

15   businesses are outweighed by concerns for the well-being of individuals such as

16   workers deprived of basic labor rights.  *See Golden Gate Rest. Ass'n v. City &*

17   *Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("'Faced with . . . a

18   conflict between financial concerns and preventable human suffering, we have

19   little difficulty concluding that the balance of hardships tips decidedly' in favor of

20   the latter." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))).

21       Plaintiffs' delay in requesting injunctive relief further tips the equities

22   against them.  "[A] party requesting a preliminary injunction must generally show

23   reasonable diligence."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding

24   plaintiffs' delay in seeking preliminary injunctive relief weighs against them).

25

26   employees, and to confer upon a commission the authority it deems necessary to

27   carry out those purposes."); *compare Mendis v. Schneider Nat'l Carriers Inc.*,
     2016 WL 6650992, *4-5 (W.D. Wash. 2016) (application of Washington rest break

28   provision to truck drivers does not violate dormant Commerce Clause, because it
     furthers legitimate public interest and applies only to in-state conduct).

**V. Granting preliminary injunctive relief is not in the public interest.**

Enjoining State Defendants' enforcement of AB 5 would further delay their ability to effectively address the misclassification of workers and the public consequences of such misclassification.  The California Legislature specifically found that "misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality," AB 5, §1(c), and acknowledged the California Supreme Court's recognition of the "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance." *Id.* §1(b).  The Legislature sought to "ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave." *Id.* §1(e); *see also* Tate Decl. ¶4.  These important public interests are not outweighed by Plaintiffs' interests in avoiding compliance with California law.[22]

Once again, Plaintiffs fall back on inapposite cases concerning individually held constitutional rights not at issue here.  *See* PI at 30 (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (First Amendment political free speech rights); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (even in case concerning First Amendment rights, public interest did not require reversal of denial of preliminary injunction motion where there were countervailing public interests)).  The public interest favors denying the requested injunction.

---

[22] While Plaintiffs' misclassification of drivers is likely already illegal under *Borello*, application of that multi-factor standard is far more resource-intensive. The ABC test allows the State to more effectively address misclassification.

1    Dated:  December 16, 2019                    Respectfully submitted,

2

3                                                 STACEY M. LEYTON
                                                  ANDREW KUSHNER
4                                                 ELIZABETH VISSERS
                                                  Altshuler Berzon LLP
5

6                                                 By:    /s/ Stacey M. Leyton
                                                        Stacey M. Leyton
7

8                                                 Attorneys for Intervenor-Defendant
                                                  International Brotherhood of
9                                                 Teamsters

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28